

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

---

ALW/ERK/JAJ
F. #2004R02094

*One Pierrepont Plaza*
*Brooklyn, New York  11201*

*Mailing Address:*   147 Pierrepont Street
                     Brooklyn, New York  11201

February 2, 2006

**By Fax and ECF**

John P. Cooney, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

David M. Zornow, Esq.
Skadden, Arps, Slate Meagher & Flom LLP
Four Times Square
New York, NY 10036-6522

>    Re:   United States v. Sanjay Kumar and Stephen Richards
>          Criminal Docket No. 04-846 (S-2) (ILG)

Dear Counsel:

    This letter shall serve as notice pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G) that the government may call two expert witnesses to testify in the above-referenced case, as described below.  The government also provides notice of certain acts pursuant to Federal Rule of Evidence 404(b), although we reserve the right to argue that such acts were done in furtherance of one or both of the charged conspiracies, and are therefore admissible without reference to that Rule.

    *David Burg of PWC.*  The government may seek to elicit testimony from David Burg of PriceWaterhouseCoopers ("PWC").  Mr. Burg is expected to testify regarding the approximate date and time at which defendant Kumar reformatted his laptop to run the Linux operating system.  (We expect that the evidence will show that this reformatting occurred after the commencement of the Government Investigations, as defined in the Second Superseding Indictment ("Indictment"), and after the issuance of company memoranda directing CA employees to preserve relevant evidence.)  Mr. Burg will further testify to the effect such reformatting had on data that was contained on the laptop prior to the

reformatting; and about what software applications, if any, were installed on the laptop following the reformatting.

In addition, Mr. Burg may testify to the contents of certain "metadata" – *i.e.*, information about when a document was created and last edited, and who authored the document – associated with contracts and correspondence relating to the license agreement with EDS that CA recognized as revenue in the quarter ended December 31, 2000.

Lastly, Mr. Burg will testify concerning the date on which a file directory titled "incinerate" was created on defendant Richards' computer hard drive.  The creation of this file occurred shortly after Richards received the SEC subpoena for testimony in connection with the Government Investigations.  We expect that Mr. Burg will identify the emails that were recovered from that file, some of which had been deleted by the user of the computer.

Mr. Burg is a Director in PWC's Advisory Services Dispute Analysis and Investigations practice, specializing in Forensic Technology Solutions.  His resume is attached, and a detailed report setting forth PWC's conclusions and methodology will follow under separate cover.

*Michael McGowan of Stroz Friedberg, LLC.*  The government may also call Michael McGowan, a computer forensics expert employed by Stroz Friedberg LLC ("Stroz").  Mr. McGowan will testify concerning tests that Stroz performed on a laptop computer that CA issued to Jack Lustig.  Specifically, Mr. McGowan will testify that, during the pendency of the Government Investigations, certain references to Citigroup were deleted from the Lustig laptop.  Mr. McGowan's curriculum vitae is attached, and his report, which will follow under separate cover, will describe the data that was deleted and set forth the approximate date of such deletions in as much detail as reasonably practicable.  Note that a fingerprint analysis performed on this computer revealed that the only recoverable print was a partial latent print that was determined not to belong to defendant Kumar.

It is possible, although we do not anticipate it at this time, that Messrs. Burg or McGowan may need to be replaced as witnesses by another employee of their respective firms by the time the trial begins.  In such a case, the substance of the testimony the government sought to elicit would not change from that set forth in the relevant report.

*Federal Rule 404(b) Notice.* The government hereby gives notice that we may seek to introduce evidence of the following acts by defendants Kumar and Richards. We give this notice pursuant to Rule 404(b) in an abundance of caution; in the event we offer the evidence, we may argue that some or all of the acts in question do not constitute 404(b) evidence, but rather were done in furtherance of the charged conspiracy or are otherwise inextricable from evidence of the conspiracy. See, e.g., United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000); United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997). The acts in question are as follows:

- In or about CA's Fiscal Year 2000, the company entered into a number of "side agreements" that effectively modified the written terms of CA's license agreements in violation of accounting rules. Various of these side agreements were entered into by, or at the direction of, defendants Kumar and Richards; they include, among others, the side agreements relating to license agreements with The Hartford Fire Insurance Company and Allstate. These side letters are relevant to a variety of issues including the defendants' intent to violate the revenue-recognition rules set forth in SOP 97-2. Moreover, because Kumar caused CA to enter into these agreements in violation of his own repeated directives to CA's sales force that side agreements constituted a terminable offense, the agreements are relevant to rebut any claim of good faith by Kumar based on his cautionary warnings to CA employees.

- In or about April 2000, CA caused a customer, Hewitt Associates LLC, to execute a backdated license agreement for CA software. This transaction constitutes an act in furtherance of the charged conspiracy, and is inextricable therefrom for a variety of reasons.

- On or about Friday, June 30, 2000, the day before the July 4 weekend, Kumar drew down approximately $51 million on a line of credit issued by UBS, for the purpose of purchasing the New York Islanders hockey team. The line of credit was secured by CA stock. On or about July 3, 2000, CA issued the earnings release described in the Indictment stating that the company would not meet Wall Street's consensus estimate for the quarter; and when the securities markets opened on July 5, CA's stock price plunged approximately 43% in one trading day, sending Kumar's loan into margin

3

shortfall. The government may introduce this evidence to demonstrate, among other things, that Kumar possessed a motive to continue through June 30, 2000 his efforts artificially to prop up CA's stock price through the "35-day month" practice, in order to ensure that the loan in question went through without incident. It is not the government's intention to argue that Kumar's withdrawal of the $51 million constituted insider-trading or otherwise violated applicable law or regulations. Accordingly, we do not view this as "other acts" evidence pursuant to Rule 404(b) at all; but we provide this notice in an abundance of caution.

- In or about January 2003, a member of CA's legal department informed defendant Stephen Richards that the company had received a discovery request in connection with the Canopy Group, Inc. v. Computer Associates litigation seeking, among other things, certain sales forecasts or projections in the possession of CA's sales department. In response to this document-discovery request, Richards stated, falsely, that he had no such documents. Later, it was determined that the CA sales department did in fact possess such documents. The government may introduce this evidence to demonstrate, among other things, that Richards' failure to produce relevant records during the Government Investigations in the instant case was intentional and not the result of oversight. The records Richards failed to produce here include, among others, the "status reports" and "missing reports" contained in the contract chronologies that you have now received. We may also argue that Richards attempted to withhold sales documents (including the missing reports) in the Canopy Group litigation because he knew that turning over the forecasts and projections would likely result in their production in the instant criminal case as well.

- In or about 1995, defendant Kumar, an unindicted co-conspirator ("UC 1"), and CA's general counsel (the "GC") were present in a conference room. The three were discussing CA's response to a "second request" for documents issued by the Department of Justice ("DOJ") in connection with DOJ's review of CA's proposed acquisition of another company. At the time, there was some concern among CA management that DOJ would not approve the proposed acquisition. While it was then

4

>the general practice for attorneys in CA's legal department to review company documents to determine their responsiveness to such DOJ requests, in this instance defendant Kumar and UC 1 did not permit the GC or members of his department to participate in the responsiveness review.  Instead, a group of non-attorney employees of CA selected by Kumar reviewed the collected documents for responsiveness to the DOJ request.  The GC acceded to the request that he not participate in the document review at this stage.  Later, the GC observed that during Kumar's and UC 1's initial review, a substantial volume of documents that various CA employees had provided during the document-collection effort had been deposited into a large dumpster that had been brought to the document-review room.  The government will offer this evidence to demonstrate the basis for Kumar's trust in the GC during the period in which Kumar and the GC conspired to obstruct the Government Investigations.  In addition, the government will offer this evidence to demonstrate the relationship of trust between the GC and UC 1, who appears in the indictment as the "senior CA executive" who traveled with the GC to Hawaii, at defendant Kumar's direction, to negotiate the $3.7 million consulting agreement designed to procure an individual's silence regarding improper revenue recognition during FY2000.  See Indictment, ¶¶ 60-62.

- In certain quarters prior to and during fiscal year 1998, CA manipulated its quarterly earnings at the direction of Kumar and others by postponing the recognition of revenue that CA earned in a given quarter until the following quarter.  In addition, Kumar also directed that CA manipulate various reserves on its financial statements upwards or downwards to bring earnings in line with, or slightly above, Wall Street expectations.  These practices were done for the purpose of "smoothing" earnings – i.e., manipulating quarterly earnings to show a steady, linear upward trend on a quarter-over-quarter basis.  The government views this evidence as part and parcel of the charged conspiracy, and inextricable therefrom for a variety of reasons.

The government intends to set forth the legal basis for the admission of each of these items in greater detail in a motion in limine to be filed in the near-term future.  In the

5

meantime, if you have any questions or further requests, please do not hesitate to contact us.

                                    Very truly yours,

                                    ROSLYNN R. MAUSKOPF
                                  United States Attorney

                    By:    /s/ Eric Komitee
                         Amy Walsh
                         Eric Komitee
                         William Estes
                         Jason Jones
                         Assistant U.S. Attorneys
                         (718) 254-6240

Enclosures

cc:  Clerk of the Court (ILG)(via ECF)
    (without enclosures)