```
ALW:ERK/WJE/JJ
F. #2004R02094
```

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

                                            04 CR 846 (S-2)(ILG)

SANJAY KUMAR AND
STEPHEN RICHARDS,

        Defendants.

- - - - - - - - - - - - - - - - X

## GOVERNMENT'S *SECOND* REPLY MEMORANDUM CONCERNING DATA DELETION BY DEFENDANTS KUMAR AND RICHARDS

                                    ROSLYNN R. MAUSKOPF
                                    United States Attorney
                                    Eastern District of New York
                                    147 Pierrepont Street
                                    Brooklyn, New York 11201

Amy Walsh
Eric R. Komitee
William J. Estes
Jason Jones
Assistant U.S. Attorneys
     (Of Counsel)

The government recently received, in response to defendant Kumar and Richards' forensic tests, the follow-up report of David Burg of PriceWaterhouseCoopers ("Burg Second Rept.") (attached hereto as Exhibit A). Based on the Second Report's conclusions, we now respond more fully to the defendants' claims in their responses of April 3, 2006.

I.  **Response to Richards' and His Expert's Factual Assertions**

   A.  Richards' Installation of the "Incinerator" Wiping Program Was Not, As He Claims, Done in the Normal Course of CA's Business

As the Second Report concludes, the disposal of Richards' older laptop makes it forensically impossible to test (a) when data was deleted from Richards' older computer, (b) whether Richards transferred all of the files from one computer to the next, or (c) most importantly, whether other files were incinerated prior to the creation of the Incinerator file.[1] There is no way even to verify that Richards' older computer was in fact malfunctioning. What can, however, be stated with certainty is that Richards' defense – that his use of the

---

[1] Richards makes much of the fact that the second step – the actual incineration – was not taken. This does not, however, undermine the conclusion that Richards did not intentionally delete, or attempt to delete, data sought by the government. First, Richards may have deleted other files prior to the creation of the still-extant incinerate file, as indicated by Mr. Burg's report. Burg Second Rept., at 3. Second, Richards may have believed, incorrectly, that he had deleted data by sending it to the Incinerate file, and simply misunderstood whether the second step was required.

2

Incinerator was consistent with CA's normal practices and the March 2002 document-retention policy – is false.

<u>First</u>, neither Richards nor his expert ever articulated, nor could they have, why Richards was attempting to use the Incinerator on his old computer <u>before</u> migrating data to his new laptop. Even viewing CA's policies most charitably to the defendants, CA users wiped old laptops <u>after</u> data was transferred to a new machine, so that the data from the old machine did not float into the wrong hands. <u>See, e.g.</u>, Defendant Kumar's April 3, 2006 Response to the Government's 404(b) Motion ("Kumar Response"), at 9 (when "an old laptop was replaced with a newer one . . . company practice was to copy <u>all</u> files onto the newer laptop, <u>and</u> <u>then</u> wipe the older laptop clean"); <u>see also id.</u> at 10 (quoting CA employee Tamrya Reich stating CA's policy that the company needed to transfer and preserve data "<u>before</u> <u>we</u> <u>erase</u> and redistribute the machine" in question) (all emphasis added). <u>See also</u> Affidavit of Sanjay Kumar dated December 19, 2003 (attached as Exhibit C to Kumar Response), at 1 (CA's policy, according to Kumar, was to delete data from his old laptop computers "<u>after</u> <u>all</u> data files had been moved from that old laptop computer to a new laptop computer") (emphasis added). Wiping data <u>prior</u> to transfer would, of course, render the data non-existent, because it would not transfer to the new computer once deleted.

As noted in the government's initial brief, CA's data-wiping policy was suspended (if it ever existed) in March 2002, over a year before Richards installed the wiping software. As demonstrated in the preceding paragraph, however, Richards' actions did not constitute ordinary-course conduct for CA even under the <u>old</u>, pre-investigation policy.

<u>Second</u>, the process by which Richards obtained the Incinerator program did not comport with normal procurement practices at Computer Associates. CA has determined that it has no record that the company ever ordered the System Mechanic or Incinerator software that Richards used. Likewise, there is no record that Richards ever submitted a reimbursement request or expense report for the purchase of the System Mechanic software.[2] Therefore, it appears that Richards purchased the software on his own, without going through any of the ordinary channels at CA, and never revealed to the legal department or anyone else at CA that he was purchasing or using the Incinerator.[3] Moreover,

---

[2] In fact, a search of Richards' hard drive reveals not a single reference, anywhere in the contents of his email correspondence, to the words "Incinerate," "Incinerator," or "System Mechanic."

[3] Needless to say, Richards never followed the instructions set forth in several document-preservation memoranda that if employees had any question about whether a planned action comported with the document-retention policy, they should contact the legal department at the number provided. <u>See</u> Document Retention Memorandum dated March 1, 2002 (attached as Exhibit H to Kumar Response). Kumar apparently never followed this policy either.

Richards did not seek the assistance of CA employee Joseph Petito, who provided computer support to high-level CA executives, in installing the wiping software. Plainly, the fact that Richards acted outside CA's normal business channels belies the assertions that his conduct was both innocent and consistent with CA's regular practices.[4]

> B. Whether Richards Installed The Incinerator in August or July is Immaterial

Mr. Burg's Second Report states that the file containing Richards' e-mail messages, the so-called "PST" file, "was sent to the Incinerator on July 23, 2003." Burg Second Rept., at 3. Mr. Richards' expert concurs that July 23, 2003 was the date the file was "last modified." Litchfield Declaration, at ¶ 14. Richards bases virtually his entire argument to exclude the "Incinerator" evidence on the fact that because he installed it on July 23, prior to the issuance of the August 25 SEC subpoena calling for his testimony, the installation of the wiping software is immaterial. This argument is frivolous.

If anything, the fact that the Incinerator program was used on July 23 is more, not less, incriminating, because that

---

[4] Lastly, CA has been unable to locate Mr. Richards' older (purportedly malfunctioning) laptop, and defendant Richards has proffered no statement of its whereabouts. This disappearance, too, supports the conclusion that Richards was endeavoring to render data unavailable.

date falls squarely within the time period when the government began to accelerate its demands for "missing" and "status" reports – the very documents that Kumar and Richards used to track contracts so that they could decide how many days to "keep the books open" while they continued to close backdated deals. (Ultimately, it was the recovery and assembly of reams of FY2000 missing and status reports – which were indisputably distributed to Kumar and Richards – that established beyond doubt the existence of the 35-day month practice.) Prior to June 2003, CA had consistently denied that such reports from Fiscal Year 2000 continued to exist, as it denied the existence of the 35-day month practice itself. By late May 2003, however, the government had obtained evidence from third-parties – predominantly CA's customers – that showed widespread backdating of contracts, and informed CA that in the government's view, the 35-day month practice had occurred and senior CA executives had participated. Thus, on June 27, 2003, the SEC issued a formal subpoena (the "June 27 Subpoena") that more specifically demanded the production of missing and status reports.[5] Shortly after, on

---

[5] Government subpoenas had called for the production of documents including such reports, among other documents, for substantially more than a year. The June 27 Subpoena, however, contained a particularized description of the missing and status reports themselves, demanding production of "[a]ny and all reports used by Computer Associates management and/or sales force to track contract negotiations, and all drafts, amendments, e-mails, correspondence and notes concerning such reports and/or the information contained within such reports." See June 27

6

July 2, 2003, the company's Board of Directors voted to initiate an independent internal investigation of the 35-day month practice.

CA responded to the June 27 Subpoena on July 23, 2003 – the <u>very day</u> on which the Incinerator program was last modified on Richards' computer – by, for the first time, producing a small number of missing and status reports and indicating that the company had, so far, located only "a limited number of such [status] reports that were created during the Period [including Fiscal Year 2000]." <u>See</u> Letter from Wachtell, Lipton <u>et al.</u> to the Securities and Exchange Commission dated July 23, 2003 (attached hereto as Exhibit C), at 2. The letter went on, however, to state that "CA is continuing to search for additional status reports and if any additional status reports are located they will be produced promptly." Accordingly, at the very moment that CA first acknowledged that it had located a small quantity of incriminating documents – and stated, importantly, that it would focus on finding more such reports if they existed – Richards was installing the "Incinerator" program on his old laptop, which Richards claimed "blew up" shortly thereafter, on approximately August 11, 2003. <u>See</u> E-mail from Stephen Richards to Walt Thomas dated August 11, 2003, 9:52 a.m. (attached to

---

Subpoena (attached hereto as Exhibit B), "Production" Section, Item 2.

Richards' Response as Exhibit B).  Given the centrality of the missing and status reports – which Richards indisputably received and used – to proving the 35-day month fraud, this evidence powerfully demonstrates Richards' consciousness of guilt concerning the backdating of contracts.

Richards may attempt to argue that the government's articulation of relevance has shifted from the August 25, 2003 SEC Subpoena to the June 23, 2003 SEC Subpoena.  The initial difficulty in pinpointing the timing of the installation of wiping software, however, is obviously a function of the facts that (a) Richards procured and installed the "Incinerator" program outside of CA's normal IT practices, making it impossible to date through CA records, and (b) Richards apparently disposed of (or directed the disposal of) the old laptop without bothering to inform CA's legal department or its outside lawyers that he was doing so.  Accordingly, Richards should not be permitted to profit from the difficulty in establishing the timeline of events.

## II. Response to Kumar's and His Expert's Factual Assertions

### A. Contrary to Kumar's Expert's Conclusions, Linux Reformatting Is Highly Destructive

Kumar's forensic expert, Joseph Looby, devoted substantial effort to quantifying the destructive effects of reformatting a computer to run the Linux operating system.  He concluded that after the installation of Linux on a test

computer, "with the use of e-mail recovery software, we were able to recover and read various complete e-mails, including attachments."  Looby Report dated April 3, 2006 ("Looby Rept."), at 4 (attached to Kumar Response as Exhibit A).  Mr. Looby says nothing about how <u>much</u> previously extant data would survive a Linux reformatting, but the implication of his report is that the installation of Linux is not, in itself, damaging to pre-existing data.  This implication, which Kumar's counsel attempted to reinforce at oral argument,[6] is incorrect: Linux installation is highly damaging to data on a computer's hard-drive.  As Mr. Burg's Second Report states, "[h]ad Kumar not wiped the hard drive prior to installing Linux, the installation of Linux would have overwritten and rendered unrecoverable approximately one-third of the hard drive.  In addition, the remaining two-thirds of the drive would have been impaired by the installation of Linux."  Burg Second Rept., at 2.  This destruction, moreover, would have been prominently articulated to the user (<u>i.e.</u>, Kumar) prior to beginning the reformatting process: **"WARNING – You have selected to remove all partitions (ALL DATA) on the following**

---

[6] Specifically, Mr. Tigue stated: "So the expert affidavit that we put in said that it was wiped, and you can tell by looking at it, and that they did an experiment and took the image from Mr. Kumar's computer and installed Linux on top of what was already there, and it wasn't obliterated.  They were able to uncover and read many e-mails, together with attachments, and including, I think the deleted e-mail."  Transcript of Oral Argument dated April 7, 2006 ("Hearing Tr.") at p. 10, lines 14 - 20.

**drives ... Are you sure you want to do this?**" <u>See</u> Screenshot of Linux Reformatting Initiation Screen (attached hereto as Exhibit D).

In addition, Mr. Burg's Second Report confirms that prior to being reformatted for Linux, Mr. Kumar's laptop was either wiped or encrypted. Burg Second Rept., at 1. Mr. Looby's conclusion is the same. Looby Rept., at ¶ 3. It remains unclear, however, why defendant Kumar believes this conclusion supports his motion. The forensic testing establishes that Kumar took <u>two</u> independent steps to destroy data and that both steps were effective. Under the circumstances, Mr. Kumar's contention is analogous to arguing that a person acted innocently in throwing his laptop into the East River because, prior to submerging the computer, the user had run it over with his car.

Indeed, the jury could reasonably infer that Kumar reformatted his laptop for Linux after wiping <u>because</u> he hoped, at the time, to cover the wiping software's traces. This conclusion is buttressed by the demonstrable falsity of Kumar's proffered reason for installing Linux: Kumar claims that he used the laptop in question "solely to test software," but Mr. Burg's examination revealed that no CA software for the Linux operating system (nor any other software) was ever installed after the Linux reformatting. Burg Second Rept., at 2.

    B.    The First Burg Report Explicitly Detailed The
           Basis for the Clock-Tampering Conclusion

10

At oral argument, Kumar's counsel conceded that his own expert does not contest the government's most incriminating allegation – that the user of the so-called Linux laptop tampered with the computer's internal clock to make the reformatting appear to have occurred months earlier. Kumar's counsel did, however, attempt to pin this failure on his claim that Mr. Burg's initial report "has no authority whatsoever" for the clock-tampering conclusion. Hearing Tr., at page 16, line 22. There is, however, no such lack of supporting detail in the Burg Report. As the government pointed out at oral argument, the initial Burg Report is replete with supporting detail, including footnotes 1 through 11.

Among other things, the Burg report states that the Linux installation began on April 3, 2003 and ended on October 11, 2003, and that the session ran on battery power – *i.e.*, the laptop was not plugged into an outlet. Burg therefore concluded, based on this fact and the fact that the clock-time program was accessed during the session, that the user altered the clock. Any other explanation would defy the laws of physics: there simply exists no commercially available laptop battery that can run for six months on battery power alone.

In response, Kumar's forensic expert – who has his own working copy of the hard-drive – could have contested Mr. Burg's conclusions (i) concerning the start date of the reformatting

11

session; (ii) that the clock-setting application was accessed during the session; (iii) concerning the end-time of the session, (iv) that the session was conducted on battery power; or (v) that no battery in the real world can power a laptop for that duration.  Instead, Mr. Looby challenged none of these conclusions.  Moreover, defense counsel never contacted the government, or the Court, to indicate that they required some additional statement of Mr. Burg's methodology in order to test his conclusions.[7]  Accordingly, as indicated in the government's prior submission, the Court should consider the allegation concerning the clock-tampering to be uncontested for purposes of this motion.

---

[7]     The government notes that it received a letter on April 21, 2006 – the date of this response – asking for some additional details concerning this aspect of Mr. Burg's report.  At the moment, the reason for the request remains unclear.

## CONCLUSION

For the foregoing reasons, the government's motions <u>in limine</u> should be granted.

Dated: Brooklyn, New York
       April 21, 2006

                                    Respectfully submitted,

                                    ROSLYNN R. MAUSKOPF
                                    United States Attorney
                                    Eastern District of New York
                                    One Pierrepont Plaza
                                    Brooklyn, New York  11201

AMY WALSH
ERIC R. KOMITEE
WILLIAM ESTES
JASON JONES
Assistant U.S. Attorneys
     (Of Counsel)

13