EOC:EK/JJ
F. #2004R02094

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

                                04 CR 846 (S-2)(ILG)

SANJAY KUMAR AND
STEPHEN RICHARDS,

         Defendants.

- - - - - - - - - - - - - - - - X

GOVERNMENT'S SENTENCING MEMORANDUM

ROSLYNN R. MAUSKOPF
United States Attorney
Eastern District of New York
147 Pierrepont Street
Brooklyn, New York 11201

Eric R. Komitee
Jason A. Jones
Assistant U.S. Attorneys
   (Of Counsel)

TABLE OF CONTENTS

PAGE

I.   Introduction and Summary of Argument..................... 2

II.  The Offense Conduct...................................... 5

     A.   Securities Fraud................................... 5

          1.   Backdated Revenue: Premature Recognition of
               License Agreement Revenue Via the "35-Day
               Month".................................... 5

          2.   Fabricated Revenue: "Swap" Transactions
               Lacking Economic Substance................... 10

               a.   Consortio............................. 11

               b.   EMS.................................. 12

          3.   Manipulated Revenues: "Smoothing" of Earnings
               Via Fraudulent Adjustments to Reserve
               Accounts.................................... 13

          4.   Illegal Side Letters.......................... 14

               a.   Allstate Insurance..................... 14

               b.   The Hartford Insurance Company.......... 16

     B.   Obstruction of Justice............................. 17

          1.   Witness Tampering.......................... 18

               a.   Kumar Directs the General Counsel to
                    Tamper with Witness Testimony........... 18

               b.   Kumar Directs Witnesses to Lie.......... 20

               c.   Kumar Lies to Outside Counsel,
                    Intending Such Lies to Obstruct the
                    Investigation......................... 21

               d.   Kumar Engineers a $3.7 Million Payoff to
                    a Witness to the EMS Revenue Swap........ 22

          2.   Records Tampering.......................... 24

               a.   Kumar Tampers with His Laptop........... 24

            b.    Kumar Deletes Key Data from a
                 Salesperson's Laptop..................... 27

            c.   Richards Installs the "Incinerator"...... 27

      3.   False Statements By Kumar..................... 30

      4.   Perjury By Richards.......................... 31

III. The Sentencing Guidelines............................... 32

    A.   The 2005 Guidelines Manual Applies................. 32

      1.   The Ex Post Facto Clause Does Not Apply to
         the Advisory Sentencing Guidelines........... 32

      2.   Application of the 2005 Guidelines Does Not
         Violate the Ex Post Facto Clause............. 35

    B.   The Fraud Loss Exceeds $400,000,000................ 39

      1.   Actual Loss.................................. 39

            a.   Applicable Law........................... 40

            b.   The Governments Expert's Analysis Proves
                 the Loss Exceeds $400,000,000, Even Under
                 the Most Conservative Assumptions........

            c.   The July 5, 2000 Drop in CA's Stock
                 Price Demonstrates the Magnitude of
                 Harm Caused By CA's False Second-Quarter
                 Disclosure.............................

            d.   Professor Fischel's Analysis Suffers
                 Fatal Conceptual Flaws, and Should Be
                 Rejected...............................

      2.   Intended Loss................................

    C.   Kumar Was An Organizer or Leader Under U.S.S.G. §
        3B1.1...........................................

    D.   Defendant Kumar Does Not Qualify for the Acceptance
        of Responsibility Reduction of U.S.S.G. § 3E1.1....

    E.   Resulting Sentencing Range.........................

IV. Defendants' Downward Departure Motions..................

A.   Lauersen/Jackson..................................

B.   Family Circumstances..............................

C.   Charitable Works..................................

D.   Alienage Status and Deportation...................

V.   Upward Departure Motion: Obstruction of Justice.........

VI.  Section 3553(a) Factors..................................

VII. Restitution.............................................

VIII.   Applicable Fine.....................................

IX.  Conclusion..............................................

I.    <u>Introduction and Summary of Argument</u>

Prior to and during Computer Associates' ("CA") Fiscal Year 2000, defendants Sanjay Kumar, Stephen Richards and others systematically inflated CA's quarterly revenues by backdating scores of license agreements.  They did so to persuade the public securities markets that CA was earning money faster than it actually was.  This fraudulent conduct severely distorted the price of CA's stock, given that the rate of earnings growth is a key criterion — if not the single most important metric — by which Wall Street analysts, institutional investors, individual shareholders and others judge public companies' financial performance.[1]

For the four quarters of Fiscal 2000, the proportions of backdated revenue are staggering: for Q1, CA backdated $122 million worth of revenue (approximately 10% of total revenue for the quarter); for Q2, $468 million (approximately 29% of quarterly revenue); for Q3, $401 million (approximately 22% of

---

[1]    <u>See, e.g.</u>, Kiplinger.com, Rules of the Earnings Game, February 28, 2005 (attached as Exhibit A hereto ("The difference between consensus stock analyst forecasts and a company's actual profits is perhaps the single most important factor driving a stock's short-term performance.  And this disparity plays an important role in longer-term performance as well."); <u>see also</u> Declaration of Melissa B. Eisenstat, former Managing Director and Equity Research Analyst at CIBC Oppenheimber (attached hereto as Exhibit B), at ¶ 12 (during indictment period, and today, "one of the most important 'metrics,' or measures, of the health of a technology company to the market is 'earnings per share'").

quarterly revenue); and for Q4, $199 million (approximately 9.3% of quarterly revenue).  In the end, as a result of the defendants' conduct, CA was forced to restate $2.2 billion in revenues for Fiscal Year 2000 alone.  Moreover, as set forth in greater detail below, the defendants committed securities fraud not only by backdating license agreement revenues (via the so-called "35-day month" practice described in the Second Superseding Indictment (hereafter "Indictment" or "Ind.")).  They also engaged in several other fraudulent earnings-manipulation schemes, including by booking sham "revenue swap" transactions and manipulating reserve accounts.

After the government investigations began, defendant Kumar oversaw one of the most coordinated, comprehensive obstructions of justice in the modern era of corporate crime. The obstruction-related conduct in this case comprised, among other things, Kumar's efforts to (a) influence CA employees to lie to the government; (b) induce CA's general counsel to coach witnesses to withhold the truth from the government and CA's outside lawyers; (c) lie to the government himself in a proffer with federal prosecutors, the SEC and FBI; (d) destroy data sought by the government and CA's audit committee from his laptop computer; (e) delete references to a backdated transaction from the laptop of a CA salesperson; (f) send his trusted lieutenant and the company's general counsel to Hawaii during the government

investigations to purchase a witness's silence concerning a "revenue swap" transaction; and (g) cause CA to announce in SEC filings, throughout this period of the obstruction, that it was cooperating fully with the government investigations.

On April 24, 2006, both defendants pleaded guilty to all counts with which they were charged.  Despite these pleas, defendant Kumar now attempts to have it both ways — claiming credit for accepting responsibility, but simultaneously persisting in denying key elements of his offense conduct.  As set forth below, the sentences for the defendants should reflect the severity of their crimes – both securities fraud and obstruction – and Kumar's continued denial of core aspects of such conduct.

II.   <u>The Offense Conduct</u>

    A.   <u>Securities Fraud</u>

        1.   Backdated Revenue: Premature Recognition of License Agreement Revenue Via the "35-Day Month"

At the end of each quarter of Fiscal Year 2000, CA had earned substantially less, under Generally Accepted Accounting Principles ("GAAP"), than Wall Street analysts and the investment community expected.  (Wall Street's expectations, in turn, were predicated in part on CA management's prior guidance.)  Kumar, Richards and others, when faced with the choice between truthfully admitting the shortfall or lying, chose to lie by keeping the quarter open and causing CA salespeople to book additional, fraudulently backdated license agreements.  This practice contravened the express requirements of the relevant standard for software license revenue recognition that CA was required to follow under GAAP, Statement of Position ("SOP" 97-2.[2]

_____

[2]   SOP 97-2 provided, among other things, that software companies could not recognize revenue from license agreements until "persuasive evidence of an arrangement exists."  Software Revenue Recognition, Statement of Position 97-2, § 10,700.01 (American Inst. of Certified Pub. Accountants 1997) (entitled "Software Revenue Recognition") (relevant excerpts attached as Exhibit C hereto).  The rule further stated that for companies that had "a customary business practice of utilizing written contracts [as CA did] evidence of the arrangement is provided only by a contract signed by both parties."  <u>Id.</u>  Accordingly, CA could not recognize license agreement revenue until the customer had signed a license agreement and CA had countersigned.

Notwithstanding his recent efforts to shift blame to predecessors, Kumar was in fact the executive primarily responsible for directing the 35-day month practice, as it has come to be known,[3] throughout Fiscal Year 2000 and earlier periods.  Kumar presided over meetings post-quarter-end at which his Chief Financial Officer (Ira Zar) and Head of Worldwide Sales (Stephen Richards) gathered to calculate where CA stood in regard to securities analysts' consensus estimate.  At such meetings, it was Kumar himself who decided whether and when to close the quarter.  In addition, Kumar frequently reached out directly to salespeople to check on the status of late contracts.[4]  In certain instances, Kumar or Richards also reached out to sales managers not to inquire about any particular license agreement, but rather to ask whether there was anywhere they could get "$10 million" or some other amount, including from customers with which no negotiations were then in progress.  CA frequently gave

---

[3]    As the Indictment indicates, the phrase "35-day month" is something of a misnomer, given that CA extended months longer than 35 days under Kumar's leadership when such further extensions were required to make or exceed the consensus estimate.

[4]    In one memorable example, Kumar contacted a sales manager several days after quarter-end to ascertain the status of a license agreement.  The salesperson reported that he would not be able to finalize the backdated agreement because his wife had gone into labor with his second child, and the salesperson needed to provide care for his first child while his wife was in the delivery room.  Kumar responded angrily that the salesperson should "get a f-cking nanny" and finish the backdated agreement so that CA could make the quarterly estimate.

enormous discounts to customers during these periods in order to make the number.  Kumar and Richards did this because of their belief, as set forth in the Indictment, that CA's stock price would be negatively impacted by a failure to meet or exceed the consensus estimate.

In addition to closely managing the 35-day month practice, Kumar also personally participated in the negotiation of several prematurely recognized transactions.  For example, on one such agreement with EDS, a major CA customer, Kumar directed (nearly a week after quarter-end, with the agreement still not signed) that the date be removed from the CA signature block. Kumar counter-signed the undated agreement himself, and subsequently handed it to CA's CFO.  Because CA's outside auditor had recently raised questions concerning the dating of license agreements,[5] the CFO inquired about the absence of a date.  Kumar told him, in substance, not to worry .

Defendant Richards directed the sales force to backdate license agreements, knowing and intending that they would be recognized prematurely.  (As the Court may recall, Richards was a certified accountant prior to becoming a sales executive.)  In

_____

[5]    The outside auditor had informed CA that it was violating SOP 97-2 by failing to *counter-sign* the agreement itself within the applicable quarter.  Needless to say, no one at CA ever acknowledged to the auditor that not only was CA counter-signing late, but that the customer itself had not agreed to the license prior to quarter-end.

one notable example, Richards closely supervised the negotiation in April 2000 of a license agreement with a customer, Verizon Wireless, that CA wanted to recognize in the revenues for the quarter ended March 31, 2000.  The customer refused to backdate the agreement to March 31 because, among other reasons, it was a newly created corporation that did not come into <u>existence</u> until April 1, 2000.  The salesperson e-mailed Richards asking him what to do, and Richards directed the salesperson to have the customer sign the contract undated, and then input the fraudulent date himself thereafter.  In addition to supervising salespeople, Richards also participated, along with Kumar and CA's CFO, in the meetings in which Kumar decided how long to keep the quarter open after its calendar end.

As the government expert's submissions make clear, the 35-day month practice substantially inflated CA's stock price, causing shareholders hundreds of millions of dollars in losses when they purchased at inflated prices and then sold after the bubble popped.  In the second quarter of Fiscal 2000 alone, the 35-day month practice allowed CA to claim that it exceeded the earnings estimate when, in truth, CA had missed the consensus estimate by 34 cents per share – meaning that CA had actually earned 58% less during the quarter than the market expected, and than CA claimed.  (Kumar compounded this lie on the analyst conference call following CA's fraudulent Q2 earnings report,

stating that the numbers showed that CA was "doing better" than competitors that had announced, truthfully, that they had missed their earnings estimates.)  The fraudulently concealed 58% miss was, simply put, an enormous earnings miss for a mature company such as CA.  As set forth in the loss calculation discussion, infra, Kumar's expert stretches credulity beyond the breaking point when he claims that an earnings miss of that magnitude would have had no impact on CA's stock price.  (Indeed, as described below, the defense expert's report suffers from at least two conceptual blunders that render it virtually valueless on its face.)

The defense expert's analysis also begs the obvious question why, if the markets would not have reacted negatively, defendant Kumar – who communicated with analysts regularly, and was a practiced prognosticator of Wall Street reactions to CA news announcements – would have engaged in such systematic backdating.  The answer, of course, is that Kumar knew and believed – correctly – that an earnings miss of more than half of the expected number would have had severe consequences for CA's stock.  The fact that he concealed that miss from the public, therefore, caused the purchasers of CA stock in the wake of the CA's inflated earnings announcement to purchase at an inflated price, and to lose substantial value when the truth came out.

CA's practice of poaching revenue from future quarters

8

finally collapsed in July 2000, when CA pre-announced that its earnings and revenues would fall short of analysts' estimates for the quarter because, among other reasons, a number of license agreements were coming in later than expected.  CA revealed this news close to midnight on July 3, 2000, when the markets were closed for the July 4 weekend.  When the markets reopened on July 5, after an initial trading halt, CA stock closed down more than 43% for the day, wiping out billions in shareholder value.

      2.    Fabricated Revenue: "Swap" Transactions Lacking Economic Substance

In addition to recognizing revenue prematurely through the 35-day month, CA also, at Kumar's direction, entered into and booked several sham contracts lacking in economic substance.  Two of these contracts – the Consortio and EMS deals – are charged in the Indictment, as described below; others constitute relevant conduct pursuant to U.S.S.G. § 1B1.3.[6]

      a.   Consortio

As alleged in paragraphs 42 through 43 of the

---

[6]     See U.S.S.G. § 1B1.2(b) (directing that the sentencing court "determine the applicable guideline range in accordance with § 1B1.3 (Relevant Conduct)"; U.S.S.G. § 1B1.3(a)(2) (providing that, for groupable offenses such as securities fraud, "relevant conduct" includes "all acts and omissions" committed, aided, or abetted by the defendant or his co-conspirators "that were part of the same course of conduct or common scheme or plan as the offense of conviction"); see also id., cmt. n.9(A) (defining "common scheme or plan" as including any two or more offenses "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi").

Indictment, Kumar knowingly directed CA to enter into a sham
license agreement with a small start-up company called Consortio
for the purpose of meeting CA's third-quarter consensus estimate.
(The agreement was backdated, as well as constituting sham
revenue.)  CA possessed an ownership interest in Consortio and,
consequently, had substantial rights over its operation.  At the
time, Consortio was nearly insolvent, and its survival depended
heavily on the prospect of future infusions of investment capital
by CA.  Between December 31, 2000 and January 5, 2001, a senior
CA executive, acting at Kumar's direction, negotiated a license
agreement with Consortio with a face value of approximately $44.5
million, despite the fact that Kumar, the senior executive and
Consortio knew that Consortio would never be able to meet its
payment obligations under the agreement.  In order to induce
Consortio's chief executive officer to sign and backdate the
license agreement, Kumar instructed the senior CA executive to
tell Consortio's CEO, in substance, not to worry if Consortio
could not pay the amount due under the license agreement.  Under
SOP 97-2, this contract should never have been booked.
Nonetheless, CA recognized the GAAP value of the $44.5 million in
the third quarter, allowing it to claim that it had met its
number.[7]

---

[7]     Kumar falsely denies the sham nature of this deal, as
set forth in the section dealing with acceptance of
responsibility, _infra_.  Kumar also appears to claim – somewhat

b.   <u>EMS</u>

As alleged in paragraphs 60 through 62 of the
Indictment, in February 2003, while the government investigations
were pending, an individual residing in Asia ("Individual #1")
contacted defendant Kumar.  Individual #1 was the principal of a
company that had entered into a $27 million license agreement
with Computer Associates dated March 30, 2000.  CA recognized
part of the revenue associated with this contract in the Fourth
Quarter.  Without this revenue, CA would have missed the
consensus earnings estimate for the Fourth Quarter.  The
transaction was set up to avoid, if possible, the scrutiny of
CA's auditor: the $27 million purchase price was just under the
threshold at which "purchased software" assets were subjected to
audit-testing.  Within ninety days of entering into the March 30,
2000 license agreement, CA purchased a software program from
Individual #1's company that CA neither needed nor used.[8]  After

_____

oddly – that this Court should offset the value of the
fraudulently recognized Consortio revenues against another,
totally unrelated accounting shift that fortuitously counter-
balanced the Consortio adjustment in the following quarter.  This
creative theory, however, finds no support in the law whatsoever.

[8]   Moreover, the investigation revealed that in connection
with the purchase of the EMS software program (called the "Sales
Configurator"), CA did none of the typical due diligence that
would be associated with the multi-million dollar purchase of
such an asset – <u>i.e.</u>, did not install and test the program prior
to purchase, and did not seek detailed engineering specifications
concerning the software's make-up and capabilities.  The revenue
swap was engineered, in part, by Tommy Bennett, Kumar's key

11

certain adjustments, the transactions back and forth between CA and EMS washed out, net of a $500,000 payment to Individual #1 for doing CA the "favor," <u>see</u> Ind., ¶ 61, of entering into the revenue-swap transaction.  As the Court is aware (and as described in the obstruction-of-justice section, below), this revenue-swap transaction became the catalyst for Kumar's directing his lieutenant and his general counsel to take a rapid round-trip to Hawaii in the midst of the government investigations to pay off Individual #1 to prevent him from revealing the improper swap transaction to the government.[9]

    3.    <u>Manipulated Revenues: "Smoothing" of Earnings Via Fraudulent Adjustments to Reserve Accounts</u>

Several cooperating witnesses in CA's finance and Sales Accounting departments report that, concurrently with the backdating of license agreements, Kumar also directed the manipulation of various reserve accounts at quarter-end in order to allow CA to claim that it met estimates.  This practice involved dipping into reserve accounts to release funds from the given reserve into the company's earnings without a basis in fact

_____

lieutenant, who later arranged the improper payoff to the EMS executive at Kumar's direction.

    [9]    Other transactions during the period also fit this rubric.  For example, CA finance executives were questioned by the FBI in connection with the investigation of accounting fraud at McKesson HBOC, on the subject of a revenue swap with that company.

for the release.[10]  These changes to the reserves were typically made on the final day of a quarter, and to reserve accounts like the "general" accrual fund.  These reserve-manipulations were a subject of the government's F.R.E. 404(b) motion.

      4.   <u>Illegal Side Letters</u>

         a.   <u>Allstate Insurance</u>

In negotiating a substantial license agreement with Allstate Insurance Co., defendant Kumar secretly agreed to a $14 million potential credit that was not written into the license agreement.  As Kumar knew and believed, (i) software accounting rules negated CA's ability to recognize the $14 million as revenue, in light of the credit;[11] and (ii) CA policy dictated that the entry into secret "side agreements" like the $14 million credit were a "dismissible offense."  For example, CA's Sales Compensation Plan for Fiscal Year 2000 provided that:

> <u>Business Ethics</u>: From time to time, documents which supplement or change the nature of a transaction or

---

[10]    This conduct, which was a subject of the government's 404(b) motion, constitutes relevant conduct for sentencing purposes because it was undertaken by the same group of co-conspirators as the 35-day month, for the same intended purpose (to make Wall Street's estimate), in roughly the same period of time, and involved similar conduct.  <u>See</u> U.S.S.G. § 1B1.3 (Relevant Conduct).

[11]    As noted above, SOP 97-2 required, among other things, that CA's fee be "fixed or determinable" at the time of revenue recognition; and given the existence of the potential credit, that $14 million component of the Allstate fee was not fixed or determinable at the time it was recognized.  <u>See</u> Exhibit C at 20,323.

> which reflect additional commitments to the client are
> not included with the contract documents submitted to
> Sales Accounting. . . . <u>This kind of activity is
> tantamount to fraud</u> and (in addition to financial
> liability for CA's perceived loss) <u>will result in the
> termination of the employment of the individual
> employee involved</u>, and possibly the person's
> manager. . . .[12]

<u>See</u> CA Sales Compensation Plan for Fiscal Year 2000 (excerpt
attached as Exhibit D hereto), at Bates page 144352.

Kumar, however, concealed the existence of the credit from
his finance and sales accounting departments, and as a result the
full GAAP revenue associated with that $14 million was booked
with no review by CA's accountants.  He did so to ensure that CA
met or exceeded the consensus estimate for the quarter in
question.  The side agreement was discovered only when CA's
internal audit department sent a copy of the counter-signed
contract to Allstate pursuant to regular procedures, and
requested confirmation that it accurately reflected the entire
agreement between the parties.  Allstate invoked the side
agreement's existence in response, stating that "Sanjay Kumar and
Frank Pollard have agreed to draft a side letter which could

---

[12]   <u>See</u> also 9/25/00 e-mail from Christopher O'Malley with
"Revenue Recognition Policies" attached letter from David Rivard,
attached as Exhibit E. ("Please remember no "side letters" or any
document changing the terms and conditions of a contract without
providing such documents with the contract at time of booking.
This is a dismissible offence [sic] as it seriously compromises
our business.")  This proscription was not merely advisory: on
several occasions, defendant Kumar fired employees himself for
their having entered into side agreements that were not disclosed
to the company.

14

result in a credit of up to $14,000,000." <u>See</u> Allstate correspondence attached as Exhibit F hereto.  CA's CFO confronted Kumar about the side agreement, and Kumar did not deny its existence but stated to the CFO that he believed it would never matter, <u>i.e.</u> that Allstate would never demand the credit.[13]  The side agreement was reduced to writing approximately a year later.

      b.   <u>The Hartford Insurance Company</u>

Richards, too, participated in the execution of side letters in violation of SOP 97-2.  In licensing software to the Hartford Insurance group ("Hartford") in early January, 2000 – a transaction CA was eager to book, prematurely, in the quarter ended December 31, 1999 – Richards negotiated and signed a side letter on behalf of CA.  The side letter allowed Hartford to "exchange" certain of the software it was purportedly licensing at a future date for some unspecified "newly available CA product technology."  This term constituted a classic "future deliverable" in violation of SOP 97-2's requirement that revenue may not be recognized on a contract until "delivery [of the software] has occurred."  Accordingly, the $13.2 million worth of

_____

[13]  Kumar apparently did deny the side agreement in other conversations.  <u>See</u> e-mail from Stephen Richards to CA Salesperson Michael Miller dated June 26, 2000 (attached as Exhibit G hereto) (Richards states, "Unsure as to where this $14m credit issue is coming from, as it was absolutely NOT part of [Kumar's] discussions with Frank or any other Allstate executive.").  Of course, the falsity of this position was revealed when CA ultimately did acknowledge the $14 million credit in writing.

software that the side agreement permitted Hartford to exchange should not have been recognized in the third quarter.  (In addition, the side letter was backdated, like the license agreement it related to.)[14]

B.    Obstruction of Justice

The obstruction in this case was singular in dimension. It was directed at the highest level, literally, of the corporation – out of the office of Sanjay Kumar, the CEO throughout the obstruction period.  It lasted over two years and, in substantial part, succeeded: the government investigations were diverted, for a time, in response to misrepresentations from CA.  Moreover, Kumar orchestrated this scheme under the banner of CA's purported full "cooperation" with the government, as Kumar directed CA to proclaim in public filings and elsewhere.  As set forth below, CA's efforts to obstruct under Kumar's leadership took virtually every form possible.

_____

[14]    Meanwhile, in response to the reforms overseen by the Independent Examiner, Lee Richards, Esq., CA continues to identify accounting machinations undertaken under Kumar's direction.  For example, in a Form 8-K filed with the SEC on July 27, 2006, CA acknowledged that Kumar had essentially created a pool of unallocated options, approved by the Board but not designated to a specific employee, for distribution years later as he saw fit.  The fact that these options had appreciated in value prior to Kumar's bestowing them on executives rendered them "in-the-money" options as of the time of grant, and therefore they should have been the subject of a compensation charge.  CA is in the process now of restating earnings as a result of these erroneously unrecognized compensation charges.  See Form 8-K attached as Exhibit H hereto.

16

1.   <u>Witness Tampering</u>

    a.   Kumar Directs the General Counsel to Tamper
         with Witness Testimony

From the outset of the investigation, Kumar directed that CA was not going to acknowledge the truth of the 35-day month practice.[15]  On February 20, 2002 – within a week or so of the initiation of the government investigations – CA issued a press release at Kumar's direction stating, falsely, that "[t]he reporting of [CA's] financial results has always been in accordance with applicable accounting principles."  CA also publicly announced that it was cooperating fully with the government investigations.  Privately, however, Kumar would soon inform CA's general counsel that the government, in Kumar's view, could never prove the 35-day month had occurred.  Kumar further directed the general counsel to make sure he met with witnesses who were scheduled to be interviewed by the corporation's outside attorneys, <u>prior</u> to such interviews, for the purpose of

---

[15]   Kumar claims, incorrectly, that the 35-day month practice was not an initial focus of the government investigations.  The minutes of CA's Board of Directors meetings, however, reflect that the timing of license-agreement revenue recognition was one of four subject matter areas discussed at the first full Board meeting concerning the investigation, on February 27, 2002.  At the time, the government was looking into allegations that CA had kept the quarter open for late-<u>countersigned</u> license agreements; the government would soon expand this part of the investigation to examine allegations that the <u>customer</u> signature, as well as CA's countersignature, had been systematically backdated.

conforming their testimony to CA's denial of the 35-day month.[16]
When Kumar gave the general counsel this order, he reiterated his
view that the government could not prove the allegation.

In several cases, Kumar went a step further, suggesting
a basis on which employees should disavow knowledge of a
systematic 35-day month practice.  For example, when the general
counsel informed Kumar that the government sought to interview
attorneys from CA's legal department who assisted in drafting
license agreements (including post-quarter-end), Kumar suggested
a posture that the attorneys should adopt: the attorneys would
have had no knowledge of when CA's sales accounting and finance
departments had booked the license agreements.  This explanation
was false; several attorneys had known and believed, given their
regular interactions with salespeople and sales accounting, that
CA needed the revenue in question for the previous quarter.  The
general counsel, however, passed Kumar's cover story on to the
legal department, and certain lawyers in turn adopted it.
(Certain, however, did not, and truthfully acknowledged the
obvious – that the reason for the frantic, late-night

_____

[16]     See Ind., ¶ 58 ("KUMAR instructed Woghin to meet with
CA employees prior to their being interviewed by the government
or by the Company's Law Firm to coach the employees on how to
answer questions without disclosing the 35-day month practice.
On several occasions, KUMAR himself coached CA employees on how
to answer questions without disclosing the existence of the 35-
day month practice."); see also Information, United States v.
Steven Woghin, filed September 22, 2004, ¶ 20 (reciting the same
allegation, to which CA's general counsel also pleaded guilty).

18

negotiations into the subsequent quarters was to close deals needed to make quarterly estimates.)

Likewise, in connection with the sales department, Kumar proffered the cover story that salespeople may have believed, erroneously, that license agreements were booked prematurely because, in Kumar's rendition, the salespeople were <u>commissioned</u> on a deal in the prior quarter, and they were "confusing" the timing of their commissions with the timing of revenue recognition. <u>See</u> Ind., ¶ 57.

b. <u>Kumar Directs Witnesses to Lie</u>

In addition to directing the general counsel's efforts to stymie the government investigations, Kumar also personally endeavored to persuade witnesses to lie. For example, with respect to the large, undated EDS license agreement that Kumar personally negotiated and executed after Q3 of Fiscal 2000, Kumar invited a salesperson who had also worked on the negotiations into CA's coffee/break room at one point during the investigation. Kumar looked the salesperson in the eye and stated that he recalled that the deal had been signed in December (<u>i.e.</u>, on time). The salesperson responded that she had been on maternity leave that year through calendar year-end, and had not returned to work until January. Thus, she continued, given that she was with Kumar when the signed contract came in over the fax machine, there was simply no way the contract had been executed

in the quarter it was booked.  Despite her absolute confidence,
Kumar inquired whether she was sure, again staring at her
intently.  Later, Kumar and Woghin again challenged her
recollection of the agreement.  Nonetheless, she did not back
down.  This witness also recalled that Kumar had attempted to
suggest, falsely, that another license agreement had come in
before certain litigation with the counter-party was resolved.

       c.   Kumar Lies to Outside Counsel, Intending
           Such Lies to Obstruct the Investigation

Throughout the investigation, Kumar falsely denied the
35-day month practice to outside counsel and suggested cover
stories to explain why it might appear, incorrectly, that the
practice had gone on.  These included the "salespeople are
confusing commission timing with revenue recognition" fabrication
discussed above.  And, Kumar ultimately directed outside counsel
to write to the government a letter "vigorously denying" that the
35-day month practice had occurred.  <u>See</u> Letter from John
Savarese, Esq. to AUSAs Eric Corngold and David Pitofsky dated
January 29, 2003, at 7 (attached as Exhibit I hereto).

Kumar also saw to it that outside counsel was misled
concerning a key aspect of their fact-gathering efforts: the
collection and recovery of e-mail.  At Kumar's direction, outside
counsel was informed that as a matter of CA policy and computer-
server architecture, CA saved no e-mail in digital form for more
than 30 days.  (CA allowed that there might be hard copies of e-

mail still in existence that were more than 30 days old.)  This
misinformation was related by outside counsel to the government,
and substantially altered the trajectory of the investigation.
It was not until the government obtained evidence from CA's
customers that proved the 35-day month, and then confronted CA
with the existence of such incontrovertible evidence, that CA
engaged the forensic recovery consultant PriceWaterhouseCoopers,
which determined almost immediately what Kumar knew all along:
that there were tens, if not hundreds, of thousands of responsive
e-mails residing on individuals' personal computers, even if no
central back-up system existed.

> d.   Kumar Engineers a $3.7 Million Payoff to
>      a Witness to the EMS Revenue Swap

As noted in the discussion of the EMS revenue-swap
transaction, _supra_, CA met its earnings estimate in the fourth
quarter of Fiscal 2000 in part by licensing a substantial amount
of CA software to EMS, an affiliated counter-party.  A
participant in these negotiations was Thomas Bennett, Kumar's
long-time lieutenant at CA and social friend.  Shortly after EMS
signed the license agreement, CA turned around and purchased a
software product – the EMS "Sales Configurator" – that CA did not
need or use.  CA did none of the expected due diligence in
connection with such a major asset purchase, and did not even
bother to integrate the Sales Configurator into any CA product
suite until nearly a year later, when it became clear that CA's

21

auditors might be examining the real value of the Sales Configurator asset on CA's balance sheet.

As set forth in the Information to which Thomas Bennett later pleaded guilty (attached as Exhibit J hereto), the revenue swap transaction with EMS – in which CA licensed software to EMS to make its revenue number, then essentially refunded the money through the sham purchase of the Sales Configurator – violated accounting rules.  See id., ¶ 9.  Years later, after the government investigations commenced, the principal of EMS contacted defendant Kumar to remind him of the "favor" he had done for CA in Fiscal Year 2000.  Over the course of communications that ensued, the EMS principal threatened to reveal the sham transaction, and Kumar, in response, dispatched his general counsel and Bennett, his trusted lieutenant, for a meeting in Hawaii – in the middle of the government investigations, when the general counsel was needed in Islandia – to negotiate for the EMS witness's silence.  Subsequently, Bennett and Woghin crafted, and Kumar approved, a $3.7 million "consulting agreement" for the EMS principal, knowing that his consulting services were neither needed nor desired.  Again, this effort at obstruction was successful, at least initially – the EMS principal, gratified by his newfound wealth, did not reveal the swap transaction, and it was only after the government had proved the CA accounting fraud by other means, and Kumar had left

22

CA, that the revenue swap and the payoff were revealed.

    2.   <u>Records Tampering</u>

      a.   <u>Kumar Tampers With His Laptop</u>

In early October 2003, the Audit Committee of CA's Board of Directors demanded that Kumar produce any computers in his possession for forensic imaging and analysis. Obviously, e-mail correspondence from the Indictment period would be expected to constitute one of, if not the, richest sources of evidence concerning defendant Kumar's knowledge, state of mind, and personal participation in the 35-day month practice. By this time, there was no question that the 35-day month practice had occurred (CA would admit as much in a press release issued when Kumar fired CA's CFO, Ira Zar, days later on October 8). Rather, the key reason for seeking the laptop(s) was to determine Kumar's own culpability.

On October 3, promptly responding to the Audit Committee's request, Kumar produced the laptop he was then using to PwC. He did not mention, however, that he possessed any older computers. On October 23, Kumar belatedly produced an older laptop – one that might, given its age, be expected to contain e-mail dating back to CA's Fiscal Year 2000.[17] Kumar indicated at

_____

    [17]   This laptop (the "Linux Laptop") would likely have contained relevant documents from Fiscal Year 2000 because the laptop was purchased in or about October 2001, and as Kumar himself indicates, it was his practice upon receipt of a new laptop to transfer all documents saved on his older computer to

23

the time that he had used the laptop to test CA software in the

Linux operating system environment (a competitor to Microsoft

Windows), and therefore that there would not be any e-mail or

other relevant documents contained on it.

　　　　After a series of sophisticated analyses, the computer

forensic experts at PwC determined conclusively that the

installation of Linux operating system occurred on October 11 –

_after_ the Audit Committee had demanded the computer for imaging

and production to the government, and after Kumar had produced

his first computer.[18]  Moreover, PwC determined that during the

session in which the user installed Linux, he altered the

laptop's internal clock, setting it back to April 2003.[19]   PwC

---

the newer one.

[18]    Installing an entirely new operating system on a
computer is unquestionably destructive to existing document and
data files.  Indeed, the installation process for the Linux
software would have begun with the following user-prompt:
**"WARNING – You have selected to remove all partitions (ALL DATA)
on the following drives . . . Are you sure you want to do this?"**
Kumar would have had to click "yes" to proceed with the
installation at that point.  See Screenshot of Linux Reformatting
Initiation Screen (attached hereto as Exhibit K).

[19]    PwC proved the fact of the clock-change by determining,
first, that the session during which the clock-change occurred
appeared, from internal logs, to have spanned a period of April
2003 to October 2003 and that the session had run on
battery power for the entire period.  See First Report of David
Burg of PriceWaterhouseCoopers, dated April 3, 2006, at 3
(attached as Exhibit L hereto) (noting that in a single session,
Red Hat Linux installation ended on April 3, 2003; five records
of clock application activity were recorded, "indicating that the
system clock time was changed"; and the computer was then "shut-
down on October 11.").  There is no laptop battery in commercial

further determined that Kumar's proffered reason for installing Linux – to test CA software – was unsupported by the forensic evidence, given that no CA (or other) software had been installed on top of the Linux operating system. Finally, PwC determined – as did Kumar's own expert – that the laptop had been digitally "wiped" clean before the Linux installation.  As a consequence, whatever documents and/or e-mail existed on that laptop prior to October 11, 2003, will never be known to the government or the Court.[20]

> b.   Kumar Deletes Key Data From a Salesperson's Laptop

At trial, CA's former general counsel would have testified that he informed Kumar, during the government investigations, that a salesperson who had worked on a certain

_____

existence that can run for such a period without switching over to outlet power, and none of the standard logging that would occur over a six-month session was recorded; therefore PwC concluded that "the [Linux Laptop] was not operated for a six-month period."  Id.  Kumar never proffered any forensic evidence to contest this overwhelming proof, despite having had a Rule 16 obligation under the Rules of Criminal Procedure to turn it over if he had any.

[20]   During the argument on the government's 404(b) motion to admit this evidence, Kumar proffered, in response, his self-serving and forensically unverifiable claim that he had digitally wiped the laptop back in April 2003.  Bootstrapping from this weak foundation, Kumar claims that it wouldn't have made sense for him to install Linux and change the clock in October.  The obvious answer to this is that Kumar did not install Linux in April (again, a conclusion that Kumar cites no forensic evidence whatsoever to dispute).  Kumar appears, however, to be persisting even now in his frivolous denial of the Linux reformatting and clock-change operation.

25

backdated licensing agreement had brought his laptop from the FY 2000 period back to the company.  (The salesperson's daughter had been using the laptop for homework in the meantime.)  Upon hearing that the laptop was in Woghin's possession, Kumar immediately went to Woghin's office and began searching through computer files, including in the computer's Microsoft Outlook "journal" feature files.  Woghin noticed, as Kumar worked very rapidly through the files, that Kumar had searched for and found a reference in the Outlook journal to the name of the customer to the backdated license agreement in question.  When Kumar clicked back to the Outlook journal screen moments later, Woghin noticed that the customer reference was gone.  He asked Kumar, in substance, whether there hadn't been a reference there to the customer in question, and Kumar responded, in substance, that it wasn't there anymore.  Another forensic expert, Stroz Friedberg LLC, subsequently confirmed that several references to the customer in the Outlook journal file on this computer had been deleted on the date in question.

        c.  <u>Richards Installs the "Incinerator"</u>

        As also set forth in the government's 404(b) motions, Richards installed and used a program called the "Incinerator" to erase computer data on an older laptop in the summer of 2003, <u>before</u> transferring the data on that laptop to a new computer. (Richards claimed that the older laptop later crashed, but he

never allowed CA's lawyers – internal or outside – to verify this claim.)  As the government noted in the 404(b) litigation, even assuming the most charitable view (to Richards) of CA's document-destruction policy, that policy still called for eradicating data on an old laptop _after_ the data had been transferred and preserved.[21]  And, as the government pointed out, CA's data deletion policy had been suspended long before Richards elected to use the Incinerator.  _See_ March 1, 2002 Document Preservation Memorandum to CA Employees (instructing all employees to "suspend any routine discarding or deleting of documents (including e-mail)"; the memo went on to state, "This memo supersedes all Company policies regarding e-mail and document retention and destruction.").

Moreover, as the government has noted, Richards purchased and used the Incinerator under highly suspicious circumstances.  First, he used it shortly after the government had become aware of, and accelerated its demands for, the "status" and "missing" reports that ultimately proved the 35-day

---

[21]    We know that Richards used the Incinerator before transferring data to his new laptop because the Incinerator files on the new laptop _copied_ _over_ from an older computer.  Again, CA policy (viewed in the light most favorable to Richards) called for such data destruction only after data transfer. _See_ Government's Second Reply Memorandum Concerning Data Deletion by Defendants Kumar and Richards dated April 21, 2006, at 3.

month.[22]  Second, the process by which Richards obtained the

Incinerator program did not comport with normal procurement

practices at Computer Associates.  CA has determined that it has

no record that the company ever ordered the System Mechanic or

Incinerator software that Richards used.  Likewise, there is no

record that Richards ever submitted a reimbursement request or

expense report for the purchase of the System Mechanic

_____

[22]    Prior to June 2003, CA had consistently denied that
"missing" and "status" reports from Fiscal Year 2000 continued to
exist, as it denied the existence of the 35-day month practice
itself.  By late May 2003, however, the government had obtained
evidence from third-parties – predominantly CA's customers – that
showed widespread backdating of contracts, and informed CA that
in the government's view, the 35-day month practice had occurred
and senior CA executives had participated.  Thus, on June 27,
2003, the SEC issued a formal subpoena (the "June 27 Subpoena")
that more specifically demanded the production of missing and
status reports.  Shortly after, on July 2, 2003, the company's
Board of Directors voted to initiate an independent internal
investigation of the 35-day month practice.

        CA responded to the June 27 Subpoena on July 23, 2003 –
the very day on which the Incinerator program was last modified
on Richards' computer – by, for the first time, producing a small
number of missing and status reports and indicating that the
company had, so far, located only "a limited number of such
[status] reports that were created during the Period [including
Fiscal Year 2000]."  See Letter from Wachtell, Lipton et al. to
the Securities and Exchange Commission dated July 23, 2003
(attached hereto as Exhibit M), at 2.  The letter went on,
however, to state that "CA is continuing to search for additional
status reports and if any additional status reports are located
they will be produced promptly."  Accordingly, at the very moment
that CA first acknowledged that it had located a small quantity
of incriminating documents – and stated, importantly, that it
would focus on finding more such reports if they existed –
Richards was installing the "Incinerator" program on his old
laptop, which Richards claimed "blew up" shortly thereafter, on
approximately August 11, 2003.

software.[23]  Therefore, it appears that Richards purchased the
software on his own, without going through any of the ordinary
channels at CA, and never revealed to the legal department or
anyone else at CA that he was purchasing or using the
Incinerator.[24]  Moreover, Richards did not seek the assistance of
CA employee Joseph Petito, who provided computer support to high-
level CA executives, in installing the wiping software.

  3. <u>False Statements By Kumar</u>

   On November 5, 2003, defendant Kumar attended a proffer
session at the U.S. Attorney's Office in Brooklyn at which
prosecutors, SEC attorneys and an FBI agent were present.  For
several hours, Kumar gave false answers to virtually every
important question posed.  Among other things, Kumar stated that
he was never aware of any CA license agreements finalized after
the end of a quarter but booked prematurely; that he had heard of
a "three-day window" after quarter-end, but he believed that was
for administrative processing of contracts only; that he never

---

   [23] In fact, a search of Richards' hard drive reveals not a
single reference, anywhere in the contents of his e-mail
correspondence, to the words "Incinerate," "Incinerator," or
"System Mechanic."

   [24] Needless to say, Richards never followed the
instructions set forth in several document-preservation memoranda
that if employees had any question about whether a planned action
comported with the document-retention policy, they should contact
the legal department at the number provided.  <u>See</u> Document
Retention Memorandum dated March 1, 2002 (attached as Exhibit H
to Kumar Response to 404(b) motion).  Kumar never followed this
policy either.

encouraged salespeople to finalize contracts after quarter-end for the purpose of meeting a revenue estimate; that he did not have meetings with Zar, Richards or anyone else after quarter-end to discuss whether CA had met its number and how long to keep the quarter open; that he did not recall receiving a breakdown of which contracts were counted in a given quarter's revenue number; and so on.  In effect, Kumar attempted to pin blame for the practice on his underlings.  As acknowledged by his guilty plea, Kumar knew and believed these statements to be false at the time he made them.  Ind., ¶¶ 72-76.

### 4.  Perjury By Richards

On October 22, 2003, defendant Richards testified under oath before the Securities and Exchange Commission.  As did Kumar, Richards gave consistently false testimony in an effort to conceal the existence of the 35-day month practice.  For example, Richards stated that he assumed CA's finance department had processes and procedures in place to ensure that late-executed contracts were booked in the correct quarter, when in fact Richards specifically knew that the finance department was holding the quarters open for such contracts.  Ind., ¶¶ 68-71 and 89.

30

III. <u>The Sentencing Guidelines</u>

    A.   <u>The 2005 Guidelines Manual Applies</u>

        1.   The Ex Post Facto Clause does not Apply to the <u>Advisory Sentencing Guidelines</u>

In the Second Circuit, a "sentencing court must generally apply the version of the Guidelines that is in effect at the time of sentencing, unless there is an <u>ex</u> <u>post</u> <u>facto</u> problem." <u>United States v. Rodriguez</u>, 989 F.2d 583, 587 (2d Cir. 1993)(citation omitted). <u>See also</u> U.S.S.G. § 1B1.11(a)(2005)("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced.")

Article I, Section 9 of the United States Constitution provides that "[n]o . . . <u>ex</u> <u>post</u> <u>facto</u> law shall be passed." Art. I, § 9, cl.3.  For a law to fall within the <u>ex</u> <u>post</u> <u>facto</u> prohibition, the Supreme Court has held that "two critical elements must be present: first, the law 'must be retrospective, that is, it must apply to events occurring before its enactment'; and second, 'it must disadvantage the offender affected by it,'" <u>Miller v. Florida</u>, 482 U.S. 423, 428 (1987).

In <u>Miller</u>, the Court held that Florida's mandatory sentencing guideline scheme could not be applied retroactively to a crime committed before its enactment, where the revised guideline increased the sentence applicable to the defendant. <u>Id.</u> at 435-36. Prior to the Supreme Court's decision in <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Second Circuit applied this

31

principle to the federal Guidelines: "An ex post facto problem
normally arises when the version of the Guidelines used at
sentencing results in a more severe sentence than that which
would have resulted had the Guidelines version in effect at the
time of the commission of the crime been applied." Rodriguez, 989
F.2d at 587.

Defendant Kumar insists that a "clear ex post facto
violation" will occur if the court applies the 2005 Guidelines in
determining Kumar's sentence,[25] but cites no caselaw decided
after Booker in support of this proposition. Because, after
Booker and its progeny, the ex post facto clause does not apply
to the federal Sentencing Guidelines, Kumar's argument must be
rejected.

The Seventh and Sixth Circuits very recently held that
because the ex post facto clause applies "only to laws and
regulations that bind rather than advise," application of a
particular advisory Guideline range which expands the range of
sentencing for a crime does not violate the ex post facto clause.
United States v. DeMaree, ___ F.3d ___, 2006 WL 2328665 (7th Cir.
August 11, 2006)(Posner, J.); see also United States v. Barton,
455 F.3d 649 (6th Cir. 2006).  Judge Posner recognized that the
"purpose of the [ex post facto] clause is to protect people

---

[25]    Defendant Richards adopts Defendant Kumar's arguments
with regard to the ex post facto issue.  Richards Sent. Mem. at
16.

against being punished for conduct that was not criminal when
they engaged in it, or being punished more severely than their
crime was punishable when committed, or being deprived of
defenses that had been available then, or otherwise being
blindsided by a change in the law," but noted that the "purpose
is not to enable criminals to calculate with precision the
punishments that might be imposed on them." DeMaree, 2006 WL
2328665 at * 1.

After Booker and Crosby, district judges are obligated
to consider, but are not bound by, the Guidelines in determining
an appropriate sentence, and must also consider the factors
outlined in 18 U.S.C. 3553(a). If, after Booker, "any regulation
traceable to Congress that disadvantages a criminal defendant is
therefore an ex post facto law, even if it is purely advisory,
the constitutional prohibition will be unmoored from both its
purpose and the circumstances in which statutes and regulations
have heretofore been deemed to be ex post facto laws." DeMaree,
2006 WL 2328665 at * 2.; see also Barton, 455 F.3d at 655 n.4
("Now that the Guidelines are advisory, the Guidelines
calculation provides no [] guarantee of an increased sentence,
which means that the Guidelines are no longer akin to statutes in
their authoritativeness. As such, the ex post facto clause itself
is not implicated.").

Thus, application of the 2005 Guidelines to all counts

33

in the Superseding Indictment does not implicate the <u>ex post facto</u> clause.

> 2.  Application of the 2005 Guidelines does not
>     <u>Violate the Ex Post Facto Clause</u>

Even if the <u>ex post facto</u> clause were relevant to sentencing in the  post-<u>Booker</u> era, Counts One through Nine are properly grouped as related offenses, and therefore application of the 2005 Guidelines does not violate the Constitution.

U.S.S.G. § 1B1.11(b)(3) provides: "If the defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to be applied to both offenses." U.S.S.G. § 1B1.11(b)(3).  The Guidelines commentary expressly contemplates that the revised edition should be applied to both offenses, "even if the revised edition results in an increased penalty for the first offense." U.S.S.G. § 1B1.11(b)(3) cmt. background.  This provision gives effect to the so-called "one-book rule" of U.S.S.G. § 1B1.11(b)(2), which dictates that sentencing courts apply a single Guidelines Manual and not pick and choose sections from different Manuals in determining sentences. <u>See</u>, <u>e.g.</u>, <u>United States v. Stephenson</u>, 921 F.2d 438, 441 (2d. Cir. 1990) ("Applying various provisions taken from different versions of the Guidelines would upset the coherency and balance the Commission achieved in promulgating the Guidelines").

34

The overwhelming number of Circuits to have considered the issue have held that U.S.S.G. § 1B1.11(b)(3) does not violate the ex post facto clause when applied to groupable offenses. For example, the Seventh Circuit held in United States v. Vivit, 214 F.3d 908, 919 (7th Cir. 2000), that "the enactment of the grouping rules provides fair notice such that the application of § 1B1.11(b)(3) and 3D1.2 does not violate the ex post facto clause." The grouping rules, together with the one-book rule, put criminals on notice that "the version of the sentencing guidelines in effect at the time he committed the last of a series of grouped offenses will apply to the entire group." Vivit, 214 F.3d at 918 (citation omitted).  See also United States v. Cooper, 35 F.3d 1248, 1250 (8th Cir. 1994) (noting that "it was not the amendments to the Sentencing Guidelines that disadvantaged [the defendant], it was his election to continue his criminal activity"); United States v. Bailey, 123 F.3d 1381 (11th Cir. 1997) (holding that there was no ex post facto violation where properly grouped, providing "fair warning" of the punishment for defendant's crimes); United States v. Lewis, 235 F.3d 215 (4th Cir. 2000) (holding that the imposition of an increased base offense level in the revised Guidelines did not violate the ex post facto clause because the defendant had ample warning of the rule change prior to committing the later offenses); United States v. Kimler, 167 F.3d 889 (5th Cir. 1999)

35

(holding that the defendant's decision to continue his illegal activities after the effective date of the revised Guidelines warranted the application of the revised Guidelines to the defendant's entire group of offenses); United States v. Sullivan, 255 F.3d 1256 (10th Cir. 2001) (defendant convicted of failing to file tax returns on three different occasions was properly sentenced by the newer guidelines effective before the third count). But see, United States v. Bertoli, 40 F.3d 1384, (3d Cir. 1994)(rejecting application of the revised Guidelines for multiple grouped offenses).  In pre-Booker caselaw, the Second Circuit explicitly reserved ruling on the issue. See United States v. Santopietro, 166 F.3d 88, 96 (2d Cir. 1999)("[W]e are hesitant to pronounce on the matter in the absence of a comprehensive presentation by the parties.")

Defendant Kumar relies extensively on United States v. Johnson, 1999 WL 395381 (N.D.N.Y. June 4, 1999), an unpublished case from the Northern District of New York.  Kumar's reliance is entirely misplaced.  In Johnson, the court decided to apply two separate Guideline manuals where there were "multiple discrete acts" of various child sex crimes.  This rationale is inapposite where, as here, the defendants' crimes are properly grouped as a continuing course of conduct.

For example, in United States v. Fiore, 381 F.3d 89 (2d Cir. 2004), the defendant was charged with, inter alia, mail

36

fraud, securities fraud, bribery and perjury relating to his involvement in a "boiler room" stock manipulation scheme. In the course of an SEC investigation into the matter, the defendant lied to the SEC about his participation in, and knowledge of, the scheme. See id. at 91. The Second Circuit noted that the district court properly grouped the obstruction (perjury) offense with the underlying fraud offense under § 3D1.2, because the defendant "perjured himself in an SEC investigation involving the precise conduct for which he was criminally convicted: conspiracy to commit securities fraud and securities fraud." Id. at 95.

Here, the PSR correctly applies U.S.S.G. § 3D1.2 to the defendants' continuing course of conduct, concluding that "Counts Six, Seven and Nine are grouped with Counts One through Five." Kumar PSR ¶ 134. Kumar suggests that he engaged in securities fraud prior to October 2000, and then engaged in "separate obstructive activity" between February 2002 and April 2004. Kumar Sent. Mem. at 61. But the obstruction to which Kumar and Richards pleaded guilty did not occur in a vacuum — both defendants obstructed the government's investigation into the very conduct forming the basis of the securities fraud and conspiracy alleged in Counts One through Five. Because these counts are properly grouped pursuant to § 3D1.2, the application of the 2005 Guidelines pursuant to § 1B1.11 does not violate the ex post facto clause.

37

B.   <u>The Fraud Loss Exceeds $400,000,000</u>

1.   <u>Actual Loss</u>

The Sentencing Guidelines applicable to large-scale accounting fraud cases, while unquestionably severe, expressly "reflect Congress' judgment as to the appropriate national policy for such crimes." <u>United States v. Ebbers</u>, 458 F.3d 110, 129 (2d Cir. 2006) (affirming 25-year sentence for securities fraud conviction of former WorldCom CEO).   The instant fraud, as noted above, implicated $2.2 billion in restated revenues and spanned a large number of years.   Kumar's direction to keep the books open concealed a shortfall of 58% of total expected earnings in the second quarter of FY 2000 alone, which, if truthfully revealed, would have caused a substantial drop in the value of CA's stock. The losses to CA investors comprise at least the following:

- losses to investors who purchased CA stock at inflated prices because of fraudulent disclosures and omissions flowing from the 35-day month, then sold after such inflation had seeped out of the stock (these alone exceed $400 million);

- losses to investors who <u>sold</u> at deflated prices, where the 35-day month caused CA to understate results;

- losses emanating from the fabrication of revenue through sham "revenue swap" transactions like Consortio and EMS (a category of harm that Kumar ignores entirely in his submission); and

- damages from the loss of "confidence in management and even in the truthful portions of a financial statement," <u>see</u> <u>Ebbers</u>, 458

38

> F.3d at 127, that flowed from the 2003
> revelation by CA that its financial reporting
> had been fraudulently manipulated.[26]

As set forth below, it cannot seriously be argued that these

losses total less than $400 million, the highest level on the

applicable fraud-loss table.

      a.   <u>Applicable Law</u>

      In securities fraud cases, the loss calculation is

"predicated on the higher of the actual loss or intended loss

from the offense." <u>United States v. O'Neil</u>, 118 F.3d 65, 74 (2d

Cir. 1997); U.S.S.G. § 2B1.1 cmt. n.3(A) (loss is the "greater of

actual loss or intended loss").[27]  In determining the amount of

loss resulting from a fraud offense, the sentencing court is not

required to compute the loss "with precision." <u>United States v.</u>

<u>Jacobs</u>, 117 F.3d 82, 95 (2d Cir. 1997).  Section 2B1.1 provides

that:

> The court need only make a reasonable
> estimate of the loss.  The sentencing judge
> is in a unique position to assess the
> evidence and estimate the loss based upon

---

[26]  Even this is not an exhaustive list of the real damages
to CA's shareholders flowing from the defendants' conduct.  A
full accounting of the losses would also include, for example,
shareholder funds expended for Kumar's and Richards' legal
defense of their fraudulent conduct – monies that CA and its
shareholders are may never recover, given that the defendants'
restitution obligations will exceed their respective net worths.

[27]  The applicable guideline is the fraud guideline in
U.S.S.G. § 2B1.1.  Prior to November 2001, the applicable
guideline was the now-eliminated 2F1.1.  The principles governing
such calculations remain the same under the newer section.

> that evidence.  For this reason, the court's
> loss determination is entitled to appropriate
> deference.

U.S.S.G. § 2B1.1, cmt. n.3(C); see also United States v. Bennett,
252 F.3d 559, 565 (2d Cir. 2001); United States v. Germosen, 139
F.3d 120, 129 (2d Cir. 1998); United States v. Burns, 104 F.3d
529, 536 (2d Cir. 1997); United States v. Phaneuf, 91 F.3d 255,
261 (1st Cir. 1996) (stating that "courts can, and frequently do,
deal with rough estimates when calculating the amount of loss").

Recognizing these principles, courts frequently
calculate loss in securities fraud cases by relying on the change
in market capitalization as a result of the disclosure of the
fraud.  See, e.g., United States v. Moskowitz, 215 F.3d 265 (2d
Cir. 2000) (loss calculated based on the decline in market
capitalization upon disclosure of the fraud); United States v.
Hedges, 175 F.3d 1312 (11th Cir. 1999) (calculating loss by
taking the difference between the average share price during the
fraud and the share price after disclosure of the fraud and
multiplying that difference by the total number of shares
outstanding).  These rules are necessary because, absent the
ability to employ rough estimates, "perpetrators of fraud would
get a windfall," a situation to be avoided.  Ebbers, 458 F.3d at
127.

40

>           b.    The Government Expert's Analysis Proves
>                 That the Loss Exceeds $400,000,000, Even
>                 Under the Most Conservative Assumptions

For a variety of reasons, the $330 million estimate of loss by Dr. Mukesh Bajaj, the government's economic expert, constitutes a "lower bound" on the range of losses flowing from the 35-day month practice – i.e., the most conservative possible estimate of such losses.  See Expert Report of Dr. Mukesh Bajaj dated March 21, 2006 ("First Bajaj Rept."), ¶¶ 13-15.[28]

---

[28]   The reasons that Dr. Bajaj's calculation substantially understates the loss are:

1.   He calculated damages only to an artificially narrow subset of victims: namely, those victims who filled out and submitted claims for restitution to Kenneth Feinberg, Esq., the claims administrator.  Academic research demonstrates that substantially fewer than all eligible victims tend to submit such claims, and Dr. Bajaj calculated that the claims data submitted to the Administrator, Kenneth Feinberg, Esq., accounts for only 56% of total trading volume for the period in question.  Had 100% of eligible victims reported claims, therefore, the loss estimate would have been nearly doubled.

2.   He calculated damages only for FY 2000.  As Kumar admits, however, the practice went on for years, if not more than a decade, prior to FY 2000; and therefore Dr. Bajaj's damage calculation captures only a small fraction of the time period.  Kumar states that the 35-day month fraud occurred at Computer Associates since the 1980s.  See Letter from Jack Cooney, Esq. dated Sept. 5, 2006 to U.S. Probation Officer Michelle Espinoza ("Kumar 9/5 Lett.") (attached hereto as Exhibit N, at 6.

3.   Dr. Bajaj's loss calculation measures only the inflation resulting from the overstatement of EPS in the second quarter of FY 2000.  As he points out, CA's stock was substantially further damaged by the

Dr. Bajaj's methodology conforms to the most widely accepted practices of economists.  He concentrated his analysis on the second quarter ("Q2") of Fiscal Year 2000, because that quarter experienced the largest earnings miss after replacing revenues CA shifted back into their proper quarters (the Q2 miss was 35 cents per share for that quarter alone).  Dr. Bajaj then employed an "event study" involving a total of 92 "earnings misses" by a sample of 30 companies that operated in the markets for enterprise software or computing.  First Bajaj Rept., ¶¶ 39-40.  He then employed regression analysis in an effort to isolate the event-specific impact of the firms' earnings-miss disclosure on the stock price, while controlling for market-wide or industry-wide factors.  <u>Id.</u>, ¶¶ 43-45.  He determined that the 30 firms in his sample experienced stock-price declines in 90% of the cases in which they announced an earnings miss – 84 announcements out of 92 – and that the declines were

---

revelation that its highest-level executives had engaged in fraud.  <u>See</u> <u>Ebbers</u>, 458 F.3d at 127-28 ("[R]evelation of an extended period of fraudulent financial statements may cause losses beyond that resulting from the restatement of financial circumstances because confidence in management and even in the truthful portions of a financial statement will be lost . . . .  Reasonable investors surely view firms with an untrustworthy management and auditor far more negatively than they view financially identical firms with honest management . . . .").  Dr. Bajaj's estimate captures none of the damages associated with the revelation of the fraud itself, which <u>Ebbers</u> identifies as a viable category of losses for sentencing calculations.

42

statistically significant in 60% of these (*i.e.*, so significant that one can say at a 95% statistical confidence level that the decline was a function of the earnings announcement, not broader-market factors).  The average decline across <u>all</u> misses was 16.05%, again controlling for market factors.  <u>Id.</u>, ¶ 46.

Moreover, when one focuses on the portion of Dr. Bajaj's study that most resembles CA – namely, by looking at the companies that announced (i) similar-sized misses (CA's, as noted above, was huge), (ii) in the same specific time frame at issue here (April 1, 1999 to July 31, 2000), the numbers are even starker.  For example, of the thirteen earnings-miss announcements that occurred in the same time frame, <u>thirteen out of thirteen stock-price responses were negative, and twelve out of the thirteen were statistically significantly negative</u>.  The stock prices of such companies fell by <u>an average of 34.20%</u> (with a median "abnormal (*i.e.*, above-market) price decline was 29.58%).  <u>See</u> Rebuttal Report of Dr. Mukesh Bajaj dated September 21, 2006 ("Bajaj Rebuttal," attached hereto), at ¶ 12.  These data show that the median abnormal return that Dr. Bajaj used to determine the predicted drop in CA's stock price – an abnormal return of only negative 10.68%, which was based on the larger 92-miss sample – was highly conservative.

Thus, Dr. Bajaj's analysis conclusively demonstrates that CA's stock price would be statistically expected, in light

43

of an earnings-miss of such huge magnitude during the time period in question, to lose <u>at</u> <u>least</u> the approximately $330 million in value that Dr. Bajaj conservatively calculates, and likely substantially more.  First Bajaj Rept., ¶ 15.

       c.   The July 5, 2000 Drop in CA's Stock Price
           Demonstrates The Magnitude of Harm Caused
           <u>By CA's False Second-Quarter Disclosure</u>

      The resolution of the loss issue in this case can be accomplished expeditiously simply by reference to the impact of CA's middle-of-the-night disclosure, on July 3, 2000 (during the July 4th weekend) that CA expected to fall short of revenue and earnings estimates.  In that release, CA announced blamed the shortfall on "the fact that several large contracts that were expected to close in the final days of the quarter have been delayed," <u>see</u> PR Newswire, Press Release: CA Announces Preliminary First Quarter Results, July 3, 2000, at 1 (attached hereto as Exhibit O), and also stated that the "quarter was affected by weak European sales and softness in [CA's] mainframe business."  <u>Id.</u>  This revelation caused (a) so much selling volume that trading in CA stock was, for a period, halted by the New York Stock Exchange, and (b) CA's stock price to plummet more than %43 percent in a single day – a diminution in value in the *billions* of dollars.[29]

---

     [29]   As discussed below, Kumar's expert attributes this entire drop not to the news that CA had fallen short of its revenue and earnings numbers, but instead to his notion that the

As Dr. Bajaj points out, <u>see</u> First Bajaj Rept., ¶ 47, "The margin of CA's reported earnings miss for 1Q FY 2001 is comparable to the margin by which CA's EPS would have fallen short of expectations had it properly disclosed its revenues and earnings at the end of 2Q FY 2000." If the Court were to determine, based on the available evidence, that the loss that would have followed from a truthful disclosure of a miss in October 1999 would reasonably have approximated the drop in July 2000, that determination would resolve the issue of loss conclusively.

        d.    Professor Fischel's Analysis Suffers Fatal
               <u>Conceptual Flaws, and Should Be Rejected</u>

As Dr. Bajaj conclusively demonstrates in his Rebuttal Report, Professor Fischel's entire theory of what CA could "truthfully" have reported about the Q2 miss – without, he claims, any impact on the stock price – suffers two fatal errors. First, Professor Fischel's purportedly "truthful" hypothetical disclosure would, in his conception, have stated that CA had missed its Q2 number by a huge margin, but made up the difference in the period between quarter's end and the earnings announcement

_____

press release communicated some theretofore-unknown macroeconomic information concerning the state of the European economy. Needless to say, he cites no evidence for the proposition that this part of CA's press release constituted such a revelation to the markets. In any event, as discussed in greater detail below, Professor Fischel's overall analysis suffers from several glaring conceptual errors that render it valueless.

19 days later.  The contention that this would not have impacted CA's stock price, however, suffers a basic conceptual flaw: Professor Fischel apparently fails to account for the obvious consequence that, <u>even if the markets had accepted</u> CA's hypothetical "truthful" disclosure concerning the huge miss, and in effect counted the 35-cent shortfall as having been made up by a series of late-executed contracts, <u>the markets would then have treated these late-executed contracts as, effectively, Q2 revenue (as CA would be asking them to) and would effectively have backed them out of their revenue-tallies for Q3</u>.  That is, market analysts would not have accepted an effort by CA to count these late-executed Q2 revenues in <u>both Q2</u> (as Professor Fischel seeks credit for them) <u>and Q3</u>.  And so, if the markets had accepted CA's invitation to treat these late-executed contracts as Professor Fischel says CA could have asked, <u>then the result would have been that CA then would have missed its Q3 revenue and earnings projections by a huge margin</u>.  This is because CA did not earn enough money in Q3 to make the Q3 estimates, if the late-executed contracts are not counted as Q3 revenues.[30]

Based on that oversight alone, Professor Fischel's

---

[30]     Another obvious response from an equity analyst would have been that, if they were inclined to count CA's late-executed contracts, then in comparing CA to its competitors, they would need also to ascertain how many contracts the competitors booked in the post-quarter-end, pre-earnings-announcement period. <u>See</u> Bajaj Rebuttal, at ¶ 20.  By this metric, too, CA would have fallen short under any "truthful" comparison.

whole analysis falters, and his conclusions should be dismissed in their entirety.  Nonetheless, Professor Fischel's purportedly "truthful" hypothetical disclosure suffers from yet a second fatal flaw: it would require CA also to have asked the markets to include, in CA's Q2 revenue tally, revenues that CA had <u>already prematurely recognized in Q1</u> – in effect, CA would have had to reveal the 35-day month fraud itself and ask for credit (again, double-credit) for revenue from another quarter.  Since Professor Fischel's hypothetical "truthful" disclosure omits that admission, it merely constitutes, as Dr. Bajaj notes, the substitution of one materially fraudulent misrepresentation for another.  <u>See</u> Bajaj Rebuttal Rept., ¶ 36.  The courts cannot, in determining loss for sentencing purposes, countenance such a proposal.

Finally, Professor Fischel's overarching empirical claim – that the markets would have had no reaction to the disclosure that CA missed earnings and revenue numbers by a huge margin – founders on the shoals of history and common sense.  Attached hereto are the declarations of Melissa Eisenstat ("Eisenstat Decl.," Exhibit B), a highly respected equity analyst whose job it was to cover CA's stock during the period in question, and Jeff Miller ("Miller Affid.," Exhibit P, an institutional investor whose job it was to invest in technology-sector stocks.  Both state that Professor Fischel, in making his

predictions about what equity analysts and investors would have thought and done in response to a "truthful" Q2 disclosure, displays a lack of understanding of how the markets actually work.  See, e.g., Miller Affid., ¶ 11 (stating that "it is implausible to suggest that CA's stock price would not have been negatively affected by an announced shortfall of more than 50% against the consensus estimate for Q2 '00"), even in light of the disclosure that CA had made up the shortfall after quarter-end. Again, the Court may reject Professor Fischel's analysis on the contrary evidence of these actual-market players alone.

In addition to those declarations, the Court should take notice of the experience of CA's most closely analogous competitor, BMC Software, in early October 1999 – exactly the Q2 time frame in which Professor Fischel contends the markets would have shrugged off CA's disclosure of a 35-cent earnings miss.  On October 6, 1999, BMC pre-announced that it would be realizing earnings per share "at the low end of the range of analysts' estimates," and below the mean, i.e. below the consensus estimate.  CA should have been making a similar disclosure – only worse, in terms of the magnitude of the miss – at the same time, had Kumar not chosen to commit accounting fraud (again).  Indeed, BMC's announcement blamed "delays in closing large license transactions," exactly the same catalyst for the shortfall that Fischel says CA could "truthfully" have cited without stock-price

48

consequences.  In response to BMC's announcement, the markets reacted in a statistically significantly negative way, driving the BMC's stock price down more than 9% on a market-adjusted basis.  (This drop is virtually identical to the 10% diminution in value that Dr. Bajaj's analysis establishes CA's stock would have experienced following a truthful disclosure of CA's own Q2 miss.  Bajaj First Rept., ¶ 62) Thus, needless to say, the markets did not shrug off the BMC disclosure concerning an earnings shortfall in the manner in which Professor Fischel hypothesizes.  Professor Fischel simply omits the October 1999 BMC press release from his analysis, either willfully or through a flaw in his research.[31]

---

[31]     Kumar's sentencing submission states that "Professor Fischel found only three analogous announcements" to his hypothetical October 1999 "truthful" CA disclosure.  Given that CA's closest competitor announced virtually identical news at the identical time and had results identical to those predicted by Dr. Bajaj's model, Professor Fischel was apparently not looking very hard.  (Indeed, BMC's October 1999 miss was one of the misses cited in Dr. Bajaj's 92-contract sample, which Fischel claims to have reviewed.)  The three purportedly "analogous" disclosures Professor Fischel did find, moreover, do not remotely resemble the situation he hypothesizes for CA.  The one he cites first is Hewlett-Packard's reported miss of November 1996. Putting aside the fact that this announcement came in a completely different time frame, it is nonetheless the case that Professor Fischel appears to have simply misread the news article he cites for the proposition that "revenue for the quarter [at issue] declined because a 15 percent increase in orders had come too late to recognize."  See Fischel Report, at 8.  The article does not indicate that revenue "declined"; rather, it indicates that "revenue rose 12 percent."  Fischel's efforts to analogize Parametric Technology and Serena Software announcements are similarly inapposite, for the reasons discussed in Dr. Bajaj's Rebuttal at pp. 16-17.

Likewise, Professor Fischel's argument about Wall Street's hypothetical (non-)reaction to a Q2 miss does not fit the facts of CA's <u>own</u> experience, either.  Fischel dismisses the market reaction to CA's middle-of-the-night press release three quarters later on July 3, 2005.  That announcement of a CA earnings shortfall drove CA's stock price to nose-dive 43% in one day, following an initial trading halt.  Fischel claims, implausibly, that this announcement moved investors only because of what it said about future economic conditions, not because of the earnings miss itself or the 35-day month problem.  The July 3 release itself, however, demonstrates the selectivity of the defense reading.  The release stated:

> [CA] today reported that it expects financial results for the first quarter [of FY 2001] ending June 30, 2000 <u>to be less than Wall Street estimates</u>.  CA expects total contract value to be in the range of $1.25 billion to $1.3 billion.  This compares to the $1.22 billion recorded in the first quarter of last year.
>
> The quarter was affected by weak European sales and softness in its mainframe business. <u>CA cited the fact that several large contracts that were expected to close in the final days of the quarter have been delayed</u>.

PR Newswire, Press Release: "Computer Associates Announces Preliminary First Quarter Results," July 3, 2000.  Fischel says that what the markets focused on here was some previously undisclosed news about changes in macroeconomic conditions in Europe – not the fact that CA had come up short in revenue and

50

earnings.   This is wrong on two counts: first, European economic conditions were known to the world before Kumar and CA deigned to reveal them at midnight on July 3, so that could not have been what was "new" in CA's announcement.   Second, the markets did not focus primarily on CA's pronouncement about Europe; rather, they focused on the miss itself and the excuse that several large contracts had not come in.   See, e.g., Laura Johannes, <u>Computer Associates Says Latest Results Will Be Hurt By Delays in Big Contracts</u>, Wall St. Journal, July 5, 2000 (copy attached as Exhibit Q hereto).   These articles made plain that the "European weakness" was not revealed for the first time by CA on July 3, but had been a focus through the entire first half of the calendar year.   See <u>id.</u> ("Computer Associates <u>has had a rough year, marred by concerns over sluggish European operations</u> . . . and a shareholder suit over large stock awards granted to executives."); <u>see</u> <u>also</u> BMC Software Press Release, BMC Software Announces Preliminary Financial Results, October 6, 1999 (mentioning that BMC's miss was attributable to delays in closing contracts "primarily in Europe").[32]

─────────────────────

[32]     Furthermore, Professor Fischel's read of what mattered in the July 3 release is undermined by another CA press release issued just two weeks later.   On July 20, CA announced final results and stated that it did <u>not</u> believe that its economic landscape had changed for the long-term.   "Although this was a difficult quarter for CA, <u>we have not changed our view of the long-term prospects for the company</u> . . . ."   Press Release, Computer Associates Reports First Quarter Financial Results, July 20, 2000, at 1 (attached hereto as Exhibit S.   Kumar further

Lastly, Kumar argues at great length that since his revenue and earnings-manipulations did not affect cash flows, they would not have affected the stock price. Kumar Sent. Mem., at 73 ("Indeed, critically, the 35-day month practice *had no impact whatsoever on CA's reported cash flow from operations*.") (emphasis in original); <u>see</u> <u>also</u> <u>id.</u> ("[T]here was no distortion of any kind of the cash flow statements."). Kumar's premise, however – that fraudulent misreporting that does not affect the cash flow statement is likely to be ignored by Wall Street – is frivolous. The recent WorldCom fraud, for instance, "primarily involved the treating of hundreds of millions of dollars of what had always been recorded [as] operating costs [instead] as capital expenditures for several fiscal quarters." <u>Ebbers</u>, 458 F.3d at 112. Thus WorldCom, too, involved revenue-shifting that did not affect the cash-flow statement.[33] Nonetheless, the Second Circuit concurred that the "$100 million threshold" representing the highest fraud-loss table category in the

---

stated in that release that "we are well positioned fundamentally and look forward to the opportunities that exist for the remainder of Fiscal Year 2001." <u>Id.</u> Needless to say, contrary to what Professor Fischel's theory would hold, this rosy statement of CA's fundamental economic outlook did <u>not</u> cause the stock price to rebound to pre-July 3 levels.

[33]   Shifting ordinary expenses (which are recognized, for accrual-accounting purposes, in the current period) into the capital-expenditure column (which are amortized over time) impacted only the timing of recognition of revenue and expenses, not cash.

applicable Guidelines manual in that case was "easily surpassed under any calculation."  Id. at 128.

Therefore, in summary, starting with a $330 million figure, see First Bajaj Rept., at ¶ 15, and adjusting that for the fact that his calculation includes only 56% of the traded shares during the period of his analysis (because he considered only investors who submitted restitution claims), the loss in this case clearly exceeds $400,000,000.  Indeed, the loss should also be increased, as noted above, to reflect the facts that (a) the fraud spanned a longer time period (over a decade, by Kumar's admission); (b) incorporated additional damages (not calculated by Dr. Bajaj) resulting from the disclosure of the 35-day month practice itself from 2001 - 2004; and (c) CA engaged in sham-revenue transactions, as well as revenue-shifting.  Under any reasonable calculation, the loss exceeds $400 million.

2.   Intended Loss

Even if Professor Fischel's radical, erroneous conclusions were to be accepted – which they clearly should not be – the loss for Guidelines purposes should still be calculated to be in excess of $400,000,000.  This is because the Guidelines direct that applicable fraud loss be the greater of the actual loss or the intended loss.  U.S.S.G. § 2B1.1 cmt. n.3(A).  Here, even assuming, arguendo, no actual loss, it still cannot seriously be disputed that Kumar, Richards and others engaged in

53

the 35-day month practice for the intended purpose of propping up CA's stock against the stock-price losses that they believed would flow from an earnings miss of such vast proportions. Because the defendants <u>intended</u> to prop up artificially the price of CA stock, and because any meaningful inflation would exceed $400 million in the aggregate, the PSR calculation is correct.

      C.   <u>Kumar Was An Organizer or Leader Under U.S.S.G. § 3B1.1</u>

      Kumar argues, <u>see</u> Kumar Sent. Mem., at 86 n.30, that he was not an organizer or leader of the fraud, and therefore qualifies only for a three-point role enhancement, not the four points that the PSR ascribes.  Kumar bases this argument on the contention that he "did not conceive the fraud, but rather joined it in progress, and then put an end to it." <u>Id.</u>  The argument is without merit.

      Kumar's effort to blame his predecessor for conceiving the fraud is inapposite.  The leadership role enhancement can apply, by its own terms, to more than one individual.  <u>See</u> U.S.S.G. § 3B1.1 cmt. n.4 ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.").  Here, while the practice may have pre-dated Kumar's ascent to the position of President, Kumar nonetheless presided over the 35-day month practice as the highest-ranking officer involved for years, making the final decision himself, as set forth above, as to whether to close the

54

quarter or keep it open for more backdated deals.  In doing so, he supervised multiple individuals in the finance, sales, and accounting departments.  This primary "exercise of decision making authority," id., particularly in the period after the 1997 adoption of SOP 97-2 made the 35-day month even more clearly illegal, easily qualifies Kumar for the 4-level enhancement. See, e.g., United States v. Ebbers, 458 F.3d 110, 129 (2d Cir. 2006) (noting that Ebbers merited substantially higher sentence under "reasonableness" analysis because each other defendant "was a subordinate of Ebbers"); United States v. Wisniewski, 121 F.3d 54, 58 (2d Cir. 1997) (vacating sentence where district court declined to assess leadership role adjustment for defendant who owned the auto dealership, was an "active participant" in the money laundering scheme, was "ultimately responsible for hiring and supervising" his co-conspirators, and was "a principal beneficiary" of the scheme); United States v. Duncan, 42 F.3d 97, 105-06 (2d Cir. 1994) (affirming four-level adjustment where business's highest officer knew of, implicitly approved of, and profited from conduct at issue).

     D.    Defendant Kumar Does Not Qualify for the Acceptance of Responsibility Reduction of U.S.S.G. § 3E1.1

Astoundingly, for a defendant who purports to accept responsibility for years of lies, false denials, cover stories and minimizations, Kumar actually persists in such conduct even to this day before an arm of this Court – the United States

Probation Department.  In response to the Pre-Sentence Report ("PSR") in his case, Kumar filed a letter to U.S. Probation Officer Michelle Espinoza dated August 11, 2006 (the "Kumar 8/11 Lett."), in which he asserted a long series of false and frivolous denials of relevant (and, in several cases, charged) conduct.  Given that he persists in such falsity, the acceptance of responsibility reduction of U.S.S.G. § 3E1.1 is not merited in his case.[34]

The acceptance credit is an affirmative benefit provided to those who "clearly demonstrate" acceptance of responsibility.  U.S.S.G. § 3E1.1.  "A defendant who enters a guilty plea is not entitled to an adjustment under [§ 3E1.1] as a matter of right."  Id., cmt. n.3. The guidelines commentary identifies, as the first criterion for demonstrating acceptance, "truthfully admitting the conduct comprising the offense(s) of conviction, and <u>truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct)</u>."  Id., cmt. n.1(a) (emphasis added).  "[A] defendant who falsely denies, or frivolously contests, relevant conduct that the court determines

---

[34]    In the event the 2003 sentencing guidelines are applied, the inclusion or exclusion of this reduction will not affect the guidelines calculation, and the issue need not be resolved if the Court so chooses.  If, however, the 1999 guidelines are applied, the determination regarding 3E1.1 will affect the sentencing range.

to be true has acted in a manner inconsistent with acceptance of responsibility." id.; see also United States v. Conde, 178 F.3d 616, 621 (2d Cir. 1999) ("Plainly, to be eligible for an acceptance-of-responsibility adjustment in offense level, a defendant is required to be truthful about his own conduct.").[35]

Of course, other factors aside from the false denial of relevant conduct also affect the determination whether acceptance credit is merited.  See United States v. Ruggiero, 100 F.3d 284, 295 (2d Cir. 1996).  Nonetheless, defendant Kumar's sentence calculation begins with a strong presumption against his receiving credit for acceptance, in light of his years-long, multi-pronged effort to obstruct the government investigations in this case.  See U.S.S.G. § 3E1.1, cmt. n.4 ("Conduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct".); see also United States v. Harris, 38 F.3d 95, 99 (2d Cir. 1994) (pre-plea obstruction supports denial of acceptance reduction).  This is especially true where, as here, a defendant's false denials persist up to the date of sentencing.

Here, Kumar falsely denies several core instances of

_____

[35]     Relevant conduct, as the Probation Department is aware, is to be established (if in controversy) by the preponderance-of-the-evidence standard at sentencing.  E.g., United States v. McLeod, 251 F.3d 78, 82 (2d Cir. 2001).

relevant – and in some cases, charged – conduct.  These instances include:

        *The Sham Contract With Consortio.*   In response to paragraph 38 of the Pre-Sentence Report ("PSR"), Kumar "denies that he 'instructed the senior Computer Associates executive, in violation of accounting rules, to advise the customer [Consortio] that it would not be a problem if the payments were not made.'" This denial relates to charged conduct.  <u>See</u> Ind., ¶¶ 42-43 (charging that Kumar knowingly directed CA to enter into a sham $44.5 million license agreement for the purpose of meeting CA's third-quarter consensus estimate).  Contrary to his denial, Kumar did instruct the senior executive to inform Consortio's CEO not to worry if he couldn't pay.  Moreover, Kumar's hyper-technical denial of the statement in question implies, falsely, that he lacked knowledge of the sham nature of the Consortio transaction as a whole.  The evidence demonstrates beyond serious dispute, however, that Kumar did knowingly direct CA's entry into the sham transaction with Consortio for the purpose of inflating CA's reported quarterly revenues.[36]  The government is prepared, if the Court deems it necessary and appropriate, to establish

---

[36]    This fact, of course, undermines Kumar's effort to portray his fraudulent conduct as having encompassed only the <u>shifting</u> of revenue into prior quarters, as opposed to the fabrication of revenue from sham transactions lacking in economic substance.  (Several other transactions, including the EMS deal that is the subject of Kumar's later witness-tampering and bribery, <u>see</u> Ind. ¶¶ 60-62, also fall into this latter category.)

Kumar's knowledge and direction of the sham Consortio contract at a <u>Fatico</u> hearing.

*The Side Agreement With Allstate.* In response to PSR ¶ 51, Kumar falsely denies that he concealed his "side" agreement with an Allstate executive from CA's accounting personnel.  In truth, however, the evidence establishes that Kumar reached an oral agreement with the Allstate executive providing for a potential credit to Allstate of up to $14 million.  Despite the fact that CA's internal policies prohibited such secret agreements on penalty of termination, Kumar concealed the side agreement from CA personnel, including his CFO and head of financial reporting.  The side agreement was discovered only when Allstate revealed it.  As Kumar knew and believed, the side agreement would, if disclosed initially, have precluded CA from recognizing part or all of the $14 million in revenue that stood to be refunded under the potential credit, and the recognition of such revenue was therefore in violation of accounting rules.[37]

---

[37]     Kumar's assertion that the Allstate side letter had no revenue-recognition impact is frivolous.  Kumar apparently bases this claim on the fact that CA's finance and accounting departments, when they later learned of the side letter, did not force CA to restate its financials for the then-closed quarter in which the revenue had initially been booked.  The analysis governing the decision whether to restate <u>prior</u> financials under the SEC's SAB 99 "materiality" standard, however, is an entirely different analysis from whether the revenue should have been booked in the first place.  It cannot seriously be disputed (although Kumar appears to dispute it anyway) that, as an *ex ante* matter, the $14 million potential credit undermined the "collectibility is probable" criterion of SOP 97-2's requirements

59

*Tampering With Evidence on His Laptop.*   In responding to PSR ¶ 71, Kumar falsely denies eradicating data from his IBM Thinkpad's hard-drive and tampering with the computer's internal clock to mask the date on which this tampering occurred.   He cites no forensic support for his denials.   Rather, he simply asserts (four times in a single paragraph) that he transferred all files from the Thinkpad to his new computer before he wiped the laptop's hard-drive.[38]   This claim constitutes self-serving, forensically unverifiable hearsay from a defendant who has now been convicted of orchestrating a massive scheme to obstruct justice and giving hours' worth of false statements to the

_____

for software revenue recognition, and therefore it did have a revenue-recognition impact.

        Therefore, Kumar's request, in response to PSR ¶ 49, that the PSR "note that entering into side letters is not a per se violation of SOP 97-2" makes no sense, in light of the fact that this undisclosed side agreement precluded the recognition of part or all of the $14 million in revenue under SOP 97-2, and therefore was indeed a clear violation of SOP 97-2.   The government objects to Kumar's request for this extraneous information, given that Kumar obviously intends it to create the misleading implication that his conduct did not violate accounting rules, when in fact it did.

        [38]   See Kumar 8/11 Lett., at ¶ 71 ("Mr. Kumar's files were first transferred to his new computer"; "All of his files were copied from the old laptop onto the new computer"; "Mr. Kumar was one of many employees [whose] computers underwent the same standard procedure whereby all files were transferred and the hard drives then wiped clean"; "After Mr. Kumar's files had been transferred . . . .").   There is no forensic evidence to support Kumar's contention that he made this transfer, despite Kumar's having had a Fed. R. Crim. P. 16 obligation to provide such forensic evidence in discovery, if it existed.

S.E.C., F.B.I. and Department of Justice in a proffer session.[39]
Likewise, Kumar provides no evidence whatsoever to rebut the
government's forensic proof – in the reports of David Burg of PwC
– that he tampered with the laptop's internal clock during the
installation of Linux in October 2003, shortly after the CA Audit
Committee's forensic investigators requested that he provide his
computer for imaging.  (Kumar's response to the overwhelming
forensic evidence of the clock-change is his contention that it
would make no sense for him to alter the clock during an October
Linux installation if he had already wiped his computer in April;
but again, Kumar has no forensic evidence to establish that the
April wiping occurred.)  As indicated in the two Burg reports and
the government's 404(b) submissions, the forensic evidence of
Kumar's clock-tampering is simply incontrovertible.

    *Reserve Manipulation.*  In response to PSR ¶ 48, Kumar
requests that the "vague and conclusory" allegations of reserve
manipulation be removed.  This request should be denied because
(a) the allegations are demonstrably true, and (b) the reserve
manipulation is clearly relevant conduct.  Multiple cooperating
witnesses from the finance and accounting departments have stated

---

[39]    Any assessment of Kumar's credibility should also take
into account the fact that Kumar appears, however half-heartedly,
to now concede that he orchestrated the witness-tampering scheme
underlying defendant Thomas Bennett's guilty plea – namely, by
sending his senior executives to Hawaii to bribe a witness to
prevent that individual from reporting the fraudulent CA-EMS
transaction to the government.  See Kumar Lett., at ¶ 65.

that Kumar directed the manipulation of reserve accounts to manage earnings. (The government provided Kumar a specific example of such fraudulent adjustments in discovery.) Moreover, the conduct is relevant under U.S.S.G. § 1B1.3 because it was carried out for the same purpose as the 35-day month (<u>i.e.</u>, to make quarterly estimates), by the same group of co-conspirators, in roughly the same time frame. As for the "array of complex legal and factual issues" and "host of unspecified accounting rules" that Kumar invokes, there is simply nothing complex or controversial about the notion that altering reserve accounts with no factual support, and for the express purpose of manipulating earnings, is improper.[40]

E.   <u>Resulting Sentencing Range</u>

Given the above arguments, the 2005-Guidelines calculation set forth in the Pre-Sentence Report, <u>see</u> PSR, ¶ 120 through 144, is correct (with the exception of the disputed acceptance-of-responsibility reduction, but that dispute does not

----

[40]   It is also inconsistent with the acceptance of responsibility that, in a securities fraud case in which "materiality" of the false statements is an element of the crime, Kumar puts forward so frivolous an argument that the fraud had no impact on CA's stock price. Kumar carried out the 35-day month practice <u>because</u> he knew, from his regular dealings with analysts and institutional investors, that an earnings miss of even a fraction of the magnitude of the <u>35-cent</u> miss of Q2 would have had a disastrous impact on CA's stock. For him to deny this, especially on the basis of as weakly reasoned an argument as that which his expert puts forward, shows a total lack of remorse for the impact of his conduct.

affect the sentencing range).  Based on a resulting offense level

of 51 for both defendants, and a criminal history category of

Category I for both, the applicable advisory guidelines range is

life.  If, however, the Court determines that the use of the 2005

guidelines violates the ex post facto clause, then the

appropriate calculation is as follows for defendant Kumar:

```
Base Offense Level (2F1.1(a)):                     6
Loss Exceeds $80,000,000 (2F1.1(b)(1)(S)):       +18
More than Minimal Planning (2F1.1(b)(2)):        + 2
Mass Marketing (2F1.1(b)(3)):                    + 2
Sophisticated Means (2F1.1(b)(5)):               + 2
Organizer/Leadership Role (3B1.1(a)):            + 4
Obstructing or Impeding Justice (3C1.1):         + 2
Acceptance of Responsibility (3E1.1):              0
Total Offense Level:                              36
```

In Criminal History Category I, offense level 36 results in n

guidelines range of 188 - 235 months under the 1998 guidelines

for Kumar.  For defendant Richards, with the inclusion of a two-

level reduction for acceptance of responsibility,[41] an adjusted

offense level of 34 results in a sentencing range of 151 - 188

months.

The government believes that, while a sentence

providing for a substantial period of incarceration is required

to comport with Congress's policy dictates and the requirements

---

[41]     The government does not contest the acceptance
reduction for defendant Richards because, while he engages in
some minimization, he does not engage in the outright, false
denial of several instances of conduct as Kumar does (with, for
example, the Consortio and EMS revenue-swap deals, the laptop
tampering and the Allstate side letter).

of 18 U.S.C. § 3553(a), it is nonetheless the case that a
sentence below the guidelines range of life imprisonment
(applying the 2005 guidelines) would constitute a "reasonable"
sentence within the meaning of United States v. Crosby, 397 F.3d
103 (2d Cir. 2005).  The Guidelines must, however, constitute a
"key component" of the sentence ultimately fashioned.  See United
States v. Ebbers, 458 F.3d 110, 129 ("Congress has directed that
the Guidelines be a key component of sentence determination
. . . . [T]he Guidelines reflect Congress' judgment as to the
appropriate national policy for such crimes [as securities
fraud].").

IV.  Defendants' Downward Departure Motions

       The defendants make several applications for a downward
departure.  These motions fail to satisfy the applicable law,
both individually and in the aggregate.

       A.   Lauersen/Jackson

              Both defendants seek a downward departure to mitigate
the alleged "cumulative effects" of overlapping sentencing
enhancements, pursuant to United States v. Lauersen, 348 F.3d 329
(2d Cir. 2003), and United States v. Jackson, 346 F.3d 22 (2d.
Cir. 2003).

              On the motion for rehearing, the Second Circuit panel
that decided Lauersen and Jackson reiterated its original
position that:

                                   64

> when the addition of <u>substantially</u>
> <u>overlapping</u> <u>enhancements</u> results in a
> significant increase in the sentencing range
> minimum (as it does at the higher end of the
> sentencing table), a departure may be
> considered.  What is present to a degree not
> adequately considered by the Commission is
> the <u>combined</u> <u>effect</u> of the aggregation of the
> substantially overlapping enhancements and
> the large increase in the sentencing range
> minimum at the higher end of the sentencing
> table.

<u>United States</u> v. <u>Lauersen</u>, 362 F.3d 160, 164 (2d. Cir. 2004)

(emphasis in original).  The Second Circuit, however, emphasized

that "not many combinations of enhancements will be substantially

overlapping."  <u>Id.</u> at 167.  For example, the court made clear

that enhancements for leadership role and abuse of trust do

<u>not</u> substantially overlap with each other.  <u>Id.</u> at 168 n.12.

    The Government respectfully submits that whereas the

enhancements applicable in <u>Lauersen</u> and <u>Jackson</u> may have been

"substantially overlapping" in a manner not foreseen by the

United States Sentencing Commission, the same cannot be said for

the enhancements applicable to public-company executives

convicted of securities fraud.  In the aftermath of an outbreak

of serious public frauds, Congress and the Sentencing Commission

expressly added – in the same fell swoop – a series of

enhancements intended to steepen the penalties for accounting

frauds committed at public companies.  <u>See, e.g.</u>, S. Rep. No.

107-146, at *11 (2002) (stating that a major component of the

proposed Sarbanes-Oxley legislation was to "effectively prosecute

65

and punish those who defraud investors" and "provid[e] for
criminal penalties tough enough to make them think twice before
defrauding the public"); id., at *13 (bill would "require the
[Sentencing] Commission to review guideline offense levels and
enhancements under U.S.S.G. § 2B1.1, relating to fraud").  The
measures subsequently adopted by the Sentencing Commission
included the expansion of the loss table to include losses in the
hundreds of millions of dollars, see U.S.S.G. § 2B1.1(b)(1)(P)
(losses exceeding $400 million); and other additional
enhancements also in § 2B1.1, including Section 2B1.1(b)(2)(C)
(more than 250 victims); and Section 2B1.1(b)(15)(A) (enhancement
for violation of securities law committed by an officer or
director of a public company).  It would be an insult to the
intelligence of Congress and the Sentencing Commission to suggest
that these enhancements, adopted at the same time and in the same
exact guideline, overlap in a manner unforeseen to the
Commission.

        Recognizing as much, the sentencing courts in two
recent public-company securities fraud cases denied the
Lauersen/Jackson motions brought by the former CEOs of WorldCom
and Adelphia.  Cf. 18 U.S.C. § 3553(a)(6) (sentencing courts must
consider "the need to avoid unwarranted sentence disparities
among defendants with similar records who have been found guilty
of similar conduct").  In the Adelphia case, the Honorable

66

Leonard B. Sand sentenced the lead defendant, John Rigas (who was 80 years old) to 15 years' incarceration and his son, Timothy, to 20 years after denying their Lauersen/Jackson motions.  Likewise, in the WorldCom case, the Honorable Barbara S. Jones denied former CEO Bernard Ebbers' Lauersen/Jackson motion and sentenced Ebbers to 25 years' imprisonment (again, for a defendant of Ebbers' age, likely a de facto life sentence).  These cases obviously recognize that the Sentencing Commission adequately considered the degree to which these public-company accounting fraud enhancements may overlap, and intended that they apply as written nonetheless.

    B.   Family Circumstances

Defendant Richards seeks a downward departure, or, in the alternative, a non-Guidelines sentence, on the basis of his family circumstances.  Specifically, Richards argues that a lesser sentence is appropriate because he "provides the sole financial support for his family," and his children are "particularly close and devoted to their father." Richards Sent. Mem. at 16-17.  The government respectfully submits that a Guidelines sentence in this case is reasonable and that, for the reasons set forth below, the defendant's motion should be denied.

Pursuant to the Sentencing Guidelines, "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted."  U.S.S.G. § 5H1.6.  The

Sentencing Commission expected that harm to caretaking relationships and a loss of financial support would be "ordinarily incident" to an incarceratory sentence. Id., App. 1(B)(ii). Accordingly, family ties and responsibilities can serve as the basis for a downward departure only where the harm caused by incarceration "substantially exceeds" the harm ordinarily incident when, for example, a parent is taken away from his or her children. Id.

         The Second Circuit has recognized as much and stated that disruption of family responsibilities is a regular outcome of criminal sentencing, and thus not ordinarily appropriate as a basis for departure:

> The Sentencing Commission understood that many defendants shoulder responsibilities to their families, their employers, and their communities. Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration. The Commission made this clear by explaining that such disruption of the defendant's exercise of responsibility, as a general matter, should not be cause for downward departure.

United States v. Johnson, 964 F.2d 124, 128 (2d Cir. 1992). The Second Circuit has thus generally permitted downward departures on the basis of family circumstances only when those circumstances are truly "extraordinary." United States v. Galante, 111 F.3d 1029, 1033 (2d Cir. 1997).

         In United States v. Faria, 161 F.3d 761, 762-63 (2d

68

Cir. 1998) for example, the Second Circuit reversed the district court's grant of a downward departure where the defendant had three minor children, because the children lived with their mother.  The Court observed that it had approved such departures only where family members were "uniquely dependent" upon a defendant for financial or emotional support.  Id. at 762.  The court recognized "the hardship" that the defendant's incarceration "undoubtedly" would cause his three young children, but nonetheless found that mere absence of a parent fell "well short of what is required."  Id. at 763.  See also United States v. Madrigal, 331 F.3d 258, 260-61 (2d Cir. 2003) (vacating downward departure granted on basis of family circumstances where, although the defendant was the mother of six, her absence had caused emotional difficulties for her children, and the district court regarded her as "better able to care for the children then any of the other available caretakers," there were in fact other members of the extended family available to take care of the children).

The present facts cannot justify a downward departure on the basis of family circumstances.  Although the defendant may in the past have provided financial assistance to his wife and children, he has parents and an adult brother who can assume that role, all of whom live in New Zealand.  In addition, according to the PSR, Mr. Richards' wife, a former CA manager, intends to

69

relocate the family to live with her parents in Australia, and is
"not opposed to working."  Richards PSR at 159. Although the
defendant is of undoubted importance to his wife and children,
they cannot be said to be "uniquely dependent" on him. See United
States v. Selioutsky, 409 F.3d 114, 119 (2d Cir. 2005) (requiring
further findings from the district court regarding potential for
defendant's brother to provide financial assistance).

The defendant's family circumstances are not
extraordinary, and his motion for a sentence below the applicable
Guidelines range on this basis should be denied.

C.   Charitable Works

Kumar additionally urges the Court to downwardly depart
or to impose a non-Guidelines sentence on the basis of "Mr.
Kumar's remarkable history of charitable contributions and
community service." Kumar Sent. Mem. at 89.  Although Kumar sets
forth an admirable list of charitable activities, his motion for
a downward departure on this ground is unsupported by the law.

The Guidelines make clear that "civic, charitable or
public service; employment-related contributions; and similar
prior good works are not ordinarily relevant in determining
whether a sentence should be outside the applicable guideline
range." U.S.S.G. § 5H1.11.  "Accordingly, prior charitable
works, however commendable and extensive, constitute a
discouraged factor with regard to the decision to downwardly

70

depart from a guideline range . . . ." United States v. Barbera,
2004 WL 2403868, at *11 (S.D.N.Y. Oct. 27, 2004).  Because a
defendant's charitable works are treated as a "discouraged" basis
for a downward departure, a sentencing court "should depart only
if the factor is present to an exceptional degree or in some
other way makes the case different from the ordinary case where
the factor is present." Koon v. United States, 518 U.S. 81, 96
(1996).

        Courts generally recognize that the charitable and
civic deeds of affluent or professionally successful individuals,
such as Mr. Kumar, do not normally render their good works
sufficiently unusual or exceptional to warrant a downward
departure.  See, e.g., United States v. Acevedo, 229 F.3d 350,
356 (2d. Cir. 2000)(declining to review the district court's
denial of a motion to departure based on the defendant's "good
work," which was "not so exceptional as to warrant a departure
from the heartland situations covered by the Guidelines"); United
States v. Rioux, 97 F.3d 648, 663 (2d Cir. 1996)(affirming
departure based on a combination of the defendant's good deeds
and the fact that he suffered from kidney and bone disease).

        In considering a request for a downward departure, the
issue is not whether the defendant engaged in charitable works –
Mr. Kumar certainly did – "but whether those works were
exceptional enough to overcome the judgment of the Sentencing

Commission that a record of good works is a discouraged basis for departure." United States v. Thurston, 358 F.2d 51, 79 (1st Cir. 2004), vacated on other grounds, 125 S. Ct. 984 (2005). As one court noted in the context of white-collar crime, because civic involvement is not unusual for high-ranking members of the business community, courts are expected to view evidence of such involvement "with the skepticism of experience." United States v. McClatchey, 316 F.3d 1122, 1135 (10th Cir. 2003).

Accordingly, the defendant's involvement in civic organizations, and his contributions to various charities, simply do not warrant an adjustment from the advisory Guidelines range, particularly in view of his professional success and considerable assets, as well as the nature of his offense and his violation of the public's trust. Mr. Kumar is to be commended for his gifts of time and money, but it is hardly unique for a corporate executive to make substantial financial contributions. As the First Circuit has noted, "business leaders are often expected, by virtue of their positions, to engage in civic and charitable activities. Those who donate large sums because they can should not gain an advantage over those who do not make such donations because they cannot." Thurston, 358 F.3d at 80. See also, United States v. Kohlbach, 38 F.3d 832, 838 (6th Cir. 1994)("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes involving high-ranking corporate executives . . . to find

72

that a defendant was involved as a leader in community charities, civic organizations, and church efforts.") (emphasis in original); <u>United States v. Haversat</u>, 22 F.3d 790, 796 (8th Cir. 1994) (noting that high-level business executives "enjoy sufficient income and community status so that they have the opportunities to engage in charitable and benevolent activities"); <u>United States v. Scheiner</u>, 873 F.Supp. 927, 934 (E.D.Pa. 1995) (noting that "an overly lenient sentence may be seen by those very individuals in the community the defendant sought to help as an indication that the law distinguishes between defendants of different racial and socioeconomic background").

Similarly, the defendant's letters of reference from friends, family, and charitable organizations do not warrant a downward departure or non-guidelines sentence. These letters reflect not only charitable giving, but acts of generosity and kindness by Mr. Kumar to friends and employees in times of need. These good works exhibit the kindness that one would hope to see from decent persons in all walks of life, especially those with the time and disposable resources of Mr. Kumar. As the Tenth Circuit noted, "excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her."

73

McClatchey, 316 F.3d at 1135; see also Barbera, 2004 WL 2403868
at *12 (same).

For these reasons, the defendant's prior good works and
standing in the community, while laudable, do not warrant a
departure below the advisory Guidelines.

D.    Alienage Status and Deportation

Defendant Richards, a citizen of New Zealand, seeks a
downward departure or a non-Guidelines sentence on the grounds
that he will be deported upon the completion of his sentence.
Specifically, he urges the court that because his "status as a
deportable alien automatically entails a more restrictive status
of confinement within the Bureau of Prisons than a United States
citizen," he should be given a more lenient sentence.  Richards
Sent. Mem. at 1.  The Second Circuit disagrees.

In United States v. Restrepo, 999 F.2d 640 (2d Cir.
1993), the Second Circuit held that a district court abused its
discretion in granting a downward departure on the grounds that
(a) the defendant's alienage rendered him ineligible to serve his
sentence in a minimum security facility or to serve the last 10%
of his sentence in a halfway house; (b) the defendant would
likely serve an additional period of detention pending
deportation following the completion of his sentence; and (c) the
defendant's status as an alien rendered him deportable, a

74

punishment equivalent to "banishment from the United States and separation from family." Id. at 642-44.

The Second Circuit reversed the district court's sentencing decision, holding that, although a defendant's alienage is a factor that can be considered in assessing the appropriateness of a departure, it is "not ordinarily relevant," and in order to justify a departure a court must identify factors occasioned by the defendant's immigration status that are specifically relevant to sentencing and that have not been taken into account by the sentencing guidelines. Id. at 644. Moreover, the Second Circuit specifically considered the grounds for departure now advanced by Richards and held that none warrants a downward departure.

The Restrepo court held that BOP policy with regard to aliens' assignment and eligibility for programs within the BOP system constitutes "an inappropriate basis for departure from the imprisonment range prescribed by the Guidelines." Id. at 645. The court further noted:

> it is difficult to believe that the Commission was
> not conscious that a large number of defendants
> sentenced in the federal courts are aliens. . . .
> [A]s a basis for a downward departure,
> deportability is at best a factor at war with
> itself. On the one hand, there is no doubt that
> in some cases deportation may cause substantial
> hardship. On the other hand, the district court's
> reduction of the prison term in recognition of
> those hardships does not eliminate the hardships
> or make the effects less harsh; rather, it
> advances the day when deportation will occur. It

75

> is difficult to see that a condition that not
> alleviated but rather hastened by the sentencing
> departure is a rational ground for departure.  It
> is also noteworthy that despite the fact that
> hastening deportation would seem to exacerbate
> rather than remedy its harshness, a defendant who
> seeks such a departure apparently prefers that
> result to the longer sentence.  If swifter
> deportation is the defendant's preference, it is
> perhaps erroneous to view deportation as so harsh
> as to warrant a reduction in the period of
> imprisonment prescribed by the Guidelines.
> Indeed, the district court's rationale, carried to
> its logical conclusion, would support a decision
> not to impose any term of imprisonment whatsoever.

Id. at 647.  See also United States v. Rivera, 893 F. Supp. 1238,

1244 (S.D.N.Y. 1995) (rejecting downward departure application

based on collateral consequences on the grounds that "[t]he

Second Circuit has ruled that such collateral consequences . . .

do not serve as a valid basis for a downward departure").

Restrepo clearly remains the law in the Second Circuit

after Koon v. United States, 518 U.S. 81, 96 (1996).  For

example, in United States v. Tejeda, 146 F.3d 84, 87 (2d Cir.

1998), the Second Circuit relied on Restrepo and reversed a

district court's decision to grant a downward departure based on

the possibility that the defendant would be deported upon

completion of his sentence.  Similarly, as Judge Lynch recently

held, "[w]hether Koon undermines Restrepo is for the Second

Circuit to decide; this Court remains bound its authority."

United States v. Mohammed, 315 F.Supp.2d 354, 367 (S.D.N.Y.

2003).  See also Tsang v. United States, No. 97 Civ. 1886 (CSH),

1997 WL 630182 (S.D.N.Y. Oct. 9, 1997) (recognizing binding authority of Restrepo despite circuit conflict and holding that "the law of this circuit is squarely opposed" to the proposition that ineligibility for prison programs due to a defendant's alienage provides a basis for a downward departure) and United States v. Gallo-Lopez, 931 F.Supp. 146, 149 (N.D.N.Y. 1996) (holding, post-Koon, that "[b]ecause petitioner has not alleged any consequences of his alienage different from those the Second Circuit addressed in Restrepo, he was not entitled to a downward departure from the Sentencing Guidelines on the basis of his deportable alien status")

Accordingly, the defendant's application for a downward departure based on the collateral consequences of his alienage should be rejected.

V.   Upward Departure Motion: Obstruction of Justice

If the Court determines that using the 2005 Guidelines would violate the ex post facto clause in this case, the government may seek an upward departure for defendant Kumar on the basis that the mere two-point obstruction enhancement vastly understates the severity of the years-long, multi-faceted obstruction scheme over which he presided.  See generally U.S.S.G. § 5K2.0(a)(1) (upward departures available if there exists an aggravating circumstance present "to a degree[] not adequately taken into account by the Sentencing Commission").  In

77

United States v. Ventura, 146 F.3d 91, 96-98 (2d Cir. 1998), for example, the Second Circuit affirmed an upward departure imposed by the district court in addition to the Section 3C1.1 obstruction enhancement, where the "defendant obstructed justice more than once through wholly discrete and unrelated acts."  This surely describes defendant Kumar's actions as well.  If, however, the 2005 Guidelines are applied, this issue should be taken into account solely in connection with the Section 3553(a)/Crosby reasonableness analysis.

VI.  Section 3553(a) Factors

As noted above, the sentencing guidelines' enhancements applicable to accounting and securities frauds reflect Congress's, and the Sentencing Commission's, considered policy judgment regarding the need for just punishment in such cases. 18 U.S.C. § 3553(a)(2)(A); Ebbers, 458 F.3d at 129.  Corporate executives who defraud investors have the capacity to cause severe social harm, diminishing individual Americans' efforts to save for retirement and damaging the reputation for integrity of the U.S. financial markets throughout the world.  In enacting Sarbanes-Oxley in 2002, Congress demonstrated – as clearly as it could – its belief that the then-existing sentencing scheme was inadequate to provide appropriate punishment for large-company, public accounting frauds in light of the massive societal harms involved.

78

Moreover, given the massive salaries, bonuses, and perquisites of position lavished on public-company executives, there exists (and will always continue to exist) a powerful incentive for those in the executive suite to seek to conceal shortfalls in performance through earnings manipulation. Moreover, these earnings manipulations are, by their very nature, opaque to investors and regulators and thus exceptionally difficult detect and prosecute.  Thus, the sentencing court's obligation to "afford adequate deterrence" in public-company accounting frauds requires substantial sentences.

The sentence must also promote respect for the law.  18 U.S.C. § 3553(a)(2)(A).  This mandate is especially relevant in this case in light of Kumar's conscious decision, after participating in the securities fraud, to marshal the years-long, all-out effort at obstruction of justice that he directed.  Given his flagrant disregard for the rule of law, to afford Kumar too lenient a sentence would send the message that obstruction is tolerated.

In addition, the sentence must account for "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  A close analogue to this case is, for several reasons, the WorldCom fraud for which defendant Ebbers was recently sentenced to 25 years' incarceration in the Southern

79

District of New York (although one key distinction is that Ebbers
was not charged with obstruction, let alone an obstruction of the
instant magnitude).  As the Court is aware, the <u>Ebbers</u> sentence
was recently affirmed on appeal.

In their Section 3553(a) arguments, the defendants rely
heavily upon the recent decision in <u>United States v. Adelson</u>,
2006 WL 2008727 (S.D.N.Y. July 20, 2006).  The <u>Adelson</u> case, in
which the sentencing judge imposed a 42-month sentence on a
defendant whose guidelines range was life, constitutes a remote
outlier in the annals of corporate crime.  It is also
unpersuasive for a series of reasons.  First, the defendant in
that case was only the chief operating officer of the company,
not the president.  Second, Impath Inc., the company at issue in
that case, was far smaller than CA, and the fraud losses were
only a fraction of those here.  Third, the government is
currently appealing the <u>Adelson</u> sentence, and given that the
sentence is blatantly inconsistent with the Second Circuit's
recognition in <u>Ebbers</u>, 458 F.3d at 129, that "Congress has
directed that the Guidelines be a key component of sentence
determination," it appears at least substantially likely that the
<u>Adelson</u> sentence will be vacated.

Lastly, the defendants' creative argument that this
case is somehow outside the heartland of securities fraud cases
because it involves only revenue-shifting, not revenue-

80

fabrication, falters for two reasons.  First, it is factually untrue in Kumar's case, given Kumar's knowing participation in the Consortio and EMS revenue-swap deals, among others. (Richards did not supervise or participate in either of these transactions, to the government's knowledge.)  Second, and perhaps more importantly, the distinction is intellectually unsustainable.  Given that the <u>rate</u> of earnings, revenues and cash flows is the key to valuing public companies, there is simply no mathematically sustainable distinction between lying about how much you earn and lying about how fast you earned it. Either one will skew the stock's value, as Dr. Bajaj, Ms. Eisenstat, Mr. Miller and, most importantly, financial theory and common sense attest.

VII. <u>Restitution</u>

Restitution is mandatory for both defendants pursuant to the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A. The MVRA provides that the sentencing court must order restitution for all offenses that are "committed by fraud or deceit," and "in which an identifiable victim or victims has suffered a . . . pecuniary loss." 18 U.S.C. § 3663A(c)(1)(A). <u>See</u> <u>also</u> U.S.S.G. § 5E1.1(a)(1)("In the case of an identifiable victim, the court shall – (1) Enter a restitution order for the full amount of the victim's loss in the case of an identifiable

victim of the offense, if such order is authorized under 18
U.S.C. . . . 3663A.")

The procedures for the determination and imposition of
restitution are proscribed by 18 U.S.C. § 3664, which directs the
Probation Department to provide to the court "information
sufficient for the court to exercise its discretion in fashioning
a restitution order, [including] to the extent practicable, a
complete accounting of the losses to each victim . . . and
information relating to the economic circumstances of each
defendant." 18 U.S.C. § 3664(a). The MVRA recognizes the
possibility that the "victim's losses are not ascertainable by
the date that is 10 days prior to sentencing," in which case "the
court shall set a date for the final determination of the
victim's losses, not to exceed 90 days after sentencing." 18
U.S.C. § 3664(d)(5).

The court must identify the victims of the fraud and
impose restitution in "the full amount of each victim's losses as
determined by the court." 18 U.S.C. § 3664(f)(1)(A). See United
States v. Catoggio, 326 F.3d 323, 329 (2d Cir. 2003)("Therefore,
we hold that even where a defendant's complex fraud scheme
results in many victims whose identities and losses are difficult
to ascertain, the district court should identify the victims and
their actual losses prior to imposing restitution under the
MVRA."); United States v. Zakhary, 357 F.3d 186, 190 (2d Cir.

82

2004)(noting that the sentencing court must identify victims and their losses before entering an order of restitution).

The amount of restitution must be determined "without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A).  See Catoggio, 326 F.3d at 329 ("[T]he MCRA makes clear that the defendant's ability to pay should not be considered in determining the amount of restitution.  Congress evidently wanted to ensure that victims be fully compensated for a defendant's past crimes if that defendant 'unexpectedly inherits money, wins the lottery, or otherwise strikes it rich.'")(citation omitted).  As the Second Circuit recently held,

> [A]s to the risk of either underestimating or
> overestimating the defendant's future resources, it is
> altogether proper for the court to favor the victim of
> the defendant's crime, rather than favor the defendant.
> In other words, a sentencing court may properly
> conclude, given the uncertainty as to the defendant's
> future resources, that it is better to impose
> restitution obligations that the defendant will be
> unable to meet than to let the victim go uncompensated
> while the defendant retains newly acquired wealth.

United States v. Lino, 327 F.3d 208, 210 (2d Cir. 2003).

In setting the schedule for the restitution payment, as opposed to the amount of restitution, the sentencing court must consider the factors of 18 U.S.C. § 3664(f)(2), including the "financial resources and other assets of the defendant," and the court is "afforded very broad discretion."  United States v. Corbett, 357 F.3d 194, 195 (2d Cir. 2004).

As discussed above, the losses resulting from the defendants' conduct exceed $400,000,000. Under the Deferred Prosecution Agreement entered into between the United States Attorney's Office and CA, the Fund Administrator of the Restitution Fund is The Feinberg Group, LLP (the "Fund Administrator"). The Fund Administrator is responsible for developing a formula to distribute the $225,000,000 paid by CA, and for distributing those funds to victims of the accounting fraud and obstruction of justice.

The Fund Administrator has identified more than 95,000 individual victims through its analysis of over 125,000 claims submitted by CA shareholders. At present, the Fund Administrator is prepared to distribute the $225,000,000 paid by CA to those identified victims. After discussions with the government, the Fund Administrator has agreed to assist the Court in distributing any additional lump-sum restitution payments to the identified victims. For the court's reference, the database of identified victims will be produced to the court within 90 days of sentencing, per 18 U.S.C. § 3664(d)(5).

Because the losses in this case exceed $400,000,000, and because CA has paid $225,000,000, the Court should order

84

restitution of $175,000,000, for which the defendants are jointly and severally liable.[42]

VIII.     <u>Applicable Fine</u>

As noted in the PSR, the maximum fines authorized by statute are as follows: Count One: $800 million (twice the loss); Count Two: $5 million; Counts Three through Five: $1 million on each count; Counts Six through Nine: $250,000 on each count.  <u>See</u> 18 U.S.C. §§ 3571(b)(3) & (d), and 78ff.  The advisory guidelines prescribe a range of $25,000 to $808,000,000.

Because it appears that neither defendant is able to pay full restitution of $175 million, a fine should not be imposed.  <u>See</u> U.S.S.G. § 5E1.1(c) ("If a defendant is ordered to make restitution to an identifiable victim and to pay a fine, the court shall order that any money paid by the defendant shall first be applied to satisfy the order of restitution."); <u>United States v. Corace</u>, 146 F.3d 51, 57 (2d Cir. 1998)("[T]he

---

[42]     For purposes of determining the payment schedule for defendant Kumar, the Court should be aware that, in addition to the financial resources listed in the PSR, defendant Kumar apparently transferred $21 million in bonds from his individual account to his wife's account on February 21, 2002, the day after Alex Berenson wrote an article in the New York Times identifying the criminal and SEC investigations of CA.  <u>See</u> Kumar Deposition at 115-124 (July 28, 2006), attached as Exhibit R.

sentencing court must be careful not to jeopardize the prospects of restitution and may impose a fine 'only to the extent that such fine . . . will not impair the ability of the defendant to pay restitution.") (citation omitted).

<u>CONCLUSION</u>

For the reasons set forth above, the government respectfully submits that the defendants should be sentenced to a term of imprisonment consistent with the Sentencing Guidelines, the severity of their crimes, and Kumar's continued denial of core aspects of the offense conduct.

Dated:     Brooklyn, New York
           September 21, 2006

                              Respectfully submitted,

                              ROSLYNN R. MAUSKOPF
                              United States Attorney

          By:    _____/s/_____
                 Eric R. Komitee
                 Jason A. Jones
                 Assistant U.S. Attorneys
                 (718) 254-6240/7553

87

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a copy of the government's

attached SENTENCING MEMORANDUM to be served this day by

electronic mail on:

John P. Cooney, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

David M. Zornow, Esq.
Skadden, Arps, Slate Meagher & Flom LLP
Four Times Square
New York, NY 10036-6522


_____/s/_____
Jason A. Jones
Assistant U.S. Attorney
(718) 254-7553

Dated: September 21, 2006