UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

        - against -

SANJAY KUMAR and
STEPHEN RICHARDS,

          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

04-CR-0846 (ILG)

# MEMORANDUM ON BEHALF OF SANJAY KUMAR
## IN AID OF SENTENCING

DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

Attorneys for Defendant
Sanjay Kumar

**TABLE OF CONTENTS**

PAGE

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND OF MR. KUMAR ............................................................................... 4

I.      Personal History of Mr. Kumar ............................................................................. 4

        A.      Upbringing ................................................................................................ 5

        B.      Early Employment History ...................................................................... 7

        C.      Employment at Computer Associates ...................................................... 8

                1.      35-Day Month Practice ................................................................. 9

                2.      Hard Work, Dedication and Innovation ...................................... 12

                3.      Mr. Kumar's Earnings ................................................................. 14

                4.      Commitment to Employees .......................................................... 16

        D.      The Kumar Family .................................................................................. 24

II.     Mr. Kumar's Philanthropy and Commitment to the Community ......................... 29

        A.      Work to Benefit Women and Children:  Health Care and Education ....... 32

                1.      Pediatric Mobile Health Unit ...................................................... 32

                2.      Friends Academy ......................................................................... 34

                3.      Education and Health Care in Kenya ........................................... 37

                4.      Work to Benefit Women and Children in India ........................... 40

        B.      Civic Projects ......................................................................................... 41

                1.      Nassau County Sports Commission: "Let's Do It!" Program ...... 42

                2.      North Shore Community Church .................................................. 42

                3.      Friends of the Arts ...................................................................... 43

                4.      India Association of Long Island ................................................. 45

                5.      North Shore INN (Interfaith Nutrition Network) ........................ 45

        C.      Wildlife Preservation .............................................................................. 46

                1.      Save The Elephants ..................................................................... 46

i

2.     Sri Lanka Wildlife Conservation Society ...................................... 47

D.     Disaster Relief................................................................................... 47

1.     U.S. Embassy Bombing in Nairobi............................................... 47

2.     AmeriCares: Tsunami Relief ........................................................ 49

3.     Earthquake Relief......................................................................... 49

E.     Corporate Philanthropy..................................................................... 49

F.     Unsung Acts....................................................................................... 52

LEGAL ANALYSIS.............................................................................................. 56

III.     Relevant Sentencing Factors..................................................................... 56

IV.     The Advisory Guidelines Range is Significantly Lower Than That Which May
Be Suggested By the Probation Department.......................................... 59

A.     The Guidelines in Effect Between November 1998 and November 2000
Must Be Applied to Calculate Mr. Kumar's Sentence on the Securities
Fraud Counts..................................................................................... 60

1.     The 1998 Guidelines, Rather than the 2005 Guidelines, Apply
to the Securities Fraud Convictions. ............................................ 60

2.     The 1998 Guidelines Apply to the Securities Fraud Counts
Despite the Obstruction of Justice Convictions. ........................... 61

B.     The Government's Loss Calculation is Ill-Conceived and Unsupportable
and Therefore No Points Should Be Added For Loss Amount. ............... 67

1.     Overview...................................................................................... 68

2.     The 35-Day Month Practice Did Not Impact CA's Future Cash
Flow Prospects and Therefore Should Not Have Caused CA's
Stock Price to Be Inflated ............................................................ 71

3.     The Government's Methodology for Calculating Loss is
Fundamentally Flawed Because it Fails to Account for the
Reasons Why the "Comparable" Companies Missed Their
Earnings Estimates....................................................................... 74

4.     In Similar Cases in Which Companies Announced a Failure to
Meet Earnings Estimates Because of Late Contracts, There Was
No Net Stock Price Decline. ......................................................... 82

5.     CA's July 2000 Earnings Miss Provides No Support For
Dr. Bajaj's Theory. ...................................................................... 83

C.     The Advisory Guidelines Calculation....................................................... 86

D.    If Mr. Kumar's Sentence is Determined Under the Guidelines, a Significant Downward Departure is Warranted.........................................87

    1.    A Number of Factors Make This an Atypical Case That Would Call For a Downward Departure From the Advisory Guidelines. .................................................................................88

    2.    The Cumulative Effect of Various Enhancements Suggested By the Probation Department Leads to an Increase in Sentencing Range to a Greater Extent Than Anticipated by the Guidelines... 89

V.    The Factors to Be Considered at Sentencing Uunder 18 U.S.C. § 3553(A) Compel the Conclusion that a Non-Guidelines Sentence Should be Imposed. ..... 92

A.    History and Characteristics of the Defendant ...........................................92

B.    The Guidelines Range is Greater than Necessary to Effect Just Punishment and Also Overstates the Seriousness of the Offense Conduct. .................93

    1.    The 35-Day Month is an Atypical Securities Fraud as it Involved Real Revenue and Real Cash Flow..............................................95

    2.    Mr. Kumar's Conduct Differed Significantly From That of the Typical Fraud Defendant, as He Did Not Originate the 35-Day Month Scheme, and He Affirmatively Put an End to It................98

    3.    United States v. Adelson: An Instructive Example of Applying a Non-Guidelines Sentence When the Guidelines Calculations are Excessively Inflated. ..........................................................100

C.    A Non-Guidelines Sentence Would Be Sufficient to Provide Adequate Deterrence and to Protect the Public. .....................................102

    1.    Deterrence ...................................................................................103

        a.    Mr. Kumar is Precluded From Ever Serving as a Publicly-Held Company's Executive ...........................................103

        b.    The Financial Impact of Mr. Kumar's Conviction on the Kumar Family Constitutes a Deterrent ...........................103

        c.    Long Periods of Incarceration are not Likely to Achieve General Deterrence in Securities Fraud Cases................104

        d.    Deterrence and Punishment Have Been Achieved Through the Shame and Pain that Mr. Kumar's Conviction has Brought to His Family ....................................................105

    2.    Protection of the Public.............................................................106

VI.     Mr. Kumar Should Be Considered for a Substantial Community Service
        Sentence. ........................................................................................................ 107

VII.    Conclusion ..................................................................................................... 112

# TABLE OF AUTHORITIES

PAGE

## Cases

Basic Inc. v. Levinson, 485 U.S. 224 (1988) .................................................................71

Blakely v. Washington, 542 U.S. 296 (2004) ................................................................95

Central Bank v. First Interstate Bank, 511 U.S. 164 (1994) ..............................................71

DeMarco v. Lehman Brothers, Inc., 222 F.R.D. 243 (S.D.N.Y. 2004) ..............................85

Edgar v. MITE Corp., 457 U.S. 624 (1982) ..................................................................71

Greenfield v. Scafati, 277 F. Supp. 644 (D. Mass. 1967) , aff'd, 390 U.S. 713
    (1968) ...................................................................................................................66

Koon v. United States, 518 U.S. 81 (1996) ..............................................................88,88

Stinson v. United States, 508 U.S. 36 (1993) ................................................................62

United States v. Adelson, -- F. Supp. 2d --, 2006 WL 2008727 (S.D.N.Y. July 20,
    2006) ............................................................................................................ passim

United States v. Bayly, H-CR-03-363 (S.D. Tex.) .........................................................104

United States v. Bertoli, 40 F.3d 1384 (3d Cir. 1994) .................................................60,63

United States v. Booker, 543 U.S. 220 (2005) .................................................... passim

United States v. Borrego, 388 F.3d 66 (2d Cir. 2004) ....................................................67

United States v. Broderson, 67 F.3d 452 (2d Cir. 1995) .................................................98

United States v. Capanelli, 270 F. Supp. 2d 467 (S.D.N.Y. 2003) ...................................68

United States v. Cooper, 2006 WL 288704 (D. Kan. Jan. 24, 2006) ................................95

United States v. Correa-Vargas, 860 F.2d 35 (2d Cir. 1988) ..........................................88

United States v. Corry, 206 F.3d 748 (7th Cir. 2000) ....................................................94

United States v. Costello, 16 F. Supp. 2d 36 (D. Mass. 1998) .........................................98

v

United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), abrogated on other grounds by United States v. Fagans, 406 F.3d 138 (2d Cir. 2005) ..................................... passim

United States v. Donofrio, 817 F. Supp. 321 (E.D.N.Y. 1993) ............................................1

United States v. Ebbers, -- F.2d --, --, 2006 WL 2106634 (2d Cir. July 28, 2006) .........100

United States v. Emmenegger, 329 F. Supp. 2d 416 (S.D.N.Y. 2004) .......................94,95

United States v. Fernandez, 443 F.3d 19 (2d Cir. 2006) ....................................................57

United States v. Forchette, 220 F. Supp. 2d 914 (E.D. Wis. 2002) ..............................97,98

United States v. Friday, 2000 WL 1618472 (E.D. Pa. Oct. 26, 2000) ................................97

United States v. Gaind, 829 F. Supp. 669 (S.D.N.Y. 1993) ............................................103

United States v. Gigante, 94 F.3d 53 (2d Cir. 1996) .........................................................68

United States v. Gonzalez, 281 F.3d 38 (2d Cir. 2002) ......................................................60

United States v. Gray, 362 F. Supp. 2d 714 (S.D. W. Va. 2005) .......................................68

United States v. Johnson, 221 F.3d 83 (2d Cir. 2000) ........................................................63

United States v. Johnson, Nos. 97-CR-206, 98-CR-160, 1999 WL 395381 (N.D.N.Y. June 4, 1999) .........................................................................................63

United States v. Jones, -- F.3d --, --, 2006 WL 2167171 (2d Cir. Aug. 2, 2006) ....56,57,93

United States v. Keller, 58 F.3d 884 (2d Cir. 1995), abrogated on other grounds, United States v. Mapp, 170 F.3d 328 (2d Cir. 1999) ...................................................62

United States v. Lara, 905 F.2d 599 (2d Cir. 1990) ............................................................88

United States v. Lauersen, 362 F.3d 160 (2d Cir. 2004), vacated in light of United States v. Booker, 543 U.S. 220 (2005) ....................................................................89,90

United States v. Lewis, 235 F.3d 215 (4th Cir. 2000) ...................................................63,64

United States v. Liebman, 40 F.3d 544 (2d Cir. 1994) .......................................................86

United States v. Maali, No. 6:02-CR-1710RL28KRS, 2005 WL 2204982 (M.D. Fla. Sept. 8, 2005) ..................................................................................................68

United States v. McBride, 434 F.3d 470 (6th Cir. 2006) .....................................................89

United States v. McNeil, 415 F.3d 273 (2d Cir. 2005).......................................................65

United States v. Meeks, 25 F.3d 1117 (2d Cir. 1994) .................................................65,66

United States v. Milne, 384 F. Supp. 2d 1309 (E.D. Wis. 2005)................................99,105

United States v. Mueffelman, 400 F. Supp. 2d 368 (D. Mass. 2005) .................................94

United States v. Nastasi, No. 00 CR 809(S-1) (ILG), 2002 WL 1267995
    (E.D.N.Y. Apr. 17, 2002).................................................................................................61

United States v. Nuzzo, 02 CR 1239 (ILG) 2006 U.S. Dist. LEXIS 6098
    (E.D.N.Y. Feb. 13, 2006)................................................................................................56

United States v. Ortland, 109 F.3d 539 (9th Cir. 1997).....................................................62

United States v. Pimental, 367 F. Supp. 2d 143 (D. Mass. 2005) .....................................95

United States v. Ranum, 353 F. Supp. 2d 984 (E.D. Wis. 2005).....................56,92,95,103

United States v. Rattoballi, 452 F.3d 127 (2d Cir. 2006) ..................................................67

United States v. Redemann, 295 F. Supp. 2d 887 (E.D. Wis. 2003) ........................104,105

United States v. Restrepo, 936 F.2d 661 (2d Cir. 1991).....................................................94

United States v. Rioux, 97 F.3d 648 (2d Cir. 1996) .....................................................88,92

United States v. Roen, 279 F. Supp. 2d 986 (E.D. Wis. 2003)..........................................94

United States v. Rogers, 972 F.2d 489 (2d Cir. 1992).......................................................88

United States v. Santopietro, 166 F.3d 88 (2d Cir. 1999), abrogated on other
    grounds by Sabri v. United States, 541 U.S. 600 (2004)................................................64

United States v. Savin, No. S1 00 CR. 45 (RWS), 2004 WL 1161323 (S.D.N.Y.
    May 25, 2004)..................................................................................................................91

United States v. Serafini, 233 F.3d 758 (3d Cir. 2000) .....................................................93

United States v. Singh, 390 F.3d 168 (2d Cir. 2004)..........................................................61

United States v. Smith, 311 F. Supp. 2d 801 (E.D. Wis. 2004).........................................99

United States v. Somerstein, 20 F. Supp. 2d 454 (E.D.N.Y. 1998)...............................88,92

United States v. Speed Joyeros, S.A., 204 F. Supp. 2d 412 (E.D.N.Y. 2002).................103

United States v. Stuart, 22 F.3d 76 (3d Cir. 1994)..............................................94

United States v. Turner, 915 F.2d 1574 (6th Cir. Oct. 5, 1990) .......................107

United States v. Wendelsdorf, 423 F. Supp. 2d 927 (N.D. Iowa 2006)............68

United States v. Weider, 01 CR. 416 (S-10) (ILG), Sentencing Mem. (Nov. 22,
    2002) ....................................................................................................92

United States v. Williams, 65 F.3d 301 (2d Cir. 1995) ......................................88

United States v. Woods, 159 F.3d 1132 (8th Cir. 1998).....................................93

Weaver v. Graham, 450 U.S. 24 (1981) .............................................................64

## Statutes and Rules

18 U.S.C. § 3553..................................................................................................59

18 U.S.C. § 3553(a) ....................................................................................... passim

18 U.S.C. § 3553(a)(1)........................................................................................56

18 U.S.C. § 3553(a)(2)......................................................................................1,57

18 U.S.C. § 3553(a)(2)(A) ...............................................................................93,98

18 U.S.C. § 3553(a)(2)(B) .................................................................................102

18 U.S.C. § 3553(a)(2)(C) .................................................................................102

18 U.S.C. § 3553(a)(4).........................................................................................57

18 U.S.C. § 3553(b)(1) ........................................................................................87

18 U.S.C. § 3583(g)..............................................................................................65

28 U.S.C. § 991(b)(1)(B) .....................................................................................87

## Other Authorities

Court & Community an Information Series About U.S. Probation & Pretrial
    Services: Community Service (2005) (available at
    http://www.uscourts.gov/misc/revision-community.pdf) .........................108

viii

Judges Finding Creative Ways of Punishing, Wall St. Journal, May 24, 1994, at
  B1 ..........................................................................................................................107

Mark Maremont, Tyco Figures Will Be Jailed at Least 7 Years – Judge Orders
  Kozlowski, Swartz To Also Pay Back $240 Million, Wall St. J., Sept. 20,
  2005, at C1 ...............................................................................................................99

In re MicroStrategy, Inc., Exchange Act Release No. 43, 724, Admin. Proc. No.
  3-10388, at Part III.E (Dec. 14, 2000) ...................................................................97

In re Minuteman Int'l, Inc. et al., Exchange Act Release No. 47, 894, Admin.
  Proc. No. 3-11131, at Part III.5-13 (May 21, 2003) ...............................................97

National Institute of Justice, Intermediate Sanctions in Sentencing Guidelines
  (1997)......................................................................................................................109

Peter Grant and Christine Nuzum, Adelphia Founder and One Son Are Found
  Guilty – Jury Remains Deadlocked on Second Son, Acquits Former Assistant
  Treasurer, Wall St. J., July 9, 2004, at A1 .............................................................98

Richard Frase, Punishment Purposes, 58 Stan. L. Rev. 67, 80 (2005) ..........................108

Ridgely Ochs, In the Vanguard of Pediatric Medicine; Mobile unit puts
  'continuity of care' on wheels, Newsday, Sept. 11, 2001, at C6 .............................34

William Kinney, David Burgstahler and Roger Martin, "Earnings Surprise
  'Materiality' as Measured by Stock Returns," 40 J. Accounting Research
  1297, 1326 (December 2002) ..................................................................................77

U.S.S.G. § 1B1.11(a), p.s. (2005)....................................................................................60

U.S.S.G. § 1B1.11(b)(1), p.s. (2005) ...............................................................................60

U.S.S.G. § 1B1.11(b)(2), p.s. (1998) ...............................................................................62

U.S.S.G. § 1B1.11(b)(3) ..............................................................................................63,64

U.S.S.G. § 1B1.11(b)(3), p.s. (1998) ...............................................................................62

U.S.S.G. § 2A1.2 ..............................................................................................................95

U.S.S.G. § 2A1.3 ..............................................................................................................95

U.S.S.G. § 2A4.1 ..............................................................................................................95

U.S.S.G. § 2A5.1 ..............................................................................................................95

U.S.S.G. § 2B1.1(b)(1) (2005) ................................................................61

U.S.S.G. § 2B1.1(b)(14)(A) (2003) .........................................................66

U.S.S.G. § 2B1.1(b)(15)(A)(i) (2005) ......................................................61

U.S.S.G. § 2B1.1(b)(2)(C) ......................................................................66

U.S.S.G. § 2B1.1(b)(2)(C) (2005) ...........................................................61

U.S.S.G. § 2F1.1 cmt. n.11 (1998) ..........................................................94

U.S.S.G. § 2F1.1 cmt. n.9 (1998) ............................................................86

U.S.S.G. § 2F1.1(a) ................................................................................86

U.S.S.G. § 2F1.1(b)(1) .......................................................................61,86

U.S.S.G. § 2F1.1(b)(2) ............................................................................86

U.S.S.G. § 2J1.2(a) .................................................................................87

U.S.S.G. § 2J1.2(b)(2) ............................................................................87

U.S.S.G. § 2M1.1 ...................................................................................95

U.S.S.G. § 2M6.1 ...................................................................................95

U.S.S.G. § 3A1.1 ...................................................................................95

U.S.S.G. § 3B1.1(a) ................................................................................87

U.S.S.G. § 3B1.1(b) ................................................................................86

U.S.S.G. § 3B1.3 ....................................................................................86

U.S.S.G. § 3C1.1 ....................................................................................86

U.S.S.G. § 3C1.1 cmt. n.8 .......................................................................87

U.S.S.G. § 3D1.2(c) ................................................................................88

U.S.S.G. § 5A .........................................................................................92

## PRELIMINARY STATEMENT

On April 24, 2006, Sanjay Kumar pled guilty to eight counts stemming from two conspiracies, one to commit securities fraud and one to obstruct justice. He is scheduled to be sentenced on October 12, 2006. This memorandum and the accompanying exhibits are provided for the Court's consideration to assist in the sentencing of Mr. Kumar.[1]

This Court has observed in the past that "the penological slide-rule exercise [of the Sentencing Guidelines] only peripherally, if at all, considers the human being standing before the sentencing court." United States v. Donofrio, 817 F. Supp. 321, 325 (E.D.N.Y. 1993). The law has changed. The Guidelines are no longer mandatory but merely advisory, see United States v. Booker, 543 U.S. 220, 245-46 (2005). Sentencing courts have been liberated from the mechanistic constrictions of the Guidelines and are now able to "achiev[e] somewhat more individualized justice." United States v. Crosby, 397 F.3d 103, 114 (2d Cir. 2005), abrogated on other grounds by United States v. Fagans, 406 F.3d 138 (2d Cir. 2005). The Court is instructed to impose a sentence that is sufficient, *but not greater than necessary*, to ensure that the purposes of 18 U.S.C. § 3553(a)(2) are satisfied. The determination of such a sentence requires careful consideration of both the offense and the offender.

This memorandum has been prepared to describe fairly the man to be sentenced. Notwithstanding his admitted misconduct, it is clear beyond doubt that Sanjay Kumar is a good man who has lived a life characterized by hard work, devotion to his family, and commitment to helping innumerable people and causes. While the offense conduct in this

---

[1] Certain portions of this Memorandum, namely Sections IV.A and IV.B, are presented on behalf of both Mr. Kumar and his co-defendant, Stephen Richards.

case has received significant publicity, Mr. Kumar's overall achievements and contributions to society have gone largely unnoticed, partially because of his ingrained modesty regarding these endeavors. In addition to his extensive and well-defined charitable works, there are countless instances in which Mr. Kumar has gone out of his way to help an employee, a friend, and even a stranger in a time of need. These instinctive acts of kindness are a great window into Mr. Kumar's character.

These measures of Sanjay Kumar as a person – the characteristics that truly define him – may well have been lost in the grinding mechanism of the advisory Guidelines. Under the new sentencing regime, as a man who has consistently been quick to help others, and who has already paid severely for his transgressions, Mr. Kumar is a person deserving of the Court's full discretion and leniency.

At the same time, we must and do address the possibility that the Probation Department may suggest that the advisory Guidelines range in this case is life imprisonment based almost entirely on the government's loss calculation. Any such sentence would be both erroneous and barbaric.[2] It is erroneous for two primary reasons: First, the *ex post facto* clause of the United States Constitution compels the application of the edition of the Guidelines effective as of November 1, 1998 (the "1998 Guidelines") to determine the advisory Guidelines range for the securities fraud conduct, rather than the later edition that may be utilized by the Probation Department. Second, the government's proffered loss amount of at least $400 million – if accepted, the single enhancement that would be most

---

[2] As of the date that this Memorandum was filed, we have not yet seen the final version of the Probation Department's Presentence Investigation Report (the "PSR"). Also, our efforts to inquire into the position to be taken by the prosecution on the issue of the application of the advisory Guidelines have been unproductive. Accordingly, we are compelled to address a "worst case" scenario.

responsible for the Probation Department's calculated advisory Guidelines range – is the result of a severely flawed methodology.

More importantly, we suggest that consideration of the Section 3553(a) factors and the instruction that the Court fashion a sentence that is no greater than necessary compel the imposition of a non-Guidelines sentence here, for at least three reasons.

First, Sanjay Kumar's history and characteristics, particularly his extraordinary charitable and other good works, militate against the draconian punishment that the advisory Guidelines suggest.

Second, the nature and circumstances of the securities fraud show that this is an atypical fraud and that the government's loss calculation, if accepted, overstates its impact to the extreme. The crux of the securities fraud at issue, the 35-day month practice, involves premature recognition of revenue by a matter of days. The 35-day month practice did not involve the booking of artificial revenue or double counting of revenue, but rather the shifting of revenue from one quarter to another, from real contracts, signed by the customer, pursuant to which a real product was delivered and payments were made, and that resulted in real proceeds for Computer Associates International, Inc. ("CA" or the "Company"). As a result of this practice, and after an audit by an independent accounting firm, CA had to restate $2 million out of a total of $6 billion in revenue for fiscal year 2000 (i.e., .0003 of the total revenue for that year). Thus, the practice had a *de minimis* impact on CA's annual financials and had no impact on its reported cash flow.

Third, just as this fraud is an atypical fraud, Mr. Kumar is an atypical defendant. Not only was he not the originator of the fraud in question, but he spearheaded changes at CA that effectively put an end to it, long before there was any governmental investigation into

3

the practice. Moreover, there are many other facts, including other positive changes he effected at Computer Associates and the lack of any indicia of corporate excess and greed that usually characterize this type of case, that demonstrate how different Mr. Kumar is from the typical defendant.

These circumstances, and others described below, show that if the government's loss amount were accepted, the advisory Guidelines range, under either the correctly-applied 1998 Guidelines or under any later edition, would make a mockery of 18 U.S.C. § 3553(a)'s demand for "just punishment." A similar conclusion was recently reached in <u>United States v. Adelson,</u> -- F. Supp. 2d --, 2006 WL 2008727 (S.D.N.Y. July 20, 2006), a case fairly similar to this one not only in terms of the nature of the charges but also in that the government took the position that the advisory Guidelines range was life imprisonment. Judge Rakoff, appalled at the "barbarity" of such an outcome, imposed a non-Guidelines sentence. <u>Id.</u> at *7-8.

* * *

We respectfully submit that this is a very unusual case, with many substantial mitigating factors. We suggest a non-Guidelines sentence far below that suggested by the government's erroneous loss calculation, followed by a significant period of community service, to allow Mr. Kumar to use his many skills to continue to help others and repay any debt he owes to society.

<strong>BACKGROUND OF MR. KUMAR</strong>

## I. PERSONAL HISTORY OF MR. KUMAR

Mr. Kumar and his family fled impending ethnic violence in his native Sri Lanka in the 1970s, arriving in the United States with little more than the clothes on their backs. Mr.

Kumar and his family relied on unfailing hard work and dedication in their struggle to gain a foothold in this new homeland. The small acts of kindness that Mr. Kumar benefited from along the way have never been forgotten and have instilled in him the immense importance of a helping hand; as a result, he has made a lifelong commitment to helping others who have been less fortunate and to contributing to the community that nurtured his success.

Mr. Kumar's life story is inspirational and best told by the people whose lives he has touched. Since his guilty plea, many of those people have written letters to share how Mr. Kumar has impacted their lives. Their letters describe the character of the man before the Court and show him to be a man of generosity, integrity, humility, and kindness.[3]

### A. Upbringing

Mr. Kumar was born to a Tamil family in Colombo, Sri Lanka in 1962. His mother, Swarna, worked as a Montessori school teacher, and his father, Roger, in animal husbandry. Mr. Kumar and his two sisters, Shemi and Sharmila, were taught some English at school and given additional lessons at home, but their first language was Tamil. Despite their limited means, the elder Kumars worked to instill the values of charity and generosity in their children from a very early age. Mr. Kumar was required to donate at least a quarter of the two-rupee gift he was given by his grandfather to a beggar whom he met on the street.

As the political and economic situation in Sri Lanka became more turbulent in the mid-1970s, the Kumars feared that they would be engulfed in the burgeoning ethnic violence

---

[3] While we have not quoted from all of the letters in the text of this memorandum, the letters in their entirety have been provided to the Court in a separate volume, Appendix to Memorandum On Behalf of Defendant Sanjay Kumar In Aid of Sentencing, Exhibit A: Letters Submitted on Behalf of Sanjay Kumar. We suggest that each letter provides a very helpful and individualized insight into Mr. Kumar's life and overall character.

against Tamils. Roger and Swarna Kumar began spending evenings in the local library, poring over the classifieds from week-old American, Australian, Canadian, and British newspapers for opportunities for emigration. After months of sending out handwritten resumés to potential employers, Mr. Kumar's mother got a job offer from a Montessori school in Greenville, South Carolina.

The hope offered by the job invitation quickly faded as the family grappled with how they could afford the plane tickets to the United States. When Swarna Kumar communicated as much to the South Carolina school, the father of one of the Montessori teachers, a farmer, offered to pay for part of the airfare. Mr. Kumar has never forgotten how a stranger's charity helped his family.

Mr. Kumar's mother and sisters arrived here first. Mr. Kumar and his father stayed behind until they earned enough to be able to pay for their airfare and to wrap up the family's affairs in Sri Lanka. By late 1976, the Kumar family had all arrived in the United States, accompanied by five suitcases of personal belongings and a few hundred dollars with which to start their new life.

The Kumars resided in a two bedroom apartment in Greenville, S.C. Roger Kumar took a job as a busboy and dishwasher, unable to find work in his field. The transition from Sri Lanka to South Carolina was difficult as the family struggled to make ends meet and to assimilate into a distinctly different cultural setting. For example, Mr. Kumar, who was 14 years old at the time, returned from his public school to ask his mother whether he belonged on the white children's or black children's lunch line; "Pick the shortest line," was his mother's advice.

6

Mr. Kumar did as much as he could to help his family get on their feet, working after school and on weekends as a bagboy in a grocery store. When he was not at the grocery store, he found himself spending more and more time after school in the computer lab, teaching himself the language of computers.

When Mr. Kumar entered Furman College in 1980 (chosen by his parents because it offered him the largest scholarship), he declared himself "pre-med," but started a software business on the side with his best friend. He also spent much of his free time tutoring underprivileged high school students in subjects like reading, writing, and math. He struggled to get this fledgling business off the ground while holding two part-time jobs, one in the computer lab of an insurance company and the other in a grocery store. After Mr. Kumar's friend and business partner was killed in a car accident in 1983, Mr. Kumar dropped out of Furman and sought a job in the computer industry.

**B.    Early Employment History**

Mr. Kumar's first full-time job in computers began with the company that he had worked at part-time while in college, Liberty Life Insurance. After hours, he worked to write his own software and market it.

Later in 1983, Mr. Kumar, at age 21, moved to Columbia, South Carolina, to work as a systems analyst for Policy Management Systems Corp. ("PMSC"). In 1986, he met his future wife, Sylvia Mann, a young telecommunications capacity planning analyst at the company, whom he married two years later in 1988.

The software that Mr. Kumar continued to develop was used not only at PMSC, but by other technology companies as well. In April 1987, one of those technology companies,

7

UCCEL, offered him a senior technology position in its Dallas office. Almost immediately after Mr. Kumar joined UCCEL, the company was acquired by Computer Associates.

While CA was notorious for terminating most employees of acquired companies at that time, Mr. Kumar was kept on by CA as a manager of a team of systems software developers, one of the lower rungs on the corporate ladder.

## C. Employment at Computer Associates

At the same time, Mr. Kumar met Charles Wang, the co-founder and Chief Executive Officer ("CEO") of the Company. Mr. Kumar caught Mr. Wang's attention because of his impressive knowledge of technological and software-related issues. Soon, in the fall of 1988, Mr. Kumar was asked by CA to move from Dallas to CA's headquarters in New York.

Mr. Kumar's work for CA in these early years focused on his area of expertise, designing and developing new software products. As his talent and the depth of his understanding of software issues became clear, he was asked by Mr. Wang to participate in strategic planning, helping the company decide what new products it needed to develop to make computers safer and more efficient. His talent for figuring out what software CA should build, and which companies it should acquire, earned him the title of Senior Vice President of Planning in 1989, at the age of 27, a position he held until December of 1992. In early 1993, Mr. Kumar was promoted to Executive Vice President for Operations. Mr. Kumar was perceived both inside and outside CA as Mr. Wang's protégé.

In 1994, at the age of 31, he was promoted by Mr. Wang again, to President and Chief Operating Officer ("COO"). While Mr. Kumar's responsibilities increased, his focus remained primarily on the company's technological side. As his former CA colleague James Tedesco describes:

8

> Sanjay was a thought leader in the software industry. He focused the company's resources and efforts around developing software products and providing services for the Fortune 500 marketplace...The software would provide for security, disaster recovery and management of resources. This was the driving strategy for Sanjay; centered around producing products that would help companies be more efficient.

Exhibit A, at Tab 76. Mr. Kumar was eventually promoted to CEO, again at Mr. Wang's

suggestion, and with the unanimous support of the Board of Directors, in August of 2000. In

November of 2002, Mr. Kumar became the Chairman of the Board of CA.

### 1. 35-Day Month Practice

Sections III-V of this submission discuss at length the specifics of the offense and the

legal implications of that conduct for sentencing. This section focuses primarily upon the

positive contributions that Mr. Kumar made which transformed CA. As Alex Vieux, a

former CA Board member, has said, "Many people will only remember his downfall. In my

mind, he will remain the man who changed the software industry forever ...." Exhibit A, at

Tab 80.

Nonetheless, it is important here to observe two uncontestable facts which relate to

the practice that the Court has identified as the "heart" of this case. First, CA had in place in

the 1980s a practice of "keeping the books open" after the end of fiscal quarters so that, in

certain instances, contracts finalized in the early days of the next quarter were counted as

revenue in the prior quarter (referred to in this case as the "35-day month") before Mr.

Kumar even joined CA.[4] And, as is clear, the practice was entrenched years before Mr.

Kumar rose to the position of COO and, subsequently, CEO. Second, as will be explained

---

[4] Several government witnesses have confirmed that this practice was in place when they joined the Company, as far back as the 1980s. Furthermore, it appears that the 35-day month practice was believed to be a fairly commonplace practice across the software industry in the 1980s and 1990s.

more fully infra at Section V.B.2, within three months of becoming CEO of CA, in October 2000, Mr. Kumar succeeded in promulgating a new business model, which, among other things, changed the accounting system at the Company to a ratable revenue recognition model, such that the revenue from a contract would be recognized pro rata over the entire life of the contract instead of almost entirely upfront (the "New Business Model"). Most importantly, the implementation of the New Business Model effectively ended the 35-day month practice. Accordingly, Mr. Kumar ended this conduct long before there was any governmental investigation into CA's accounting practices (which commenced in 2002).

The Company still operates under the New Business Model. CA was the first company in the industry to make such a change and the bold move was praised by Wall Street analysts. See Computer Associates Earnings Call, Q2 FY2001, October 25, 2000 ("Halleluiah from Boston," Drew Brosseau, SG Cowen & Company); ("Congrats [sic] for biting the bullet, and doing this, and recognizing the change in the business model," Charles (Chuck) Phillips, Morgan Stanley Dean Witter); ("Congratulations on making this tough decision to go this way," Robert (Bob) Johnson, ABN AMRO); ("Congratulations on a good move, I think it is a step in the right direction," Jordan Klein, UBS Warburg). Over time, other software companies, including Synopsis, Cadence Design Systems, and Clarus, later followed CA's lead to move to a ratable recognition model.[5]

---

[5] Besides changing the accounting system the Company had in place, the New Business Model really brought to the industry an entirely new concept of "software as a service." Under the new model, customers could determine the length and dollar value of their software licenses and vary their software mix as their business and technology needs changed. Employing innovative month-to-month contracts meant customers would no longer be forced into signing long-term contracts for specific products in pre-determined quantities. That provided the customer the peace of mind that if its software needs changed dramatically, it would not be beholden to CA for a license for software that did not fit its needs. Moreover, CA was able to introduce a greater number of innovative technologies (...continued)

While he had made, and was still making, many positive changes to CA in his new position as CEO – including the New Business Model – Mr. Kumar was also confronted, in early 2002, by the internal and governmental investigations that are described in the Indictment. See Indictment at ¶¶ 54-55. Although these investigations' initial focus was not on the 35-day month practice, questions regarding that practice were eventually put to CA employees, both by the government and CA's law firms. It was here that Mr. Kumar made a crucial mistake, a mistake which he deeply regrets: faced with questions regarding a practice that he had put an end to, he conspired with others to cover up the existence of that practice. He maintained his position of denial through the course of the investigations, thereby obstructing the government's inquiry into the 35-day month activity. Eventually, Mr. Kumar stepped down as CA's Chairman and CEO in April 2004. Mr. Kumar was asked by the Board of Directors of the Company to stay on as Chief Software Architect. He remained in that position until early June 2004 when he resigned as result of the instant case.

---

(continued…)

into the marketplace because customers were more likely to try out a new product on a shorter term basis. Mr. Kumar truly revolutionized the industry with these changes:

> I joined the CA Board of Directors because I was fascinated like many others by the audacious business model that Sanjay pioneered in the software industry … Sanjay transformed the equation and the rest of his competitors have followed. It means that Microsoft and the whole ecosystem took notice and followed CA's steps in that regard. Now customers can pay as they go, like we do for monthly utilities, and they are not charged a premium. And the medium companies can now afford to pay a fraction of the traditional fees. This represents a huge revolution with significant micro and macroeconomic impact that industry luminaries such as Mr. Gates or Mr. Ballmer from Microsoft and others have – in front of me – credited Sanjay with achieving, thanks to his forethoughts and serious implementation.

Ltr. of Alex Vieux, Former CA Board Member, Exhibit A, at Tab 80.

11

## 2.     Hard Work, Dedication and Innovation

Mr. Kumar was considered a visionary in the software industry. His tireless work and zealous dedication to the Company effected long-lasting improvements at CA that changed the face of the Company – and the industry as a whole – forever. See Ltr. of Tom Donohue, President and CEO of the U.S. Chamber of Commerce, Exhibit A, at Tab 24 ("As the leader of the U.S. Chamber of Commerce, I meet business executives from all over the world and have always thought of Sanjay as one of the leaders, innovators, and forward-thinkers amongst this important group."); Ltr. of Matthew Gordon, Current CA Employee, Exhibit A, at Tab 36 ("I found [Mr. Kumar] to be a charismatic leader, technological visionary, and a caring manager and executive...."); Ltr. of James Tedesco, Current CA Employee, Exhibit A, at Tab 76 ("Sanjay was an icon in the industry and led the company through a tremendous growth period. When I started at CA we had less than 7,000 employees and during Sanjay's term we more than doubled. He has provided tremendous opportunity for thousands of young men and women around the world and he is personally responsible for revolutionizing the industry; providing tools to make computers more efficient and useful giving greater value.").

Mr. Kumar worked tirelessly to improve the company – early mornings, late nights and working weekends were common for Mr. Kumar. His exceptional work ethic and willingness to be available any time to attend to any issue stood out to employees at every rank in the Company. See Ltr. of George Kafkarkou, Current CA Employee, Exhibit A, at Tab 46 ("Sanjay had a tremendous work ethic, one that surpassed most, and matched by a few."); Ltr. of Alex Nelon, Current CA Pilot, Exhibit A, at Tab 64 ("Sanjay is possibly the hardest working man I have ever met."); Ltr. of Randolph J. Watson, Former Colleague,

12

Exhibit A, at Tab 82 ("During these visits, Sanjay would follow gruelling [sic] time schedules to enable all of the meetings that had been prepared for him to be concluded ... In my opinion, I think that his commitment to Computer Associates was second to none."); Ltr. of James Tedesco, Current CA Employee, Exhibit A, at Tab 76 ("He worked tirelessly to build a great company...."); Ltr. of David Tomlinson, Former Colleague, Exhibit A, at Tab 78 ("During the business trips I have been privileged to accompany Sanjay on he has shown total commitment to his work for CA, working many hours a day on a lot of occasions we would be lucky to get five hours sleep because Sanjay was always striving to improve and promote CA."); Ltr. of James Gary Starkey, Current CA Employee, Exhibit A, at Tab 74 ("I have personally witnessed him to be one of the hardest working people I have ever been associated with.").

When Mr. Kumar assumed senior management responsibility at CA, he was very aware that CA had a negative image in certain parts of the marketplace as a cut-throat entity unconcerned with customer satisfaction. As Nancy Bhagat, a former Senior Vice President at CA, explains, she joined the Company because of Mr. Kumar's vision to create "a company that customers respected and admired; a company that put customers first in everything they did; and a company that had a single message articulating the value they delivered." Ltr. of Nancy Bhagat, Exhibit A, at Tab 13. Mr. Kumar spearheaded the creation of a new logo and used marketing tools to re-position the Company, but "[a]nother key aspect was to help drive change internally and to educate the employees and sales force that Sanjay was serious about developing and driving a kinder and gentler CA than the one that existed in years past." Id. In a bold move, Mr. Kumar also overhauled the compensation structure for roughly the top 250 managers to include an element of compensation that was

13

determined purely by customer satisfaction. Mr. Kumar's drive to better the Company proved invaluable as research soon demonstrated new levels of customer satisfaction, and that the perception of CA in the marketplace had improved. See id.; see also Ltr. of Alex Vieux, Former CA Board Member, Exhibit A, at Tab 80 ("[Mr. Kumar] also earned his peers' respect, for he turned around CA's reputation as a merciless, customer-averse company into a friendly, responsive and energetic one."). Mr. Kumar's willingness to be available at any time and to work extraordinarily hard made this all possible. See id.

### 3. Mr. Kumar's Earnings

Mr. Kumar was well compensated for his efforts. As set forth in detail in our submission to the Probation Department, Mr. Kumar received a generous base salary. He also was compensated under a shareholder-approved incentive compensation plan, adopted in 1994, which compensated certain executives pursuant to a formula measuring contributions to invested capital. This 1994 Plan provided both cash and stock awards to executives participating. Finally, in 1995, the Company's Board of Directors – after consulting executive compensation experts – recommended, and the shareholders overwhelmingly adopted, a Key Employee Stock Ownership Plan ("KESOP") which awarded stock to the Company's three most senior executives – Mr. Wang, Mr. Kumar, and Mr. Artz – upon the Company's stock price attaining certain levels.

The details of these plans and their resulting awards to Mr. Kumar have been presented to the Probation Department. Here, it is necessary only to make three observations. First, the record is clear that Mr. Kumar attempted, throughout his career, to

14

obtain and retain CA stock. Mr. Kumar always believed that the stock was undervalued.[6] Second, as described in the submission to the Probation Department, neither the results of the formula applied to determine compensation under the 1994 Plan nor successful attainment of the price targets to effect awards under the KESOP can be seen as materially affected by the 35-day month practice. In short, there is no causal connection between that practice and the compensation awarded to Mr. Kumar.[7] Third, the widely reported value of Mr. Kumar's award pursuant to the KESOP is vastly overstated.

While Mr. Kumar was well compensated for his efforts, he never forgot his obligation to use his wealth constructively. Also, importantly, Mr. Kumar was famous for his scrupulous conduct in ensuring that his personal expenses and lifestyle were not subsidized in any way by CA. Mr. Kumar was fastidious about reimbursing CA for every conceivable expense and wrote checks to pay the Company back for such minor items as a $1.74 pack of two blank video tapes and a $16.29 set of pens. See generally Ltr. of Denise Zimmerman, Exhibit A, at Tab 89 ("Sanjay always reimbursed the company. I know, because I was the

---

[6] Since virtually his entire net worth was in CA stock, Mr. Kumar was advised to liquidate some of his holdings for diversification. Accordingly, he adopted a plan to sell off a fixed number of shares per quarter. Notably, as the price of CA stock began to drop Mr. Kumar reduced, then discontinued, his participation in the quarterly liquidation program.

[7] In fact, Mr. Kumar pushed the New Business Model forward even though he knew that its adoption by CA would come at a financial cost to him. Since the New Business Model ushered in an era of recognizing revenue ratably over the life of a contract, it meant that the total accrued revenue numbers in FY 2001 were not as high as they had been in previous years, thus generating less profit and no incentive compensation for Mr. Kumar under the 1994 Plan's formula.

15

one who usually walked the reimbursement check down to the Accounting Dept ... He would never, ever think of having CA pay for anything that was personal.").[8]

### 4.  Commitment to Employees

Under Mr. Kumar's influence, CA became one of the most desirable places to work in the country. The company was named a "Best Place to Work in IT" by Computerworld in 2000, hailed as one of the 100 Best Companies in America for Working Mothers by Working Mother magazine in 2000, 2001, and 2002 (CA made it into the top ten in 2002), and described as one of America's Most Admired Companies by Fortune Magazine in 2000. Mr. Kumar's belief that employees came first led him to set new benchmarks in how well a large company's workers were treated by their executives. As Michael Brock, a former colleague, sees it, "Today, it is hard to find leaders who take personal interest in their employees like Sanjay did." Exhibit A, at Tab 18. In the words of former colleague Frank Yang, "[i]n my humble opinion a good manager can be easily found in many companies anywhere in the industry, but a true leader who earned this kind of high respect and appreciation from all his employees is probably rare in today's corporate environment." Exhibit A, at Tab 86. Another former CA employee, Edward Benz, Jr., describes Mr. Kumar's leadership in the following way:

> When Sanjay was there Computer Associates was a family company...During my fourteen years at Computer Associates I had a wonderful time working there and I contribute [sic] that directly to the way Sanjay ran the company. I have never met a more knowledgeable, caring, helpful and loyal boss than Sanjay Kumar. If Sanjay was to have another company I would not hesitate

---

[8] Because the Company's security policy required that he and Charles Wang travel in the company aircraft for all trips, business and personal, Mr. Kumar occasionally used the company plane for personal travel. Mr. Kumar – although not required to do so – voluntarily paid the Company for such personal usage.

working for him again. I know he did some foolish things but beyond that he is a man of immense integrity and character.

Exhibit A, at Tab 12.

Under Mr. Kumar's leadership, CA built a Montessori Child Development Center on CA's campus which gave employees the ability to work close to their young children. Mr. Kumar designed a sliding scale tuition system for the Montessori school such that the fee any given employee was charged varied with his or her salary; in this way, early childhood education was equally available to every employee and his or her family, regardless of salary. Creating a work environment that provided support for families was clearly a priority for Mr. Kumar:

> Sanjay was renowned for his hands-on approach to establishing and maintaining the excellent Montessori Program. He would frequently visit the kids and teachers in the Development Center and would, without fail, take time to present awards to the kids at the Kindergarten Graduation Ceremony each year. I remember he personally stepped in to resolve a situation when the Center's Administration turned down the enrollment application of a parent for her Special Needs child. I was very proud to watch that particular child graduate in June this year from the CA Kindergarten program.

Ltr. of Una O'Neill, Current CA Employee, Exhibit A, at Tab 66. Despite being a "brilliant software engineer" Mr. Kumar's "favorite spot in [the] building wasn't a laboratory," but the Child Development Center which hosted hundreds of children each day:

> It was comical to see him park his 6-foot-plus frame on a chair designed for a three-year old, but he did, and it brought giggles and smiles to a lot of little faces. In fact of all his accomplishments I think he was most proud that he had helped make world-class day care a reality for the working mothers of CA – and that he had done so with a lot of coaching from his late mother, herself a Montessori school teacher.

Ltr. of Charles B. Holleran, Former CA Employee, Exhibit A, at Tab 38.

17

Mr. Kumar worked long hours, traveled extensively, confronted the Company's most difficult problems, while at the same time he inspired people to reach new heights and supported them in times of personal difficulties. "[W]e have seen firsthand the sense of urgency and helpfulness that Sanjay would exhibit if ever a fellow employee was in a needful situation. Whether this was due to illness, an accident or a family emergency, Sanjay would be the very first to come to their aid no matter the case." Robert Bird and Vikki Kilminster-Bird, Current CA Employees, Exhibit A, at Tab 15. Mr. Kumar truly considered these efforts to be part of his job description. "Sanjay did not pay attention to remember these kinds of nice things that he had done for others. To help people for the betterment of their lives is simply part of his daily work, part of his living, and part of his great personality." Ltr. of Frank Yang, Former CA Employee, Exhibit A, at Tab 86.[9]

Too numerous to recount in full, a sampling of some of the instances in which Mr. Kumar discreetly came to the aid of his colleagues – described in the words of the employees themselves – is provided here:

> In late March of 1997, during the Easter Holiday, my father died. My father had resided in Europe since his retirement. I was devastated by my father's death. I called Sanjay to ask if he might be able to help in securing passports for my brother and fiancee, [sic] as they had none. Sanjay without hesitation, arranged for transportation for myself, fiancee, [sic] and brother to Stamford, Connecticut in order to expedite the procurement of the passports ... Upon our arrival back at Computer Associates, Sanjay asked me to come into his office. At that time, he presented me with 3 tickets to Europe, which he paid for, and expressed his heartfelt condolences. Sanjay said I could take all the time I needed to grieve the loss of my father and to help my mother during this very difficult time. I just stood there dumbfounded. I cannot even begin to tell you

---

[9] Mr. Kumar has also helped numerous colleagues, friends and family members by lending them money when needed for investments, mortgage payments and navigating difficult financial circumstances.

18

how much gratitude I had. Here was the President of a large company, who took the time to personally help me in my time of greatest need.

Raymond Kuck, Former CA Pilot, Exhibit A, at Tab 49.

Early in 2003 a CA employee was killed in an airplane crash. For some, flowers and kind words would be enough, but not Sanjay. He dropped everything and found his way to the family's home in North Carolina. There was no fanfare or entourage but there were grieving parents, a distraught wife and two little girls who had no idea what was happening. I'm sure they'll know some day that the CEO of their father's company showed up just to tell them what a great guy their dad was.

Charles B. Holleran, Former CA Employee, Exhibit A, at Tab 38.

[D]uring one of the annual corporate world conferences in New Orleans where some twenty thousand customers and partners would come together to learn about the new technologies...[o]ne member of my team was taken very seriously ill and needed to be taken urgently to the hospital ... [Mr. Kumar's] response was to immediately visit the young lady at her bedside in the hospital and having spoken to the medical staff decided to send for the parents, so that they could be beside her until such time as she could be moved and taken home. In my humble opinion any other person in that same situation would have just wanted to ensure that the company had acted properly. I found it amazing that [Mr. Kumar] could sense the human aspect when the business pressure for his time was at its highest.

Abram Azagury, Former CA Employee, Exhibit A, at Tab 5.

When one of CA's employees was killed in a plane crash [Mr. Kumar] personally contacted his wife and set up financial and emotional support for his family. He did this without telling anyone. The only reason I knew is because the employee's wife told me. When my wife's brother had a stroke at the age of 32, Sanjay offered to take him to any doctor in the world to make sure he was taken care of properly. He checked daily on his status. We were able to better understand what to ask and how to validate the care he was receiving because Sanjay had done research on his condition.

Michael Brock, Former Colleague, Exhibit A, at Tab 18.

I had one of my younger staff members get into serious financial trouble where he was in the process of losing his house. I spoke to Sanjay about this employee and his problem. Sanjay told me to have him see one of our vice presidents in our legal department and then personnel department. I set up appointments for him and with Sanjays [sic] approval he was given a payroll

advance, the legal department helped cleared [sic] up his credit and legal issues and he was counseled on how to handle his finances. This employee was one of my entry level facilities staff, after getting this helping hand this employee turned his life around and is now a manager with the company.

\*\*\*

[S]ix years ago...[my son] came down with a very rare autoimmune disease called Good pasture Syndrome...All through our ordeal Sanjay told me not to worry about work, come in when I can and leave when I have to because there is nothing more important than family. Sanjay always inquired about the status of my son even when he was out of the office his secretary would call me for an update. There came a time when I received a notice from our company insurance provider that my son's coverage was cancelled because he went well over the deductible for the year. I was so upset reading this I went to see Sanjay once again. Sanjay called the insurance and told them that as long as I was with Computer Associates they would fully insure my son and they did . . . These are just a few examples of things that Sanjay did for individual employees that were never made public knowledge because he wanted it that way.

Edward Benz, Jr., Former CA Building Manager, Exhibit A, at Tab 12.

On the day of [my mother's] wake Sanjay was traveling out of town. He and Mrs. Kumar sent a beautiful spray of flowers. At about 8pm that night, Sanjay walked through the door of the funeral home. I was shocked to see him. I knew he has a very long day of traveling and he did not have to show up, but he did. My dad, who was 81, wheelchair bound and suffering from the onset of Dementia was brought to the wake from a nursing home. Sanjay got down on his knees and talked to my dad. Not just hello, he knelt there and talked to him for a long time. My dad recognized him from the newspapers and was so happy. For days all he would talk about was Sanjay...He never, ever forgot what Sanjay did. How many CEO's do you know [who] would do that? I can never thank him enough for making my father smile on that day.

Denise Zimmermann, Former CA Administrative Assistant, Exhibit A, at Tab 89.

When one of the senior staff's new baby was having major health problems and the doctors were not treating the situation as well as she would have liked, Sanjay assisted in getting her the right attention. The little girl is now wonderfully happy – but could have died within the first 6 months of her life if not for Sanjay's generosity. This is one of the many cases where Sanjay demonstrated a personal commitment to loyal employees who needed his help.

20

Amanda Litzow, Former CA Executive Assistant, Exhibit A, at Tab 57.

> The first was an instance where Sanjay showed tremendous caring and compassion for one of our young employees. This young lady worked in my organization and was tragically involved in a car accident on her way to work and was killed only a few hundred yards from our Islandia office. Sanjay asked for the location and time of the funeral service. He did not send flowers or an emissary but cancelled his meetings and attended the service personally to pay his respects to an employee he did not know. He arrived without fanfare, stood in line with all other mourners and spent time with her family offering support and consolation. This kind gesture meant a great deal to both her family and colleagues.

> The second instance I would like to highlight involved a customer of CA's. During our annual customer conference it came to Sanjay's attention that one of our customers, who was in Las Vegas attending the CA conference, had suffered a tragic personal loss – his 11 year old son had been killed in a hit and run accident. Without hesitation, Sanjay immediately offered any help we could provide and flew the gentleman home on the CA corporate jet to get him back to his family as quickly as possible.

James Gary Starkey, Current CA Employee, Exhibit A, at Tab 74.

Mr. Kumar showed an equal regard for all employees, regardless of their place within the company hierarchy. One of Mr. Kumar's former assistants, Jessica Pincomb, recalls: "Over the past ten years I have witnessed Sanjay treat everyone he meets with this level of respect and care; regardless of differences in background, business level, age, social class, or the like." Exhibit A, at Tab 70. Former CA Board Member Alex Vieux states: "I cannot but emphasize the value of his contribution to transforming prejudices in Corporate America through his work and vision." Exhibit A, at Tab 80. As Abram Azagury put it, "he was a man that showed compassion and caring for his colleagues. He had time for the staff and showed real concern for everyone's real issues. He never made his position one where he would consider his seniority in the company to be important when dealing with personal

issues." Exhibit A, at Tab 5. As Mr. Kumar's former administrative assistant, JoAnn

Sciachetano, recounts:

> CA had a suite at Madison Square Garden along with 4 floor seats for the
> Knicks…The times when we had extra tickets that were not being used by
> clients, [Mr. Kumar] would tell me to give them to the Mailroom or Facilities
> employees because they usually didn't get to go to the special events. He was
> always thoughtful of all the employees. He treated everyone as a special
> person.

Exhibit A, at Tab 71. Mr. Kumar was always quick to lend a helping hand to any person who

seemed deserving and in need; recipients of his generosity ran the gamut from gas station

attendants to business executives. Mr. Kumar's former assistant recounts an incident in

which Mr. Kumar received a call from a young person whose voice she did not recognize:

> I asked him what this was in regard to and he told me that he worked at a gas
> station and that Mr. Kumar gave him his card and said to call him…I then
> asked [Mr. Kumar] if he had given his business card to a boy at the gas
> station. [Mr. Kumar] remembered and said yes that the boy would always
> hustle and run to get his change and appeared to be a hard worker. He
> instructed me to call the HR department and arrange to have him come in for
> an interview. He was hired and worked with us as a sometimes driver, gofer,
> and eventually customer service capacity.

Id.

"People in the company respected him and many to this day bemoan the

disappearance of a clear voice who cared about employees and made people proud to be

apart [sic] of the culture." Ltr. of Nancy Bhagat, Former CA Employee, Exhibit A, at Tab

13. Despite Mr. Kumar's present situation, many of the letters the Court has received

remark on Mr. Kumar's integrity. Even today, many who worked with him at CA recall

being inspired by his forthrightness and virtue. See, e.g., James Tedesco, Current CA

Employee, Exhibit A, at Tab 76 ("In leading CA, I experienced Sanjay as a person with the

highest integrity and personal morals."); George Kafkarkou, Current CA Employee, Exhibit

A, at Tab 46 ("With the exception of Sanjay's crime, I had no cause to doubt his integrity over the years. Quite frankly, my experience of Sanjay's record of integrity, caring, sincerity and loyalty was inspirational."); M. Lewis Temares, Former Colleague, Exhibit A, at Tab 77 ("In all of our dealings, Sanjay has proven to be ethical, honorable and forthright. He has conducted himself with integrity…"); James Lansing, Former CA Employee, Exhibit A, at Tab 52 ("Sanjay lead [sic] most of our field training sessions and was emphatic about honesty and integrity in all business dealings.").

Mr. Kumar's integrity has stood out to his friends and those he has worked with in the community as well. See Reverend Allan Barth, Exhibit A, at Tab 6 ("Despite his fall in this area, I believe him to be a man of genuine integrity and character."); Marcus D. Hurlbut, Former Headmaster, Friends Academy, Exhibit A, at Tab 40 ("I find myself looking for people within our school community with the same honor and integrity as Sanjay Kumar."); Laurence S. Hughes, Partner, Rivkin Radler LLP, Exhibit A, at Tab 39 ("I just have to admire how often, during the course of some of the business negotiations I have worked with him on, he has expressed his desire to do what's 'fair,' 'right,' and 'reasonable' (rather than extract as much as possible from the other side)"); Christine Johnson, Former Nanny, Exhibit A, at Tab 44 ("It does not surprise me that Sanjay has taken responsibility for his actions because he has always shown good character and integrity."); Bonnie Fisher-Lundquist, Family Friend, Exhibit A, at Tab 59 ("[Mr. Kumar] is a man of integrity, humility and grace."); David Lesch, Brother-in-law, Exhibit A, at Tab 55 ("I have and continue to admire his honesty, integrity and intelligence."); Rene and Geoffrey Boisi, Family Friends, Exhibit A, at Tab 16 ("We have witnessed both Sanjay and Sylvia approach situations or tasks with integrity, perceptiveness, thoughtfulness, sensitivity and hard work."); Jim Penosky, Brother-

23

in-law, Exhibit A, at Tab 68 ("Over the course of the past sixteen years, I have come to respect Sanjay as a man of integrity and intelligence, a caring and loving father, husband, son and brother, a dedicated and loyal professional and a generous human being who always puts other people first.")

### D.   The Kumar Family

Mr. and Mrs. Kumar have two daughters: Alisha, age 13, and Lindsey, age 16. In spite of his dedication to the Company and his colleagues, Mr. Kumar never let business demands prevent him from fulfilling his most important role – that of a father and husband. Those who know him universally describe him as a "family man." Married for 18 years, Mr. Kumar and his wife found in each other unlikely companions; though they came from very different backgrounds, they shared a world view and a commitment to the same personal values. As Mrs. Kumar's father explains it:

> I have always been struck by Sanjay and Sylvia's exceptional understanding of one another and their great ability to communicate. I have personally witnessed the special bond between the two of them and it is a wonderful feeling for a father to know that his daughter is truly happy. I have witnessed Sanjay's devotion to Sylvia – during trying times, as well as in less obvious ways on an ordinary day – and it has given me complete faith and trust in him.

Ltr. of Roland and Brenda Mann, Exhibit A, at Tab 61.

Education has been of the utmost importance in the Kumar family throughout the generations and Mr. Kumar has been committed to and involved in his daughters' education whatever the other demands on his time. He is known around Friends Academy, the school both girls have attended, as one of the few fathers always in attendance at school events, from parent teacher conferences, to school plays and concerts, to parent council meetings. As family friend Don Vassallo remembers:

24

The very first time I met Sanjay Kumar I knew right away that he would be someone I would both like and respect. It was about 11 years ago and the occasion of our older daughter's "graduation" from kindergarten. It was the middle of the afternoon of a work day and my wife and I were seated in the Montessori school auditorium. As I looked around the room I began to believe that I would be the only Dad in a place filled with Moms. I actually started to wonder if I should even be there. Then Sylvia Kumar walked in, and at her side was Sanjay...When I saw him walk into the room, I knew I was about to meet a man with his priorities in the right order. He had taken the time out of his incredibly busy schedule to come to his daughter's kindergarten graduation! To me, dedication and devotion to family says more about a man's character then [sic] anything else.

Exhibit A, at Tab 79.

Mr. Kumar has been a more stable and constant presence in his daughters' lives than most professional fathers. Again, examples of Mr. Kumar's commitment to his role as a father are too numerous to recount here. Many of the letters submitted to the Court bear testament to Mr. Kumar's exceptional devotion to his daughters. See, e.g., Ltr. of Bonnie Fisher-Lundquist, Family Friend, Exhibit A, at Tab 59 ("In his busy life, family has always been the priority. This man, I have witnessed throughout the years, has been devoted, attentive, nurturing and disciplined."); Ltr. of Colleen Fortuna, Family Friend, Exhibit A, at Tab 33 ("Sanjay brings unique insights and understanding to parent council discussions often as one of the only fathers participating."); Ltr. of Susan Karches, Family Friend, Exhibit A, at Tab 47 ("He is a devoted husband and father who has been extremely helpful and generous in our community and at our school."); Ltr. of Robert Farrell, Family Friend, Exhibit A, at Tab 31 ("His relationship with his children is exemplary. No matter how busy he might be, he always took time to attend the children's class functions and participate in parent-teacher activity."). Shannon Sykes, a former caretaker of Mr. Kumar's daughters writes:

I struggle with the current circumstances because I know the relationship Sanjay has with his daughters and how this must impact each of them. Sanjay

25

was an incredible role model for me, and as Lindsey and Alisha reach the ages when the lessons I learned from him will be the most valuable to them, I know that the girls need him now more than ever. There is perhaps nothing more important in a young person's (more particularly a young woman's) life than to be encouraged and supported, especially by a father. Sanjay has always played such a large role in Lindsey and Alisha's lives that I cannot help but be very worried about what the future holds for them and Sylvia. Sanjay is the fulcrum of this family unit and Lindsey and Alisha will be the ones who suffer that loss.

Exhibit A, at Tab 75.

Mr. Kumar has imbued in his daughters the importance of caring for people less fortunate than themselves.[10] Sylvia's father, Roland Mann, recounts: "I know it was important for Sanjay to show the girls that people were less fortunate than they and to instill in them, at an early age, the importance of giving back." Exhibit A, at Tab 61. On Thanksgivings, the family volunteers in a soup kitchen; the rule that Mr. Kumar has set for the children is that they must make sure others are fed before they can sit down to their own Thanksgiving meal. Mr. Kumar has taught his daughters about, and exposed them to, the extreme levels of poverty, disease and hardship that children their age in Africa face. In response, his daughters pool their allowances and provide a scholarship for a young Masai girl in Kenya – whose family could not afford to educate their daughters – to attend high school. As the mother of one of Lindsey's friends, Bonnie Fisher-Lundquist, has observed:

---

[10] Those who know the Kumars are constantly surprised to eventually discover that the family was well-off – as Janaki Yadlapalli recalls, "It must be been months before I found out who the Kumar's [sic] were. Never once did they flaunt their fame or fortune." Exhibit A, at Tab 85. Family friend Susan Karches further notes:

One of the most admirable qualities of Sanjay and Sylvia is that despite their good fortune in life, they are simple people and material things are not a priority for them. There is not [sic] sense of entitlement or superiority and they treat others with kindness and respect.

Exhibit A, at Tab 47.

[Mr. Kumar] has been an amazing example of strength and courage for his children. He has raised with his wife two beautiful, poised, well-mannered girls who are dedicated to their studies and to making their world a better place. This I have found to be a rarity in our world today. These girls have a sense of compassion and earnestness that is so refreshing. Sanjay has instilled in them the importance of leading a life of grace, humility and the importance of education. It has been a unique opportunity for me and [my daughter] to have the Kumar's [sic] in our life. In short, how they conduct their life has been a wonderful example for my daughter.

Exhibit A, at Tab 59.

Nothing has been harder for Mr. Kumar than facing the fact that his actions have put his family in a position of suffering. Family friend Thomas Dooley notes, "Sanjay and his wife Sylvia and their two daughters Lindsey and Alisha have endured great humiliation during this challenging period. I know how difficult it must be for Sanjay to put his family through this and I know he is deeply hurt to see them suffer." Exhibit A, at Tab 25. As Jennifer Fischer, a former nanny, notes:

> In my time with the Kumar's [sic] I was able to observe that they were a very private family. They never wanted to be the center of attention. Ironically, Sanjay always wanted his good works to be anonymous and to avoid the spotlight. Of course, the tragedy is that over the last several years, he and his family have had to endure horrible public scrutiny and humiliation. Sanjay always wanted to shield Lindsey and Alisha from anything that could hurt them. As a result of his actions, they are suffering. I know this brings him pain beyond words. I cannot even imagine how Alisha, Lindsey and Sylvia will be able to cope with his absence. He is the center of their world!

Exhibit A, at Tab 32.

The toll this has taken on the Kumar family, and in particular Alisha and Lindsey, has been painfully evident to all who surround them. As their friends' mother, Janaki Yadlapalli, has observed: "Lindsey and Alisha are very young and impressionable and their dad is their whole life." Exhibit A, at Tab 85. Mr. Kumar's sister, Sharmila, feels that: "[w]hile the

27

media coverage has greatly hurt all of us, it has most unfairly brought the greatest pain to Lindsey and Alisha." One of the people closest to them, Mrs. Kumar's father, laments:

> [A]lthough we tend to be a very reserved and proud family, I feel it is necessary to explain how very worried I am about what the future holds for Sanjay and his family. Sanjay's daughters are so close to him and rely on him so very much. He has never been an absent father, as so many professional fathers are. His girls will be so devastated if their father is now torn away from them at such an impressionable age.

Ltr. of Roland and Brenda Mann, Exhibit A, at Tab 61.

Mr. Kumar is also relied upon by his extended family. As family friend Don Vassallo has seen, "Sanjay is critical to the health and well-being of his family." Exhibit A, at Tab 79.

- For Mrs. Kumar's sister, Teena Adams, who is blind and afflicted with diabetes, Mr. Kumar has been an anchor of psychological and financial support. He has taken a lead role in her health care, researching her condition, finding the right doctors, and arranging for her to receive the proper treatments. The prospect of facing these issues without Mr. Kumar by their side is daunting to the Adams family. See Ltr. of Jeffrey and Teena Adams, Exhibit A, at Tab 1; Ltr. of Josh Adams, Nephew, Exhibit A, at Tab 2.

- Mr. Kumar has been instrumental in supporting the education and career goals of his young nephew Josh, Teena's son, helping him to stay focused on school despite his mother's many health problems, and setting up an educational fund for his benefit. See Ltr. of Jeffrey and Teena Adams, Exhibit A, at Tab 1; Ltr. of Josh Adams, Exhibit A, at Tab 2.

- Mr. Kumar has been a particularly critical supporter of Sharmila, his sister, and her husband David recently as their young son was diagnosed at birth with numerous chromosomal abnormalities, "[w]hile we have fallen short of spirit at times, Sanjay has always been there for us." Ltr. of Sharmila Kumar Lesch, Exhibit A, at Tab 56.

When Mr. Kumar's mother died suddenly in 2001, and his father's health consequently deteriorated, Mr. Kumar's father moved to Long Island so that he could be closer to Mr. Kumar and his family. Roger Kumar depends on Sanjay Kumar for comfort, companionship, and everyday help such as rides to the doctor's office. The thought of being

28

separated from his only son is heartbreaking. See Ltr. of Roger Kumar, Exhibit A, at Tab 50

("[Sanjay's] absence from my life will create an incredible hardship on me. However, it is

frankly the loss of his companionship that I can hardly bring myself to consider."). Roger

Kumar's physician, Dr. Gary Wadler, has observed the toll that Sanjay Kumar's legal

troubles have taken on Roger Kumar:

> There is little question that the recent events affecting Sanjay have had a profound effect on his father. Roger, normally cheerful and outgoing, has become increasingly withdrawn since Sanjay's plea. Given Roger's dependency on his son, there is little question that the length of Sanjay's sentence will have a significant, if not dramatic, lasting effect on his father, a man of deep religious conviction.

Exhibit A, at Tab 81.

## II. MR. KUMAR'S PHILANTHROPY AND COMMITMENT TO THE COMMUNITY

Mr. Kumar's unflagging dedication to serving the community has lasted all of his life,

beginning well before he rose to the top of his profession. Mr. Kumar is a man who has

always stepped forward when people were suffering and who has been particularly attuned to

the needs of the most vulnerable: women and children. His charitable good works reach far

and wide, across the world, and are so numerous that they are difficult to summarize. From

funding a mobile health care unit in Long Island to provide lacking medical assistance to

Nassau County's many indigent children, to creating scholarship programs at a local Quaker

school to allow needy students to attend, to setting up and endowing a scholarship program

for poor African girls who were denied an education by their families, to his immediate

provision of much-needed medical aid following the United States embassy bombing in

Nairobi and the tsunami in his native Sri Lanka, Mr. Kumar has always been more a partner

than just a donor.

While it is not uncommon for highly successful executives to become involved in charitable endeavors after or toward the end of their careers, it is particularly noteworthy that Mr. Kumar's dedication to charitable causes has been a central defining theme to his life from a very early age, and remarkably only increased when the demands of his career were at their highest. In the brief period of his young life when he has been fortunate enough to earn significant means, he has donated millions of dollars to those in need. In addition to the countless groups Mr. Kumar has supported over the years, Mr. Kumar also established his own charitable fund – the Limo Almi Foundation – to which he has made very substantial financial contributions that are irrevocably earmarked for distribution to charitable organizations. And, because of his generosity, individuals and entities have been inspired to donate millions more.[11]

However, these dollar figures, though impressive, vastly understate his philanthropy. More than simply writing a check, Mr. Kumar rolls up his sleeves and gives his time to each of the many organizations with which he has partnered. The former headmaster of Friends Academy observed: "Perhaps it was because of his mother's experience or perhaps it was simply just who he was, but the fact was that Mr. Kumar was always there with interesting and provocative ideas and a generous spirit to support those ideas." Ltr. of Marcus D. Hurlbut, Exhibit A, at Tab 40. Iain Douglas-Hamilton, biologist and wildlife conservationist, echoes those sentiments: "I am also moved because when he was in this high powered

---

[11]Mr. Kumar fostered CA's charitable matching gift program whereby an employee's contribution to a charitable organization was matched by the Company 2-to-1. Many of Mr. Kumar's personal donations were matched through this program.

executive world he would take time out to help causes he thought right, and not just dole out money but use his intelligence and forethought to get involved." Exhibit A, at Tab 26.

The good Mr. Kumar has done may be immeasurable, as his creativity and vision enables him to craft and endow successful programs which themselves perpetuate the good works that he sets in motion. As Monroe Diefendorf, a church elder at the North Shore Community Church observed: "[t]he widespread influence and impact as a result of the generosity of the Kumars has been in the magnitude of thousands of people." Exhibit A, at Tab 23. Oria Douglas-Hamilton, who runs the scholarship program in Kenya that enables young girls to attend secondary school, writes: "[t]here is no doubt in my mind that the programme is where it is today because of Sanjay's initial involvement – his sponsorship set this all in motion." Exhibit A, at Tab 27.

Mr. Kumar's generous spirit has inspired many around him and encouraged them to follow in his footsteps. As Lillian Cupelli, a fellow parent and friend of the Kumars writes: "Sanjay Kumar is one of those rare individuals who, with his actions, makes you aspire to be better than you are." Exhibit A, at Tab 22.

Despite the force with which he has impacted the lives of others, Mr. Kumar has always been extraordinarily modest about his good works. Throughout the letters submitted by those Mr. Kumar has touched are testaments that refer to Mr. Kumar's requests for anonymity and his repeated refusals of recognition. "In this way, he embodies [our] Quaker principle of selfless service." Ltr. of Bill Morris, Head of School, Friends Academy, Exhibit A, at Tab 63; Ltr. of Jennifer Fischer, Former Nanny, Exhibit A, at Tab 32 ("I observed [Mr. Kumar] make countless contributions to charities. He gave anonymously, and I always thought that revealed a lot about his character."); Ltr. of Don and Melanie Vassallo, Family

31

Friends, Exhibit A, at Tab 79 ("[Mr. Kumar's] philanthropy is evidenced all around [Long] Island, but you may have to look hard to find it tied to his name because he did most of it with little or no publicity or fanfare."); Ltr. of Maryann Beaumont, Executive Director, Friends of the Arts, Exhibit A, at Tab 9 ("A few years ago we tried to dedicate a bench at Planting Fields in his honor to thank him for his support, and he did not want the gift. His giving has been, in my view, quite selfless and sincere . . . ."); Ltr. of Curtis Welling, President, AmeriCares, Exhibit A, at Tab 83 ("[Mr. Kumar] seemed quite uninterested in any personal publicity or profile and he couldn't have been more helpful in facilitating this important response."); Ltr. of Ronald Baskind, Dean of Students, Friends Academy, Exhibit A, at Tab 7 ("Not only did Sanjay offer his time and his ideas he offered generous support without any thought of recognition.").

While it is not possible to adequately describe the time, resources and skills Mr. Kumar has dedicated to each of these organizations within the confines of this submission, some of Mr. Kumar's charitable endeavors are described below and in the accompanying letters.

A.    **Work to Benefit Women and Children:  Health Care and Education**

The bedrock of Mr. Kumar's philanthropic work is support for women and children in the fields of health care and education. Mr. Kumar's philosophy stems from his view that, in impoverished communities where life is difficult for all people, the circumstances are often all that much worse for women and children. A sample of his most significant contributions are:

1.    **Pediatric Mobile Health Unit**

32

Deeply concerned about the unmet healthcare needs of Long Island's low-income children, Mr. Kumar formed a relationship with Michael Dowling, the President and CEO of the North Shore-Long Island Jewish Health System, beginning in 1999, and started work aimed at reaching out to those children at-risk.

> During this process . . . I got to know Sanjay quite well. I considered him an extremely talented, compassionate and caring individual who was committed to doing positive things for his community. He often talked about his immigrant background, his love for his parents, how fortunate he considered himself to be and his desire to give back.

Ltr. of Michael Dowling, Exhibit A, at Tab 28.

"[Mr. Kumar] was constantly pursuing innovative ideas about how the private sector and government could collaborate to enhance access to care." Exhibit A, at Tab 28. Mr. Kumar's imaginative thinking and generous funding contributed to the construction of North-Shore LIJ's first ever Pediatric Mobile Health Unit. The Mobile Unit is able to park in at-risk communities on Long Island and thereby bring free preventative health care to children who would otherwise be without access to a doctor. Thanks to Mr. Kumar's support, the Mobile Unit is fully equipped with all the accoutrements of a medical practice and staffed with doctors, a social worker, a nurse practitioner and medical technicians. "Sanjay wanted to expand the program and increase the number of mobile units. He was so committed to this program that he required I send him monthly statistical reports on how many children were served." Ltr. of Michael Dowling, Exhibit A, at Tab 28.

More than 4,000 patients continue to visit the Mobile Unit each year. "Part of the mobile unit's mission is to create a zone of safety so that parents can feel free to bring their children in without fear of legal repercussions [e.g., because they are undocumented]. For many, a visit to the van is a family's first step toward giving their children a new life: With

33

proper medical checkups and shots, they can enroll their children in school." Ridgely Ochs, In the Vanguard of Pediatric Medicine; Mobile unit puts 'continuity of care' on wheels, Newsday, Sept. 11, 2001, at C6.

## 2. Friends Academy

For well over a decade Mr. Kumar has been involved in an incredible number of projects at Friends Academy, a local Quaker school on Long Island, to improve the facilities and faculty and to broaden the cross-section of the population that it serves. In the words of the former headmaster:

> Frankly, as I continue in my role of headmaster of another independent school in Southern California, I find myself looking for people within our school community with the same honor and integrity as Sanjay Kumar. It would be very difficult to assess the impact he had on the lives of the people of Friends Academy. He is indeed the parent that every school headmaster dreams of. We all wish there were many, many more like him.

Ltr. of Marcus D. Hurlbut, Exhibit A, at Tab 40. Some of the projects that Mr. Kumar has been involved in at Friends Academy are described below.

*Scholarship Program and Diversity at Friends:* Aware of the importance of diversity in education, Mr. Kumar has been actively involved in designing and endowing scholarship programs for children on Long Island who would otherwise be unable to attend Friends. "[Mr. Kumar] believed education was a path to defeat poverty and was tireless in his efforts to push the Board and school to provide a Friends Academy education to as many underprivileged children as possible." Ltr. of Thomas Dooley, Friend and School Parent, Exhibit A, at Tab 25. In the words of Friends Academy's Head of School:

> In some years, [Mr. Kumar] has supported up to 20% of our financial aid budget, a number that equates to assistance for some 30 students. This is a remarkable gift for these students, and one that Sanjay makes without

34

expectation of public recognition. In this way, he embodies [our] Quaker principle of selfless service.

Ltr. of Bill Morris, Exhibit A, at Tab 63.

Mr. Kumar has also helped dramatically expand a free summer school program –

"Breakthrough Long Island" – for talented students from limited economic backgrounds.

Mr. Kumar spearheaded a scholarship program whereby the most successful summer school

students are offered the opportunity to attend Friends Academy as full-time students.

Herb Lape, the Religion and Ethics department head at Friends, recalls Mr. Kumar's

participation in a program aimed at encouraging ways to address the tension between the

school's mission to educate an economically and ethnically diverse student body and the fact

that as a private school Friends is dependent upon tuition to meet its costs:

> Sanjay spoke movingly about his own story as an ethnic minority of modest means who had been afforded many opportunities in his adopted country that values economic and racial justice. He has given very generously to help build our endowment that helps make financial aid for diversity possible, but I was mostly impressed that he was willing to give of his time to show up at a meeting that was not that widely attended on a topic that many in our school give lip service to. I [am] sure he had less time than money to give and yet he wanted to be there and show his support for economic and racial justice and diversity.

Exhibit A, at Tab 53.

*Health and Wellness Initiatives:* In an effort to help students and parents deal with a

number of issues facing the student body (including drug abuse, depression, sexual acting

out, over-permissive parenting), Ronald Baskind, the current Dean of Students, partnered

with Mr. and Mrs. Kumar and a few other parents to create the Health and Wellness Program

at Friends. Over fifty programs have been offered since its inception and thousands of

students and parents have been served. As Mr. Baskind explains:

35

> Not only did Sanjay offer his time and his ideas, he offered generous support without any thought of recognition. I cannot express how much Sanjay and his family's support has meant to the program and the school.... In fact, his support has enabled us to extend the program beyond the school community, and we now offer all resources and programs to our neighboring public and private schools.

Exhibit A, at Tab 7.

Mr. Kumar not only provided financial support for the health and wellness initiatives, but also has chipped in to do the small tasks that need to be done to make the programs work:

> [Mr. Kumar] helps with set-up and registration, stands behind the book sale table, and stays late to help with clean-up long after most others have left. Volunteerism and philanthropy can be the grand gesture or the little act of kindness, and Sanjay has done both because he appreciates that in both ways he is helping to make a positive difference in the lives of others.

Ltr. of Bill Morris, Head of School, Exhibit A, at Tab 63.

In addition to his participation in the Health and Wellness programs, Mr. Kumar has himself conducted evening seminars for parents of Friends Academy students on the topic of computers and Internet safety. See Ltr. of Colleen Fortuna, Friend and School Parent, Exhibit A, at Tab 33.

*Faculty Enrichment Program:* Mr. Kumar also sought a way to improve the lives of the faculty at Friends – where the salaries are generally lower than in the public schools – and spearheaded the creation of a new faculty enrichment program that gives dozens of teachers the opportunity to learn and travel domestically and internationally during the summer months.

> ... Mr. Kumar was instrumental in creating and then providing funding to support a Faculty Enrichment Program which provided $100,000 per year to be awarded to deserving members of our faculty for summer travel and professional development. I can think of no other program in my 35 year career as a schoolteacher and school leader that has had a greater impact on the growth and development of the faculty than this program.

36

Ltr. of Marcus D. Hurlbut, Former Headmaster, Exhibit A, at Tab 40.

*Friends Academy Library:* Mr. Kumar also helped endow Friends Academy's extraordinary new library. See Ltr. of Judith James, Library Director, Exhibit A, at Tab 43. "It is filled every day with the voices of young people who are drawn to the library as a place to study, read, relax and meet with their teachers. Were it not for Sanjay's personal involvement in the project I doubt it would be the success it is today." Id.

*School Events:* Mr. Kumar's participation in school events is perhaps best described by those who have watched him in action:

- "For the last three years, during our Fall Fair, a day-long event to build community, Sanjay has done the thankless task of working in the 'bank,' a small room where cash receipts go for counting and reconciliation. He always maintains his sense of humor and upbeat attitude, which helps the other volunteers do the same. This is another example of Sanjay doing the quiet, behind-the-scenes work that makes a difference for our community." Ltr. of Bill Morris, Head of School, Exhibit A, at Tab 63.

- "Sanjay has contributed to life at Friends Academy in countless ways not only by making generous contributions, but also by giving his time and sharing his knowledge through evening seminars on computers and the Internet when most of us were just learning how to navigate the web. At Friends Academy, Sanjay could frequently be seen volunteering for various events and delivering trays of food for the dances and concerts." Ltr. of Lillian Cupelli, Family Friend, Exhibit A, at Tab 22.

- "As Friends [sic] building campaign progressed, the Lower School was not the focus of the first round of priorities. Sanjay recognized the need for at least a cosmetic refreshing of the Lower School as well as the necessity of developing an overall technology plan for the primary grades. Quietly and without public acknowledgment, Sanjay spearheaded the refurbishing of the Lower School's physical plant and the installation of computer stations in several grades. This had a very positive effect on the students, teachers and parents." Ltr. of Rene and Geoffrey Boisi, Family Friends, Exhibit A, at Tab 16.

### 3. Education and Health Care in Kenya

On a business-related trip to the Lake Naivasha region in Kenya in 1997, Mr. Kumar met Iain Douglas-Hamilton, an elephant biologist, and his wife Oria, a longtime volunteer

involved with humanitarian and environmental problems in Africa. He was at once taken by the "simple life and beauty of Kenya," Ltr. of Oria Douglas-Hamilton, Exhibit A, at Tab 27, and saw an opportunity to help with Mr. Douglas-Hamilton's conservation projects and, later, Ms. Douglas-Hamilton's efforts to improve education and health care in the region.

*Scholarships for Young Girls in Kenya:* Concerned that young girls in the local communities surrounding several national reserves in northern Kenya were without secondary education opportunities, Mr. Kumar spearheaded the creation of a scholarship program to sponsor these girls and enable them to continue their education. See Ltr. of Shivani Bhalla, Education Officer, Exhibit A, at Tab 14. In 2000, the wildlife group in Kenya, run by Mr. Douglas-Hamilton, that Mr. Kumar supported was just beginning an education program focused on providing scholarships to bright children from the poor semi-nomadic families that live near the wildlife reserves. At the time Mr. Kumar learned of the new venture, the program sponsored three students – two of them boys. Mr. Kumar shared with the program's founder, Oria Douglas-Hamilton, his vision of developing the program with a specific focus on furthering the education of girls in the region.

> In an effort to support the broader community, [Mr. Kumar] challenged us to go beyond the children whom we already knew near the reserves and to go out and interview young girls in the broader region to find girls deserving of the scholarships. Sanjay gave us the resources to overcome many of the obstacles to finding these girls. Sanjay's support at the inception allowed us to set up the programme properly and it is because of him that it is such a success – we now sponsor 25 students who would otherwise be unable to attend secondary school. Eight children have already completed the programme.

Ltr. of Oria Douglas-Hamilton, Exhibit A, at Tab 27.

The recipients of the scholarships receive funds to cover four years of education, uniforms, personal items and travel allowances. "The girls who enter the programme – who

38

would otherwise be circumcised and married off – have had their lives completely changed."

Id. In addition to his overarching support of the program, Mr. Kumar and his family

personally sponsor two girls each year. Two of the girls that Mr. Kumar has sponsored have

not only completed their secondary school education, but one has earned a diploma in

nursing and another is currently pursuing a diploma in child-care education. Patina Lemooli,

age 17, explains the effect Mr. Kumar's generosity has had on her:

> Sincerely this has changed my life ... after completing my education I can go
> back to my village and use my education in a very positive way. Going to
> secondary school was a dream which only came true. Thanks to Mr. Kumar.
> I'm now the only educated girl in my entire village and [I am] very happy and
> fortunate to have been given this amazing opportunity. I have no words to
> express my gratitude for what Mr. Kumar and his family have done [for] me
> and my family.

Exhibit A, at Tab 54. Josephine Nuria, a young lady from the Borana tribe writes the

following:

> ... Mr. Sanjay helped to stand in for my school fees in a diploma course in
> nursing which was too expensive [for] my family . . . Now [] I am qualified
> and working [as] a diploma nurse in my country all just [be]cause of him,
> what a wonderful man . . . I am now [the] bread winner of my family [and] try
> to care for [my] siblings. May God continue blessing him and strengthen his
> love to many.

Exhibit A, at Tab 65.

Mr. Kumar has instilled the importance of charity in his own daughters, who have

come to Kenya to spend time with the girls from the scholarship program. Iain Douglas-

Hamilton recalls how impressed he was when Mr. Kumar's daughters told him that they were

going to pay for some of the scholarships from money saved up from their holiday

allowance:

> [Mr. Kumar] is a loving father and he and his wife Sylvia have educated their
> two girls with simple unspoiled manners and attitudes. The children have

39

been encouraged to develop a real sense of social responsibility based on personal example ... Sanjay has avoided lavishing his children with the extravagant trappings of an extravagant life, and they have been taught to regard wealth as a great responsibility.

Ltr. of Iain Douglas-Hamilton, Exhibit A, at Tab 26.

*Medical Care in Kenya*: Familiar with the Community Clinic in Naivasha run by Oria Douglas-Hamilton, Mr. Kumar was concerned about the many people further north in Kenya who had no access to medical treatment. Inspired to do something about it, Mr. Kumar partnered with Oria to organize several "clinic days" in the remote villages in the north of Kenya whereby individuals who would normally never receive medical attention were treated. Mr. Kumar donated the necessary medical supplies and he and his family traveled with the nurse into the bush (a group of houses made out of branches and mud cover encircled by thorn branches) to administer the medical care. During these clinic days hundreds of Samburu people – women, elders, warriors and young children – had their wounds, stomachs, eyes and chests treated. As Oria Douglas-Hamilton explains:

It was incredibly important for Sanjay to be there and meet the people who were being treated. To attempt to put this in perspective, North Kenya is an extremely hot, arid and harsh place to live and these people have so very little – they deal with their problems as best they can. Sanjay gave them an *incredible* gift – "Sanjay" is not a name people in this region will forget.

Exhibit A, at Tab 27.

### 4. Work to Benefit Women and Children in India

Keenly aware of the poverty in India, Mr. Kumar has consistently supported smaller charities that help support Indian women and children in need in specifically targeted ways. Mr. Kumar believed that donations to these smaller organizations, which were matched by CA's matching program, would ensure more of a direct impact. Reports from just a

40

sampling of the numerous charities to which Mr. Kumar has donated show that these donations have had a profound and direct impact on people in need in India:

- <u>Salaam Baalak Trust</u> – Mr. Kumar's donation helped to provide 2,500 street children in and around the railway station in New Delhi with education, training, healthcare, shelter and, sometimes, reunification with their families. <u>See</u> Ltr. of Sunil Agarwal, Exhibit A, at Tab 4 & Tab 4A (Ltr. of Dr. P.N. Mishra, Program Manager of the Salaam Baalak Trust).

- <u>Aarohi</u> – Mr. Kumar's donation was used toward the purchase of land for running a primary school in the village of Satoli in the Himalayas and helped make possible the construction of a hospital in this remote region. Over 80 children now attend the primary school and over 12,000 people have received the benefit of hospital care. <u>See</u> Ltr. of Sunil Agarwal, Exhibit A, at Tab 4 & Tab 4B (Ltr. of Dr. Sushil Sharma, Secretary of Aarohi).

- <u>The Servants of India Society</u>: Mr. Kumar's donation helped improve the nutritional standards of several pre-schools (children ages 3-6) in the slums around Delhi and also provided those children with health care and immunizations. <u>See</u> Ltr. of Sunil Agarwal, Exhibit A at Tab 4 & Tab 4C (Ltr. of Mrs. K. Satyanand, Hon. Secretary and Director of The Servants of India Society).

- <u>Raphael</u> – Mr. Kumar's donation was used toward the education and welfare of children whose parents suffer from leprosy and mentally handicapped children. <u>See</u> Ltr. of Sunil Agarwal, Exhibit A, at Tab 4 & Tab 4D (Ltr. of Brig AAS Sinha, Director and CEO of Raphael).

Mr. Kumar's donation also helped develop and support scholarships for approximately one thousand undergraduate engineering students in India who would otherwise have been unable to afford to attend college at Jadavpur University, BITS (Pilani), B.M. Srinivasan College of Engineering (Bangalore), and VJTI (Mumbai).

## B. Civic Projects

In addition to his work to improve education and health care described above, Mr. Kumar has made a quiet effort to improve the community in which he lives on Long Island. Representative of these efforts is Mr. Kumar's involvement with:

## 1.   Nassau County Sports Commission: "Let's Do It!" Program

In 1999, Mr. Kumar helped conceive and endow a program to provide children from lower socio-economic backgrounds with the opportunity to learn about and participate in sports.  As Dr. Gary Wadler, President and Chairman of the Nassau County Sports Commission, explains:

> Sanjay volunteered that he would like to contribute to the Commission provided that the funds were to be used principally to provide disadvantaged youth from underprivileged communities with participatory sporting opportunities that they would otherwise [] not experience.  This gave rise to the Nassau County Sports Commission's flagship program entitled: "Let's Do it!"

Exhibit A, at Tab 81.

The program is specifically designed to give disadvantaged and at-risk youth a chance to participate in sports.  The program facilitates 8 to 12 week sessions which expose children (ages 7 to 16) of all backgrounds to non-traditional sports such as swimming, tennis, martial arts, roller hockey, lacrosse, luge, soccer and golf.  Each sport hosts approximately 100-150 young people and for many of the children involved this is their first experience with these sports.  In addition to instruction, participants attend professional and amateur sporting events as spectators.  Fostered by Mr. Kumar's vision and made possible by his generous donation, the goal is to build the confidence and leadership skills of at-risk youth through exposure to and participation in sports, attention from coaches and inspirational lectures by sports leaders.

## 2.   North Shore Community Church

When the North Shore Community Church faced nearly insurmountable obstacles in securing a place of worship for its growing congregation and a home for its ministries to aid

42

the community, Mr. Kumar led the effort to fund the purchase of its church building and to ensure that it established other outreach services. Although instrumental in securing a home for the church, as church elder Monroe Diefendorf stresses, "this was not just about providing funds for the Hope for Long Island building. Sanjay was careful to craft a mission statement that would help our church fulfill our purpose – to reach the local community with a culturally relevant message of hope." Ltr. of Monroe Diefendorf, Exhibit A, at Tab 23. As described by Reverend Allan Barth:

> [Mr. Kumar's] gift led directly to the development of several significant ministries, one that taught English as a second language to poor immigrants, another that taught job skills and a third that provided fresh vegetables, bread, milk and meat to as many as seventy-two needy families (about three hundred people) each week.

Exhibit A, at Tab 6.

As such, Mr. Kumar's participation fostered the creation of programs that have done an immeasurable amount of good.

> What are the results of the efforts of Sanjay and Sylvia Kumar? The church currently has weekly services with over 250 people in attendance with an annual budget of over half a million dollars. The youth ministries are thriving with over forty kids actively involved. Ministries to the Hispanic community have been ongoing with ESL [English as a Second Language] a cornerstone of the activities. And the food pantry has provided over 125,000 meals since inception! The widespread influence and impact as a result of the generosity of the Kumars has been in the magnitude of thousands of people.

Ltr. of Monroe Diefendorf, Exhibit A, at Tab 23.

### 3. Friends of the Arts

Friends of the Arts ("FOTA") is a non-profit organization which seeks to build audiences for the arts and encourage learning through the arts with education programs for children. Intrigued by FOTA's ArtReach program – focused on motivating students of

43

diverse backgrounds to broaden their knowledge of music and improve their academic performance – Mr. Kumar set out to see what he could do to expand that program. After discussions with the Founding Director, Theodora Bookman, it was decided that the best way Mr. Kumar could help to support the children's programs was by underwriting the Long Island Summer Festival, which is part of a summer concert series sponsored by FOTA on Long Island. As such, Mr. and Mrs. Kumar have been the major financial sponsors of the Festival for the past four years. It serves a total audience of approximately 25,000 people and the "Kids Go Free" program allows children age 12 and under to attend the concerts for free on the Lawn with a ticketed adult. Because of Mr. Kumar's funding, the proceeds from the concert series ticket sales are used to expand FOTA's children's programs.

ArtReach touches more than 25,000 students in 50 schools across Long Island. This past school year over 400 ArtReach activities took place, ranging from performances, workshops and residencies with professional artists. The JazzSampler program is a specific ArtReach project tailored for at-risk students in underserved communities. "Sanjay and his lovely family would often attend concerts and our jazz workshops for students. He would meet with them and inspire them. Sanjay was a great role model for these teenagers, many who were minorities." Ltr. of Theodora Bookman, Exhibit A, at Tab 17. Mr. Kumar's keen interest in exposing all children to the arts has motivated him to support all of these efforts:

> [Mr. Kumar] has inspired us to use the Long Island Summer Festival concerts as a vehicle to increase public awareness of our educational programs for children. As a result, we now make the audience aware that their presence at our concerts helps to support and advance our arts-in-education programs.

Ltr. of Maryann Beaumont, Executive Director, Exhibit A, at Tab 9.

44

## 4. India Association of Long Island

Recognizing the importance of staying connected to and providing support for the south Asian community in the U.S., Mr. Kumar generously supports the India Association of Long Island, an organization designed to organize and promote socio-cultural activities from India on Long Island. As Indu Jaiswal, President Emeritus of the Association explains:

> While [Mr. Kumar] loves and has shown great generosity towards his new homeland and community, he has always strived to remember and nurture his roots. His experience as an immigrant shaped him in incalculable and powerful ways, instilling in him the values of hard work, integrity, and helping those less fortunate than oneself.

Ltr. of Indu Jaiswal, Exhibit A, at Tab 41.

Mr. Kumar has been a generous donor and a regular organizer and participant in the Association's functions. "It was great to see the pride he had in his roots; as a self made man, he never shied away from his humble and foreign origins." Id.

## 5. North Shore INN (Interfaith Nutrition Network)

Throughout his life Mr. Kumar has volunteered at soup kitchens during the holiday season. He has continued this tradition with his wife and daughters – the family has a practice of serving Thanksgiving dinner to the hungry in Long Island prior to eating their own meal. Ltr. of Jeffrey and Teena Adams, Exhibit A, at Tab 1 ("We have spent Thanksgiving with Sanjay and have seen him give up his holiday to work at the soup kitchen for the homeless."). As Bob Adams, the former president of a soup kitchen in Glenn Cove, the North Shore INN, recalls: "As I remember, Mr. Kumar was a soft-spoken, seemingly modest man who fit right in with our other volunteers." Exhibit A, at Tab 3. Following their father's example, Lindsey and Alisha Kumar have raised money to donate to that soup

45

kitchen as well. Mr. Kumar also made key contributions to the INN, providing the organization with the funding to renovate its kitchen.

## C. Wildlife Preservation

Interested in helping to preserve the environment for future generations, Mr. Kumar has utilized his software knowledge to further creative conservation projects.

### 1. Save The Elephants

Mr. Kumar's boyhood fascination with elephants has led him to be actively involved in providing funding, advice and other support to "Save the Elephants," helping this organization to enhance its computerized tracking devices in order to monitor elephant migration in Africa. The tracking technology allows researchers to identify areas where elephants are more likely to come into contact with humans with a view toward reducing human-elephant conflict across Africa. Iain Douglas-Hamilton, chief executive of Save The Elephants, first met Mr. Kumar in 1997:

> I was tracking movements of elephants by remote sensing GPS satellite collars that were replayed on the computer screen. Sanjay was absolutely fascinated by this high-tech, problem-solving in the heart of Africa and instantly understood the rationale ... Sanjay told us that he had done very well, but that he wanted to put something back and this was one way he could repay his debt to the world.
>
> ....His questioning mind and personal computer expertise made a direct technical contribution to research and development of our radio-tracking systems.

Exhibit A, at Tab 26. In addition to significant monetary contributions, Mr. Kumar set the organization up with its website (which allowed monitoring to take place over the internet) and made sure that small details, such as laptops and spare batteries for use in the bush, were taken care of. "That he always found time to do this despite his extraordinary busy schedule

46

tells of a thoughtfulness and an underlying motivation for helping others that is a deep part of his character." Id.

### 2. Sri Lanka Wildlife Conservation Society

Inspired by the projects in Kenya, Mr. Kumar was moved to support conservation efforts to protect the endangered Sri Lankan elephant. Mr. Kumar helped launch a pioneer program of the Sri Lanka Wildlife Conservation Society ("SLWCS") called "Saving Elephants by Helping People." In an attempt to establish workable boundaries for Asian elephants and villagers, solar powered electric fences were erected in order to manage human-elephant conflict. The fences prevent elephants from destroying crops and habitats, and from villagers attempting to ward off the elephants. Ravi Corea, President of SLWCS, notes that Mr. Kumar has been the organization's one and only major individual donor:

> In our opinion this sets him apart from all the other Sri Lankan Americans. There are many other Sri Lankans in the U.S. who have become as successful in achieving their personal ambitions and aspirations as Sanjay has – but there is none amongst them who has so far responded to the efforts of our organization the way Sanjay has done. Sanjay's desire to "give back" in this way is unparalleled.

Exhibit A, at Tab 21.

### D. Disaster Relief

A critical actor in response to several major international disasters, Mr. Kumar's generosity has reached thousands of individuals in the aftermath of global tragedies.

### 1. U.S. Embassy Bombing in Nairobi

Within minutes after the U.S. Embassy in Nairobi was blown up by terrorists in 1998, approximately 4,000 people were in dire need of medical attention. Within hours, the much-needed supplies were depleted. Oria Douglas-Hamilton – having met Mr. Kumar for the first

47

time only the year before – made a call to Mr. Kumar for help. Finding most everyone she called in the U.S. away for the August summer weekend, Mr. Kumar returned Ms. Douglas-Hamilton's call within hours. After attempts to find a way to airlift medical supplies directly to Kenya failed, Mr. Kumar suggested that he could put together a substantial financial aid package to be used to purchase the needed medical equipment. That very Saturday, Ms. Douglas-Hamilton received a copy of a letter to AMREF (the African Medical Research Foundation and The Flying Doctors) assuring the organization that Mr. Kumar and Computer Associates, through its matching gift program, would be contributing a significant sum to be used for emergency medical supplies. As described by AMREF Coordinator Nicola Blundell Brown, "[t]his hugely generous and instantaneous contribution the day after the Bomb Blast was quite invaluable in enabling us to keep our relief efforts going as we were needing extra supplies of every type of medical equipment to help the local hospitals that were quite overwhelmed." Exhibit A, at Tab 19. By Tuesday AMREF was able to stock 12 hospitals – enabling them to deal with all of the wounded.

> No one else took such immediate action to provide aid and we in Kenya will never forget what Sanjay did. Sanjay specifically requested that his donation be anonymous – he was not interested in recognition for himself or for the Company, only in getting the job done, and I never saw mention of his name in the foreign press.

Ltr. of Oria Douglas-Hamilton, Exhibit A, at Tab 27.

The extreme gratitude for Mr. Kumar's immediate assistance during Nairobi's time of need is perhaps best summed up by Iain Douglas-Hamilton:

> I can never forget that side of his character. Those days are burnt on our minds and Sanjay's reaction triggered the largest American corporate response to that disaster . . . . Many of the wounded owe their lives and subsequent recovery to Sanjay's decisive help that was instantly forthcoming.

48

Ltr. of Iain Douglas-Hamilton, Exhibit A, at Tab 26.

### 2. AmeriCares: Tsunami Relief

In the aftermath of the December 2004 tsunami, which devastated Mr. Kumar's native home, Mr. Kumar personally sponsored one of the very first airlifts of supplies into Sri Lanka. He made possible the airlift of 4.9 million water purification supplies to the region – enough to provide 49 million liters of clean drinking water to those in desperate need. As Curtis Welling, the President of Americares, describes: "[i]t was a magnificent gift at a moment when time was of the essence and the needs were particularly acute." Exhibit A, at Tab 83.

### 3. Earthquake Relief

Mr. Kumar has similarly supported the relief efforts in the wake of the September 1999 earthquake in Taiwan. He has also supported the American India Foundation, an organization founded in the aftermath of the January 2001 Gujarat earthquake. The Foundation provided relief to those in need immediately after the disaster, but has since focused its mission on longer term reconstruction and education, with a particular emphasis on elementary education and women's rights.

### E. Corporate Philanthropy

Part of what makes Mr. Kumar's charitable acts so remarkable is that he sets in motion programs which perpetuate the good he seeks to do with his own personal contributions. Rather than merely making one-time donations, or lending assistance to a singular project, Mr. Kumar ensures the longevity of his support and encourages others to follow his example along the way. Mr. Kumar brought this spirit with him to Computer Associates and helped instill in the Company's employees the importance of "giving back."

49

Leading the way through his own personal contributions, Mr. Kumar also guided Computer Associates in carrying out numerous good works, some of which are detailed below:

- Mr. Kumar helped foster Computer Associates' institution of the "Matching Gift" program through which employees who donated money to a cause or charity could have CA match the donation 2-to-1 – thereby tripling the original donation. See Ltr. of George Kafkarkou, Current CA Employee, Exhibit A, at Tab 46 ("I witnessed [Mr. Kumar's] frequent encouragement for employees to take advantage of CA's 2 to 1 matching contribution for registered charities."); Ltr. of Abram Azagury, Former CA Employee, Exhibit A, at Tab 5 ("[Mr. Kumar] was imaginative in introducing the policy (which at the time was unusual and is today quite commonplace) to encourage the staff to make donations to charity by committing the company to match their donations.");

- Mr. Kumar was also very involved in CA's partnership with KaBoom! – an organization that designs and builds playgrounds in communities lacking safe, accessible places for children to play. Through the KaBoom! program, CA championed a campaign to build "7 Playgrounds in 7 Days Around the World." In one week CA employees constructed playgrounds to serve over 7,500 children. See Ltr. of Charles B. Holleran, Former CA Employee, Exhibit A, at Tab 38 ("Many corporate sponsors send checks, but when CA sponsored the building of inner-city playgrounds Sanjay put us all to shame by showing up to clear shrubs and pour cement."); Ltr. of George Kafkarkou, Current CA Employee, Exhibit A, at Tab 46 ("I recall being a member of the audience seeing one of CA's internal videos that included activities around the Kaboom charity...We saw Sanjay on the video working as part of a team building a Kaboom playground ... I am sure watching Sanjay on the video helped CA employees feel good about making the time available to contribute to this charitable project ... It certainly did for me.")

- At Mr. Kumar's direction, CA established the NY KIN (Kids in Need) Fund in the wake of 9/11. CA pledged $2 million to this fund for the benefit of children – particularly those who, as a result of losing a parent or caretaker, could potentially be denied basic opportunities to ensure their healthy development. In collaboration with CA, The Children's Aid Society has administered the Fund to help countless children who were affected by 9/11. See Ltr. of Herb Siegel, Current CA Employee, Exhibit A, at Tab 73; Ltr. of Philip Coltoff, Former CEO and Special Advisor to the Children's Aid Society, Exhibit A, at Tab 20.

- Under Mr. Kumar's leadership CA often donated monies earmarked for its global employee breakfast program to relief efforts in the wake of natural disasters. Through CA's "Breakfast to Charity" Weeks, all of the Company's employees made a small sacrifice – giving up their free breakfast – to help those in need of aid.

- Not all of the good deeds Mr. Kumar encouraged were through formal programs. As Herb Siegel, a current CA employee, recalls, Mr. Kumar would invite elementary school students in New Orleans – generally from underprivileged schools – to CA's "CA World" conferences in order to learn about technology. "Sanjay would make it a point to provide these students with school supplies and to make sure we provided them with good meals. Sanjay would tell us to make sure the kids were well taken care of and that they should leave the conference with food to take home and share with their brothers and sisters." Ltr. of Herb Siegel, Current CA Employee, Exhibit A, at Tab 73.

- Mr. Kumar also served as a "Principal For a Day" for several years in the New York City Public School System. The goal of this program is for business leaders to translate their one day experiences into long-term relationships that enhance the learning environments at their schools. Herb Siegel recalls how Mr. Kumar would spend time with the students of P.S. 1—in Ozone Park, Queens and share with them his views on the importance of family and education: "Sanjay and CA would also donate funds to the school library ... Sanjay would also make sure to provide the students with book bags and school supplies." Ltr. of Herb Siegel, Current CA Employee, Exhibit A, at Tab 73.

- A major contributor to the National Center for Missing and Exploited Children, Mr. Kumar has provided personal monetary support and employed CA's technological resources to develop software programs that helped to identify missing children years after their abductions. Ltr. of Jessica Pincomb, Former CA Employee, Exhibit A, at Tab 70.

Mr. Kumar has also made a tradition out of personally purchasing toys for the children of the Village of Hempstead during the holiday season. After setting up a time with Toys "R" US before store hours, Mr. Kumar calls on his family and friends to help him shop for age-appropriate children's gifts, personally pays for them and helps load them up for delivery. See Ltr. of Michael Brock, Former Colleague, Exhibit A, at Tab 18; Ltr. of Denise Zimmerman, Former Administrative Assistant, Exhibit A, at Tab 89.

Mr. Kumar is also a major supporter of the Make-A-Wish Foundation on Long Island and could be counted on to fulfill any remaining wishes of children that existed at the end of the year. See Ltr. of Jessica Pincomb, Former CA Employee, Exhibit A, at Tab 70; Ltr. of Edward Benz, Jr., Former CA Building Manager, Exhibit A, at Tab 12. Mr. Kumar's support

51

has enabled Make-A-Wish to "grant over 280 wishes to children who are challenged by life-threatening medical conditions." <u>See</u> Ltr. of Karine Hollander, President and CEO of Make-A-Wish Foundation of Suffolk County, Exhibit A, at Tab 37.

**F.    Unsung Acts**

In addition to his unstinting work for and devotion to these and numerous other organizations, Mr. Kumar's life is marked by unsung, quiet acts of kindness and generosity towards his family, friends, employees, and strangers. A few examples of Mr. Kumar's seemingly instinctual desire to help others in need, without fanfare or expectation of gratitude, follow:

> [While my family was] on vacation in Aruba with my parents who were visiting from Italy, Sanjay received word that my father fell ill while on the island and was given very little chance of survival. Sanjay knew that the only hospital on a small island must have limited capability. He also knew that he had friends stranded there who needed to make critical decisions for a loved one. Within one day, he was on a flight to Oranjestad. The following Morning he was deep in conference with the doctors...The thing that amazed us most was that while in Aruba he was just honestly there to help with whatever was needed no matter how trivial it may have seemed at the time...[H]e took [my very young daughters] to the hospital gift shop and let them pick a toy and just talked with them for a while. That may seem like such a small gesture but that meant so much to them. It is one of the main things they now remember about the trip.

Micaela DiVittorio Falabella, Current CA Employee, Exhibit A, at Tab 29.

> A few years ago, I was privileged enough to travel to Spain, accompanied by a young teacher and seven other of my classmates. Lindsey Kumar was among the seven...[A]fter two weeks in Spain, I got very ill from the food, and luckily enough, Mr. Sanjay Kumar happened to be in Spain at that very time...Mr. Kumar instantaneously dropped what he was doing and came right to where all of the girls were, and watched them while the teacher was taking care of me . . . Mr. Kumar, however, was not just concerned about the un-chaperoned girls, but more concerned with my health. While sitting in the hospital, I got a phone call from Mr. Kumar telling me that everything was okay. Just in case it was appendicitis, Mr. Kumar had arranged for the best

surgeon, as well as the best hospital for me to be operated on. He furthermore arranged the first flight home for me, where he would take me with him.

Christine Farrell, Friends Academy Student, Exhibit A, at Tab 30.

> [At a CA event] in Delhi...there was a hotel employee who serviced the rooms on Sanjay's floor. Sanjay had noticed while working on his computer, this employee glancing over his shoulder with great interest and curiosity. Soon a conversation began between the two of them and Sanjay learned of his desire to go to computer school. This was not possible on the poor pay he earned from the hotel. This meeting ultimately resulted in Sanjay personally funding his schooling, where upon he graduated and eventually became a CA employee in Calcutta.

Vikki Kilminster-Bird and Robert Bird, Current CA Employees, Exhibit A, at Tab 15.

> [Mr. Kumar] once came into the office and told me he saw a boy about 10 years old from Atlanta on the news who had been left home alone by his Mother and was being asked questions by the police. The boy answered each question and addressed the officer as Sir. This very much impressed Sanjay and he wanted me to call our Atlanta office and see if they could find out the boy's name. Sanjay wanted to donate clothes and toys to him because of his polite demeanor. Our people in Atlanta got the information...He did send money to help the family anonymously. For many years, most of the contributions and good works he did he did not want any credit or publicity for.

JoAnn Sciachetano, Former Administrative Assistant, Exhibit A, at Tab 71.

> Sanjay was in Las Vegas at a conference, speaking and maintaining other business engagements. I got a call one night to let me know that he had found my father. My father suffers from a severe mental illness and had abandoned my mother and family . . . My father was stalking Sanjay at the conference. Instead of dealing with him harshly, Sanjay demonstrated great compassion by personally meeting with him and arranging for him to be taken care of for as along as he was there as well as after Sanjay left . . . This was done even as my father was, in essence, being a nuisance (although Sanjay in no way seemed bothered by this). This reveals what Sanjay's true character is: he will earnestly care for someone when the need arises. Many things that Sanjay did and has done are not because he's required to, but because he truly cares for others.

Jennifer Fischer, Former Nanny, Exhibit A, at Tab 32.

My family has recently had more than it's [sic] share of difficult times. My husband and I faced the greatest challenge in our lives 17 months ago when our first and only son Stephen was born. He was diagnosed at birth with numerous chromosomal abnormalities. Our road is a definite challenge ahead as we have faced over nine surgical procedures with young Stephen to date and doctors consultations that include words like "mental retardation" and "cerebral palsy". Throughout our course, Sanjay and his family have been phenomenal in their support of us. While we have fallen short of spirit at times, Sanjay has always been there for us. He has given us sound guidance, love and hope for our future.

Sharmila Kumar Lesch, Sister, Exhibit A, at Tab 56.

Dozens of letters from Mr. Kumar's friends, family and former co-workers recount similar stories. See Ltr. of Robert Bird and Vikki Kilminster-Bird, Current CA Employees, Exhibit A, at Tab 15 ("He was a huge support for us when we were adopting our daughter, Gracie. He showed extreme compassion for not only us, when Robert's father died, but for Robert's mother as well, taking it upon himself to find a way to help ease her grief"); Ltr. of Robert Farrell, Family Friend, Exhibit A, at Tab 31 ("[Mr. Kumar] arranged for Chrissy to be seen at the best hospital, have the best surgeon, and get a CAT scan done ... I will forever be grateful to Sanjay for doing this for me and our family."); Ltr. of Matthew Gordon, Current CA Employee, Exhibit A, at Tab 36 ("I have seen him make personal phone calls to the spouses of injured and sick employees, and offer transportation to families in crisis. His compassion and empathy for people is amazing."); Ltr. of Abram Azagury, Former CA Employee, Exhibit A, at Tab 5 ("I will only relate to you [Mr. Kumar's] invaluable support for me and my family when my son's young wife ... was diagnosed with cervical cancer."); Ltr. of George Kafkarkou, Current CA Employee, Exhibit A, at Tab 46 ("I approached Sanjay to share with him that I was leaving CA to go back to Cyprus to spend a few months with my best and likely dying friend...Sanjay told me to put my personal belongings in

54

storage, take three months off unpaid leave and go to Cyprus and to call him at the end of three months. I did this ... and Sanjay offered me a job back in CA UK."); Ltr. of Susan Karches, Family Friend, Exhibit A, at Tab 47 ("For the past six years my husband suffered from leukemia and, despite some of his worries, Sanjay always called or wrote to inquire about Peter's health and to see if he could help in any way."); Ltr. of Janet Kask, Former VP of Administration, New York Islanders Hockey Club, Exhibit A, at Tab 48 ("When my family and I went through our harrowing experience on September 11, 2001, and my husband's subsequent diagnosis, Sanjay was there for us.").

Additionally, as is typical of executives in his position, Mr. Kumar received countless requests for support and contributions from different organizations. Perhaps to the surprise of some of those writing to him, he was always quick and generous in his response. As his former assistant JoAnn Sciachetano remembers, "A teacher at Bronx High School of Science requested that he speak before the students and Mr. Kumar did this for several years. The children loved seeing him because many of them were minorities and could relate to his stories and upbringing." Exhibit A, at Tab 71.

*     *     *

Mr. Kumar is a man who stands before the court at the relatively young age of 44 years old, but has in that short span helped more people – in large and small ways – than most people could hope to reach in several lifetimes:

> They say it never happens in New York, but I literally bumped into Sanjay on 6th Ave a few weeks ago. Knowing what he is facing I struggled awkwardly and unsuccessfully to offer comfort and encouragement to a very good man who is in a very bad place. There was a deep and unfamiliar sense of sorrow all over his face, but true to form he wouldn't focus on his own excruciating circumstance, choosing instead to tell me not to worry. As he hurried away I couldn't help but think that he was still one [of] the finest and most decent

55

people I have ever met. That's an opinion shaped over hundreds of hours of personal interaction and it remains absolutely unshaken."

Ltr. of Charles B. Holleran, Former CA Employee, Exhibit A, at Tab 38.

# LEGAL ANALYSIS

## III. RELEVANT SENTENCING FACTORS

The above description of Mr. Kumar's background and extraordinary philanthropy shows a more complete picture of the person that the Court will be sentencing on October 12. That picture is especially important because Mr. Kumar's personal traits and good works are, in the wake of Booker, ever-more relevant to the imposition of sentence. See 18 U.S.C. § 3553(a)(1). Whereas mandatory application of the Guidelines led, in many instances, to a "bloodless, mechanistic" approach to sentencing, United States v. Nuzzo, 02 CR 1239 (ILG), 2006 U.S. Dist. LEXIS 6098, at *10 (E.D.N.Y. Feb. 13, 2006), a sentencing court may – and, indeed, must – now impose a sentence after taking full account of factors that were previously relevant only in the fairly circumscribed context of a downward departure analysis. See United States v. Ranum, 353 F. Supp. 2d 984, 986 (E.D. Wis. 2005) ("[I]n cases in which a defendant's history and character are positive, consideration of all of the § 3553(a) factors might call for a sentence outside the guidelines range."); see also United States v. Jones, -- F.3d --, --, 2006 WL 2167171, at *4 (2d Cir. Aug. 2, 2006).[12]

In addition to a defendant's history and characteristics, the Court must also consider "the nature and circumstances of the offense[.]" 18 U.S.C. § 3553(a)(1); see Crosby, 397

---

[12] As will be discussed in Section IV.D.1, infra, there are several factors in this case, including Mr. Kumar's charitable work and the atypical nature of the offense, that are so extraordinary as to form a basis for a downward departure even under the pre-Booker Guidelines regime.

F.3d at 113. Additionally, § 3553(a) mandates that the sentence imposed be sufficient, but not greater than necessary, to comply with the following purposes:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2).

While the Guidelines continue to serve as a substantial source of guidance, see 18 U.S.C. § 3553(a)(4); Crosby, 397 F.3d at 111, the Second Circuit has held that a range suggested by the Guidelines does not enjoy the status of being presumptively reasonable. See United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006). In this way, Booker has given courts a greater degree of freedom to exercise discretion in fitting sentences to a defendant's individual circumstances, see Crosby, 397 F.3d at 114, and also to give "consideration [to] the judge's own sense of what is a fair and just sentence under all the circumstances." See Jones, -- F.3d at --, 2006 WL 2167171, at *3.

Here, it appears that the Probation Department's calculation of what the advisory Guidelines range would be in this case will be driven by the securities fraud conduct, rather than the obstructive conduct. In calculating the range for securities fraud, the Probation Department may make two fundamental errors that would drive its proposed advisory Guidelines range to unconscionable heights. First, in violation of Mr. Kumar's rights under the ex post facto clause of the Constitution, the Probation Department may utilize the edition of Guidelines effective as of November 1, 2005 (the "2005 Guidelines"), rather than the 1998

57

Guidelines, to determine the range for securities fraud. Second, in terms of the single most influential specific offense enhancement under the advisory Guidelines in this case – the amount of loss – the Probation Department may accept a method of calculation, proffered by the government, that is unsupportable. If the government's ill-conceived loss amount were accepted, a range of 108-135 months (under the 1998 Guidelines) would result. If the further error of using a later edition of the Guidelines were made, then the application of the advisory Guidelines (without any downward departure) would call for Mr. Kumar to be imprisoned for the rest of his life.

We respectfully submit that a term of imprisonment even approaching the lower of these two flawed advisory Guidelines calculations would far exceed what is necessary and sufficient to meet the sentencing purposes of 18 U.S.C. § 3553(a). In particular, the statute's demand for a just punishment would be subverted by the imposition of a lengthy period of incarceration for a securities fraud conspiracy that is completely atypical of the other types of securities fraud conspiracies that destroy companies and livelihoods in that:

- the securities fraud conduct at issue began long before Mr. Kumar joined Computer Associates;

- Mr. Kumar was the person who spearheaded the measures that ended the 35-day month practice, and took such action well before the initiation of any investigation into the practice;

- the crux of the securities fraud did not involve sham transactions or phony revenue, but was instead based on the chronological shifting of real contracts that brought in real revenue to the Company;

- the 35-day month practice did not impact the cash position of CA or its reported cash flow from operations; and

- the final tally of the 35-day month practice, in terms of the amount of annual revenue that CA had to restate, was $2 million for Fiscal Year 2000, which represented .0003 of that year's overall revenue of over $6 billion.

58

Moreover, § 3553(a)'s requirement that the sentence adequately protect the public and provide both a general and specific deterrent effect clearly does not require a prolonged term of imprisonment. The consequences of Mr. Kumar's conviction – including the effect that his conviction has had on his family, the economic impact that his conviction will have on him, and his inability to serve as an officer of a publicly traded company again – have already addressed those goals.

All of these important facts, and several others that will be detailed below – all unique to Mr. Kumar's case – combined with the details of Mr. Kumar's background and extraordinary record of charitable deeds support imposition of a sentence well below any range calculated under the 1998 advisory Guidelines that is based on the government's loss calculation.

## IV. THE ADVISORY GUIDELINES RANGE IS SIGNIFICANTLY LOWER THAN THAT WHICH MAY BE SUGGESTED BY THE PROBATION DEPARTMENT

As will be discussed in Section V, the unique facts of this case compel the conclusion that a non-Guidelines sentence should be imposed here. Nevertheless, although the Guidelines are now only advisory, they remain one of the factors under § 3553 that the Court must consider in reaching an appropriate sentence. For the reasons set forth below, the advisory Guidelines range applicable to this case is much lower than the range that may be proposed by the Probation Department.

59

**A.** **The Guidelines in Effect Between November 1998 and November 2000 Must Be Applied to Calculate Mr. Kumar's Sentence on the Securities Fraud Counts.**

    **1.** **The 1998 Guidelines, Rather Than the 2005 Guidelines, Apply to the Securities Fraud Convictions.**

The initial question in determining Mr. Kumar's range under the advisory Guidelines is which edition of the Guidelines applies. While the general starting point in determining a sentence is the Guidelines Manual in effect at the time of sentencing, see U.S.S.G. § 1B1.11(a), p.s. (2005), if application of that version of the Guidelines results in a violation of the *ex post facto* clause of the United States Constitution, the "court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." U.S.S.G. § 1B1.11(b)(1), p.s. (2005); United States v. Gonzalez, 281 F.3d 38, 45 (2d Cir. 2002). An *ex post facto* violation in this context occurs when an amendment to the Guidelines that postdated the commission of the offense "works to the detriment of a defendant." Gonzalez, 281 F.3d at 46 (citation omitted).

Here, the timing of the conduct at issue is not in dispute: the securities fraud conduct underlying Counts One through Five of the Indictment had been completed by October 2000, as the government itself acknowledged at Mr. Kumar's plea hearing. See Plea Tr. 4-5, April 24, 2006. The obstruction of justice conduct commenced no earlier than February 2002.[13] See Indictment at ¶¶ 54-56. As the conduct that comprised securities fraud (and the accompanying conspiracy) was over by October 2000, the version of the Guidelines in effect

---

[13] The identification and resolution of *ex post facto* concerns regarding which Guidelines edition applies should be made prior to any overall grouping of counts. See United States v. Bertoli, 40 F.3d 1384, 1403-04 (3d Cir. 1994). Thus, the temporal analysis here relates to the securities fraud conduct in isolation, and not as grouped with the obstruction of justice conduct.

at the time of the commission of these crimes was the one promulgated on November 1, 1998.

An analysis of the respective loss calculation tables relating to fraud convictions under the 1998 Guidelines and the 2005 Guidelines immediately demonstrates that applying the 1998 Guidelines to the conduct at issue is necessary to avoid a clear *ex post facto* violation. Compare U.S.S.G. § 2F1.1(b)(1) (1998) with U.S.S.G. § 2B1.1(b)(1) (2005); see, e.g., United States v. Singh, 390 F.3d 168, 192 n.2 (2d Cir. 2004) (subjecting defendant to increased penalty set forth in 2002 loss table, as compared to 1998 loss table, would violate *ex post facto* clause); United States v. Nastasi, No. 00 CR 809(S-1) (ILG), 2002 WL 1267995, at *1 n.2 (E.D.N.Y. Apr. 17, 2002) (applying earlier edition of Guidelines when loss tables of more recent edition would have led to a worse result for the defendants). Additionally, certain enhancements that the government argues apply to this case – namely the enhancement for an offense that "involved 250 or more victims," U.S.S.G. § 2B1.1(b)(2)(C) (2005), and the enhancement for the offense having involved a violation of securities law while the defendant was an officer of a publicly traded company, U.S.S.G. § 2B1.1(b)(15)(A)(i) (2005) – are found in the 2005 Guidelines but not in the 1998 Guidelines, also resulting in an *ex post facto* issue.

### 2. The 1998 Guidelines Apply to the Securities Fraud Counts Despite the Obstruction of Justice Convictions.

The conclusion that application of the 1998 Guidelines to Counts One through Five is mandated by the *ex post facto* clause does not change due to the fact that Mr. Kumar's separate obstructive activity – encompassed by Counts Six, Seven, and Nine of the Indictment – took place during the time period of February 2002 to April 2004, at the

61

earliest. Although a policy statement in the Guidelines suggests that the 2005[14] Guidelines

be used for all counts of conviction, an application of the 2005 Guidelines to the securities

fraud counts would still present a significant *ex post facto* problem.

Policy statements are not to be applied if such an application would violate the

Constitution. See Stinson v. United States, 508 U.S. 36, 45 (1993); United States v. Ortland,

109 F.3d 539, 546 (9th Cir. 1997). The policy statement particularly relevant here states that

"[i]f the defendant is convicted of two offenses, the first committed before, and the second

after, a revised edition of the Guidelines Manual became effective, the revised edition of the

Guidelines Manual is to be applied to both offenses." U.S.S.G. § 1B1.11(b)(3), p.s. (1998).[15]

Where, as here, the application of that policy statement results in a significantly harsher

penalty for the earlier conduct, several courts have held that the Guidelines must bow to the

*ex post facto* clause of the Constitution, and have applied the earlier Guidelines edition to

calculate the sentence for the earlier offense. See Ortland, 109 F.3d at 547 (vacating

defendant's sentence because "application of the policy statement [§ 1B1.11(b)(3)] . . . would

violate the Constitution [as it] would cause Ortland's sentence on earlier, completed counts to

---

[14] The actual edition of the advisory Guidelines in effect at the time of the obstructive conduct is the one effective as of November 1, 2003. However, since the 2003 version does not differ from the 2005 version in terms of the advisory Guidelines calculation for this case, we continue to refer to the 2005 edition.

[15] This is a corollary of the Guidelines' "one-book rule" which states that the Guidelines Manual to be used in determining a sentence be used in its entirety, and not by selecting certain provisions from various editions. See U.S.S.G. § 1B1.11(b)(2), p.s. (1998); United States v. Keller, 58 F.3d 884, 890 (2d Cir. 1995), abrogated on other grounds by United States v. Mapp, 170 F.3d 328 (2d Cir. 1999).

be increased by a later Guideline."); <u>United States v. Bertoli</u>, 40 F.3d 1384, 1403-04 (3d Cir. 1994).[16]

The sole district court in this Circuit to rule on this issue, to our knowledge, has likewise held that application of a later version of the Guidelines Manual to counts of convictions whose crimes had ended before that later version took effect would run afoul of the *ex post facto* clause. <u>See</u> <u>United States v. Johnson</u>, Nos. 97-CR-206, 98-CR-160, 1999 WL 395381, at *10 (N.D.N.Y. June 4, 1999) (McAvoy, C.J.). In <u>Johnson</u>, the defendant pled guilty to multiple counts, some of which were for crimes that had ended before an amendment of the Guidelines that took effect on November 1, 1996. <u>See</u> <u>id.</u> at *9-10. The PSR had calculated defendant's punishment by utilizing the Guidelines as amended in November 1996, due to the defendants' conviction of certain crimes after that date, and this resulted in an increased punishment for the older offenses. <u>Id.</u> at *9. The court held that such a course of action would violate the *ex post facto* clause and, the policy statement in U.S.S.G. § 1B1.11(b)(3) notwithstanding, decided to apply the previous version of the Guidelines to the crimes committed before November 1, 1996, while utilizing the more current Guidelines edition for the later offenses. <u>Id.</u> at *10-11. This sentence was affirmed by the Second Circuit, which mentioned the District Court's application of different editions of the sentencing Guidelines to the distinct offenses – as well as the District Court's reasoning for that application -- without comment. <u>See</u> <u>United States v. Johnson</u>, 221 F.3d 83, 92-93 (2d Cir. 2000).

---

[16] There is a split in the caselaw, and other Circuit Courts of Appeals have followed the policy statement in § 1B1.11(b)(3) over defendants' *ex post facto* objections. <u>See, e.g.</u>, <u>United States v. Lewis</u>, 235 F.3d 215, 218 (4th Cir. 2000).