UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

          - against -

SANJAY KUMAR AND STEPHEN
RICHARDS,

             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

JAN 2 6 2007

      P.M. _____
TIME A.M. _____

Criminal Docket
No. 04-846 (ILG)

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT STEPHEN RICHARDS' MOTION TO SUPPRESS
## HIS COERCED STATEMENTS TO SULLIVAN & CROMWELL AND THE
## SECURITIES AND EXCHANGE COMMISSION

## PRELIMINARY STATEMENT

Defendant Stephen Richards respectfully submits this memorandum of law in support of his motion to suppress his statements to Sullivan & Cromwell LLP ("S&C") and the Securities and Exchange Commission ("SEC").

There can be no dispute that Mr. Richards submitted to an interview by Sullivan & Cromwell LLP ("S&C") and provided testimony to the SEC only because Computer Associates International, Inc. ("CA") threatened to terminate Mr. Richards' employment if he declined to do so. Nor can it be disputed that the government violates a defendant's Fifth Amendment rights when it sufficiently "involves itself," directly or indirectly, in a private employer's decision to force statements by an employee under threat of termination. United States v. Montanye, 500 F.2d 411, 415 (2d Cir. 1974). The question here is whether the actions of the United States Attorney's Office ("USAO") and the SEC created responsibility on the part of the government for the dilemma faced by Mr. Richards. As discussed in detail below, the prosecution promoted and exploited a scenario in which Mr. Richards would speak or lose his job. For example:

- The USAO and SEC specifically requested the investigation undertaken by S&C and monitored all developments. As a condition of resolving their investigation of CA, they demanded that CA waive its privileges and provide debriefings and memoranda from S&C's interviews. If CA resisted government demands for access to witnesses or their statements, the USAO and SEC responded that CA was failing to "cooperate," and was therefore risking that CA itself would be prosecuted. CA was thereby pressured to compromise the rights of its employees.

- When subjects of the government inquiry were not immediately available for interview at the USAO, the SEC issued civil subpoenas returnable for testimony at the offices of the USAO. In a meeting with Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") at which the USAO declared its intention to prosecute Mr. Richards, the SEC nevertheless demanded a full day of testimony from him. Although its offices were in Manhattan, the SEC insisted on testimony at the USAO in an apparent effort to solidify venue for a perjury charge. Additionally, an SEC attorney involved in these demands has since joined the USAO and is now assigned to this prosecution.

- S&C advised Skadden that Mr. Richards' employment would be terminated if he declined to be interviewed by S&C, that such an interview had to occur prior to Mr. Richards' scheduled SEC testimony, and that Mr. Richards would be placed on administrative leave or terminated if he invoked his Fifth Amendment rights before the SEC. S&C warned Skadden that even an administrative leave arrangement would be subject to the reaction of the government, which might prompt termination of Mr. Richards' employment on less favorable terms than CA's modest severance program.

- Demonstrating its control over the joint investigation, the USAO contacted Skadden shortly before Mr. Richards' scheduled S&C interview and SEC testimony and offered to obtain an adjournment of the SEC testimonial subpoena if Mr. Richards agreed to a proffer at the USAO.

While these facts standing alone are compelling evidence of the coordinated effort to coerce Mr. Richards' testimony, we have been denied access to communications between the USAO and SEC, and between CA's representatives and the government entities, that may be highly relevant to this motion. Therefore, we request a suppression hearing at which a full factual record may be developed.[1]

This Court should suppress the statements made to the SEC by Mr. Richards for two reasons. (1) The government's violation of Mr. Richards' Fifth Amendment rights requires suppression of the statements and a hearing at which the government must prove that its remaining evidence is untainted by the suppressed statements. (2) Under an emerging trend in the case law, the government's abuse of the parallel SEC proceedings itself requires suppression of Mr. Richards' statements.

---

[1]     On February 10, 2006, we wrote to the USAO, SEC, S&C and Wachtell, Lipton, Rosen & Katz ("WLRK") to make narrowly tailored requests for discovery on this motion. By letter dated February 13, 2006, the USAO declined to provide discovery. By letter dated today, the SEC declined to provide discovery but represented that it "does not believe" it has responsive materials. S&C and WLRK did not respond to our letter. Copies of our letter and the government's responses are attached as Exhibit A to the accompanying Declaration of Christopher J. Gunther ("Gunther Decl.").

2

## STATEMENT OF FACTS

Amid a wave of spectacular corporate bankruptcies (*e.g.*, Enron and Worldcom), the Department of Justice and the SEC, respectively, announced guidelines for determining when criminal prosecutions and civil SEC enforcement actions were appropriate against corporations.[2] The guidelines placed a high value on a corporation's cooperation in rooting out corporate wrongdoing. However, in this matter the government used the guidelines to an unlawful extreme: Through pervasive direction in the affairs of corporate counsel and the SEC (akin to a master-servant relationship), the prosecution engineered a stalking horse to coerce statements from an unwilling individual already slated for prosecution.

### 1. The Joint Investigation

In February 2002, the USAO and the SEC began a joint inquiry into a number of accounting issues at CA. CA engaged WLRK as its counsel and publicly announced its intention to cooperate with the investigation. From the earliest stages of communication with the company, the USAO and SEC made clear that "cooperating" meant, among other things, facilitating access to CA employees and former employees; any failure to facilitate such communication was met with disapproval. In April 2002, the USAO and SEC asked CA to waive certain confidentiality agreements with former employees so that those employees could provide informal interviews to the USAO and SEC without resort to subpoenas. When CA executed a waiver that was not to the government's liking, the USAO by letter dated May 7, 2002 complained, "we must infer that CA has no real intention to cooperate with us." (Gunther Decl. Ex. C.)

---

[2]    The Department of Justice guidelines are in the so-called Thompson Memorandum, and the SEC guidelines are in the so-called Seaboard opinion. See Gunther Decl. Ex. B.

By December 2002, the USAO and SEC began to focus more specifically on the issue of backdated software licensing agreements. WLRK interviewed Mr. Richards on two occasions, in February and April of 2003, and Mr. Richards denied wrongdoing. On May 20, 2003, WLRK advised the USAO and SEC that after a number of interviews with CA employees, including Mr. Richards, WLRK had found no evidence that CA had a regular practice of recognizing revenue prematurely. (Gunther Decl. Ex. D.) The government did not agree; it suggested that it "believed that senior management of the company had intentionally held quarters open and used backdated contracts to meet earnings estimates." (Id.) The USAO and SEC indicated that CA should "investigate the matter" and ensure "that the persons responsible were identified and dealt with appropriately." (Id.)

More specifically, in a telephone call with WLRK on June 9, 2003, the USAO and SEC requested that CA (1) "conduct a thorough investigation regarding the '35-day month' issue and agree in advance to share its findings with" the USAO and SEC; (2) waive its attorney-client and work product privileges over the memoranda that WLRK had generated in the course of conducting employee interviews (which would include two WLRK memoranda of interviews with Mr. Richards); and (3) give the USAO and SEC "direct access to company employees without company counsel." (Gunther Decl. Exs. D & E.)[3] In that call, the USAO and SEC further requested interviews of CA's CFO Ira Zar

---

[3]    From the beginning, we submit, the government wanted the unfettered ability to obtain statements from CA employees, a right the prosecution ultimately exacted from CA in the Deferred Prosecution Agreement. In the Deferred Prosecution Agreement, CA agreed to a program of "continuing cooperation," which is defined to include "[u]sing its reasonable best efforts to make available its present and former officers and employees to provide information and/or testimony." (Deferred Prosecution Agreement at 4-5.)

4

and finance executives Lloyd Silverstein and David Rivard. The USAO indicated that these individuals were "subjects" of the criminal investigation. (Id.)

## 2. The Audit Committee Investigation

On July 2, 2003, CA's board of directors considered the request of the USAO and SEC that CA conduct an additional internal investigation. WLRK recommended that CA's Audit Committee conduct such an investigation and warned that refusal to accede to the wishes of the USAO and SEC would be interpreted as "non-cooperation and could therefore create difficulties." (Gunther Decl. Ex. F.) The Audit Committee undertook responsibility for the investigation and engaged S&C as its counsel (although WLRK remained actively involved) on July 22, 2003. (Gunther Decl. Ex. G.) The Audit Committee's minutes memorialize that the investigation was undertaken "at the suggestion of the Securities and Exchange Commission and the Department of Justice in connection with their investigation of the Company." (Id.) Meanwhile, the USAO tried to persuade CA to force the three identified subjects of the investigation to appear for interviews with the USAO and SEC. By letter dated July 24, 2003 (and copied to the SEC), the USAO "request[ed] that CA, consistent with its pledge to cooperate fully, make available" Messrs. Zar, Silverstein and Rivard for "interviews in this Office during the week of August 4, 2003." (Gunther Decl. Ex. H.)

On August 5, 2003, S&C met at the USAO with the prosecutors and the SEC. The prosecutors told S&C that the government had "evidence members of top management engaged in securities fraud 'with the specific intent of falsely representing quarterly revenues.'" (Gunther Decl. Ex. I). The USAO and SEC asked S&C to investigate and report back by October 15, 2003. (Id.) The obvious mission for S&C

5

was to conduct interviews of CA employees and report back employee statements to the prosecutors.

Later in August, the USAO and SEC escalated their concerted campaign to pressure CA so that the company would, in turn, pressure its employees to provide statements that could be used by the USAO and SEC. The point of leverage employed by the USAO and SEC was that CA should make its employees available as part of its "cooperation." On the morning of August 22, 2003, the USAO faxed a letter to WLRK (and copied to the SEC) stating: "We remain concerned regarding the adequacy of Computer Associates' cooperation." (Gunther Decl. Ex. J.) The letter went on to quote from the Thompson Memorandum on factors that prosecutors should consider in deciding whether to bring criminal charges against a company. In an additional letter faxed to WLRK (copied to the SEC) that evening, the USAO tersely stated: "You informed us that CA would produce Mr. Zar to be interviewed, consistent with CA's pledge to cooperate fully with [the USAO and SEC]. This letter is to inform you that I was advised, during a telephone call today with . . . counsel to Mr. Zar, that Mr. Zar will not submit to an interview." (emphasis added) (Gunther Decl. Ex. K.)[4]

The next business day, August 25, 2003, the SEC faxed to WLRK subpoenas requiring testimony from nine individuals, including Mr. Richards, Sanjay Kumar, and Messrs. Zar, Silverstein and Rivard, as well as three independent directors on the CA board. (Gunther. Decl. Ex. L.) Although the SEC's offices were then located at 233 Broadway in New York County, the subpoenas were returnable at the USAO's office

---

[4] The government obviously was holding CA accountable for its employees' invocation of their privilege not to speak with prosecutors. For example, when an in-house attorney was declining in November 2003 to be interviewed at the USAO, the prosecutors contacted S&C and WLRK to "find out what the company is 'doing' about" the witness. (Gunther Decl. Ex. M.)

space at the United States Courthouse in Central Islip. (Id.) The next day, August 26, the SEC faxed a letter to WLRK complaining that CA was not being cooperative and had failed to find evidence of backdated software licensing agreements. (Gunther. Decl. Ex. N.)

This pressure on CA had its intended effect. On August 27, 2003, CA's board of directors met and "considered various steps that might be taken by the Corporation and its counsel to assure the government that the investigation is being taken seriously." (Gunther Decl. Ex. O.) On September 2, 2003, the Audit Committee met telephonically and "determined that the best way to demonstrate the depth of the Corporation's commitment to cooperate with the government was to provide the government oral summaries of the information learned from the witness interviews. . . . These oral summaries could be presented to the government every three weeks or more frequently, if desired by the government." (Gunther Decl. Ex. P.) Thus, the USAO and SEC secured for themselves prompt reporting by S&C of all interviews being conducted of CA employees.[5]

### 3. Skadden's Meeting With the Government

On September 22, 2003, Skadden met on Mr. Richards' behalf at the USAO with the prosecutors then assigned to the case, as well as SEC staff attorneys. The attorneys from the USAO and SEC indicated that they were working closely together. (Gunther Decl. ¶ 13.) The prosecutors indicated that a criminal prosecution would be

---

[5]    In addition to these oral briefings, the government obtained "materials summarizing the Committee's preliminary conclusions, interview memoranda and investigative working papers in connection with this inquiry" beginning in mid-October of 2003; and CA later agreed to turn over copies of all of the interview memoranda that WLRK had created during its investigation, which the USAO and SEC made a condition of CA's resolution of the investigations. (See Gunther Decl. Ex. Q.)

instituted against Mr. Richards. The SEC nevertheless demanded a full day of testimony from Mr. Richards immediately in satisfaction of the SEC subpoena previously issued to Mr. Richards. (Id.)

In subsequent telephone calls, the SEC refused to adjourn further the return date of the SEC subpoena and threatened to enforce the subpoena if Mr. Richards did not appear for testimony at the USAO's office space in Central Islip on October 23, 2003. When asked whether the testimony could occur at the SEC's offices in Manhattan, the SEC responded that the testimony had to take place at the USAO location.[6] (Id.)

### 4. S&C's Communication of CA's Position

Meanwhile, S&C sought to schedule its own interview with Mr. Richards and communicated to Skadden CA's position on how Mr. Richards' employment at CA would be impacted if he either declined to be interviewed or invoked his Fifth Amendment rights before the SEC. On October 8, 2003, CA's Audit Committee announced in a press release the preliminary results of its investigation, including the fact that CA had obtained the resignations of Messrs. Zar, Silverstein and Rivard. (Gunther Decl. Ex. R.) In a telephone call that day, S&C advised Skadden that if Mr. Richards invoked his Fifth Amendment rights at his scheduled testimony before the SEC, his employment would be terminated. (Gunther Decl. ¶ 14.)

The following day, October 9, S&C advised Skadden that Mr. Richards would receive minimal severance if he departed from CA — in part because CA historically paid low severance and in part because CA was dealing with the government. S&C indicated that it would be a problem for CA if Mr. Richards' invoked his Fifth

---

[6] Continuing this "what's mine is yours" approach to enforcement, one of the SEC attorneys who was involved in the investigation, and who attended Mr. Richards' SEC testimony, is now an Assistant U.S. Attorney assigned to this prosecution.

wish to provide statements to the prosecutors who were preparing criminal charges against him.[8]

        In October 2003, Mr. Richards had been employed by CA for fifteen years, nearly his entire professional career. He was economically dependent on his employment at CA to support his wife and children, and his valued professional reputation was dependent on his status as a senior executive at CA. There can be no doubt that he submitted to an interview with S&C on October 22, 20003 and testimony before the SEC the following day only to save his employment.

---

[8] The prosecution is in no position to dispute that Mr. Richards spoke under threat of job loss. The government has proffered to the Court testimony from former CA General Counsel Steven Woghin that Mr. Richards faced and was emotionally impacted by just this dilemma. (See Government Letter to the Court dated December 15, 2005.)

# ARGUMENT

## POINT I

### THE PROSECUTION UNLAWFULLY COERCED
### MR. RICHARDS' STATEMENTS TO S&C AND THE SEC

**1. The Penalty Cases**

In the so-called "penalty cases," the Supreme Court has held that "when a State compels testimony by threatening to inflict potent sanctions unless a constitutional privilege is surrendered, that testimony is obtained in violation of the Fifth Amendment and cannot be used against the declarant at a subsequent criminal prosecution." Lefkowitz v. Cunningham, 431 U.S. 801, 805 (1977); see also Minnesota v. Murphy, 465 U.S. 420, 434-35 (1984) (discussing the penalty cases). While this series of cases originated in the sphere of public employment, see Garrity v. New Jersey, 385 U.S. 493 (1967) ("The option to lose [one's] livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or remain silent."), it later expanded to protect against penalizing one's status and valued reputation as well. See, e.g., Cunningham, supra, (political party office); Lefkowitz v. Turley, 414 U.S. 70, 82-83 (1973) (architects seeking public contracts); Spevack v. Klein, 385 U.S. 511 (1967) (state bar licence). As the Supreme Court stated in Cunningham, threatening the loss of prestige, professional standing or reputation is "inherently coercive." 431 U.S. at 807; see also Spevack, 385 U.S. at 515 ("The threat of disbarment and the loss of professional standing, professional reputation, and of livelihood are powerful forms of compulsion....")

Although the general rule states that an individual must claim the privilege when self-incrimination is threatened, that rule "has also been deemed inapplicable in cases where the assertion of the privilege is penalized so as to 'foreclos[e] a free choice to

remain silent, and . . . compe[l] . . . incriminating testimony.'" Murphy, 465 U.S. at 434

(quoting Garner v. United States, 424 U.S. 648, 661 (1976). This Fifth Amendment

protection prohibits the government not only from using the coerced statement, but also

any fruits of that unlawful statement, making it the equivalent of traditional use immunity.

Garrity, 385 U.S. at 500 ("We now hold the protection of the individual under the

Fourteenth Amendment against coerced statements prohibits use in subsequent criminal

proceedings of statements obtained under threat of removal from office....."); Hester v.

City of Milledgeville, 777 F.2d 1492, 1496 (11th Cir. 1985) ("In essence, the privilege

against self-incrimination affords a form of use immunity which, absent waiver,

automatically attaches to compelled incriminating statements as a matter of law.");

Murphy v. Waterfront Comm'n, 378 U.S. 52, 79 (1964) (To ensure that compelled

testimony leaves the witness and the government "in substantially the same position as if

the witness had claimed his privilege" against self-incrimination, "compelled testimony

and its fruits cannot be used in any manner ... in connection with a criminal

prosecution.").

      The threat faced by Mr. Richards — the loss of his livelihood at his

employer of 15 years — is the paradigmatic loss against which the penalty cases protect.

S&C advised Skadden that Mr. Richards would be terminated with minimal severance if

he declined an interview with S&C, and that, if he invoked his Fifth Amendment rights

before the SEC, he would be placed on administrative leave with pay (subject to the

reaction of prosecutors). The only remaining question, therefore, is whether this

forbidden penalty is attributable to the government for purposes of the Fifth Amendment.

12

## 2. State Action

While the penalty cases were still newly decided, the Second Circuit issued its opinion in United States v. Montanye, 500 F.2d 411 (2d Cir. 1974). In Montanye, a newly hired employee made incriminating statements during a pre-employment polygraph examination. Upon notification by the private employer, a detective requested that the employer bring the employee back in for another polygraph examination so as to elicit additional admissions, which were used at a criminal trial to convict the employee. The Second Circuit held that rationale of the penalty cases applied under appropriate circumstances in the private sector, as follows:

> In Lefkowitz [v. Turley, 414 U.S. 70 (1973),] the Supreme Court held that a state could not compel incriminatory answers from independent contractors under the threat that unless they waived immunity they would be disqualified from contracting state agencies for a period of five years. It found no constitutional significance in the fact that the statements were sought or obtained through coercion practiced upon members of the private, as opposed to public, sector. The controlling factor is not the public or private status of the person from whom the information is sought but the fact that the state had involved itself in the use of a substantial economic threat to coerce a person into furnishing an incriminating statement. Nor do we perceive any consequence flowing from the fact that the threat in the present case was conveyed through a private employer, admittedly acting as an agent for the police, rather than through a person on the public payroll. The state's involvement is no less impermissible for having been concealed. The state is prohibited in either event from compelling a statement through economically coercive means, whether they are direct or indirect.

Montanye, 500 F.2d at 414-15 (emphasis added).[9]

The situation in Montanye is distinct from one in which an independent investigating party acts for its own purposes without the prodding of the prosecutor.

---

[9]    The Montanye Court was unanimous on this analysis. However, applying that standard to the newly hired employee in that case, the majority found his economic interest after a few days on the job insubstantial, while Judge Feinberg in dissent would have found even the new employee had been economically coerced. 500 F.2d at 416-17 (Feinberg, J., dissenting). The issue that divided the Montanye court is irrelevant here because Mr. Richards was a 15-year CA employee.

Judge Friendly drew this distinction in United States v. Solomon, 509 F.2d 863 (2d Cir. 1975). In Solomon, an executive at a New York Stock Exchange ("NYSE") member firm was convicted of violating the recordkeeping provisions of the Securities Exchange Act, in part based on his testimony before NYSE investigators. Id. at 865. The Court of Appeals concluded as a factual matter (an evidentiary hearing had been conducted below) that the "NYSE's inquiry . . was in pursuance of its own interests and obligations, not as an agent for the SEC," id. at 869, and therefore distinguished Montayne on the ground that Montanye involved "government action," id. at 871. Relying on Wigmore, Judge Friendly explained as follows:

> [W]hat is generally required is "a legal interest in the prosecution" and "not the mere existence of actual control or influence growing out of the social or commercial relations of the person." . . . .
> [E]ach case is decided upon its own circumstances, and that actual state of him (the master) and the confessor is inquired into with reference to the probable strength of the inducement."

Solomon, 509 F.2d at 871-72 (quoting 3 Wigmore, § 829).

Your Honor properly followed Solomon in United States v. Shvarts, 90 F. Supp.2d 219 (E.D.N.Y. 2000), declining to suppress statements the defendant had made to the National Association of Securities Dealers ("NASD") without any prosecutorial involvement. In that case, this Court relied upon (and had no reason to question) the government's affirmative representation "that it played no role in the investigation of [the defendants] by the NASD, an investigation that was initiated by the NASD years before the government's investigation." Shvarts, 90 F.Supp.2d at 221. Here, however, in light of its request for and pervasive involvement in the S&C inquiry, and its constant coordination with the SEC, the government cannot make anything approaching such a representation to the Court.

14

Finally, <u>D.L. Cromwell v. NASD Regulation, Inc.</u>, 279 F.3d 155 (2d Cir. 2002), illustrates the intensely factual nature of the state action inquiry. In <u>Cromwell</u>, an NASD member firm and its employees sought on Fifth Amendment grounds to enjoin the NASD from conducting a regulatory investigation amid a parallel criminal investigation. After an evidentiary hearing, the district court found no evidence of prosecutorial involvement of the type warranting application of the Fifth Amendment, and the Court of Appeals affirmed on the ground that this factual finding was not "clearly erroneous," taking pains not to address "whether the record would have supported contrary findings, inferences and conclusions." <u>Cromwell</u>, 279 F.3d at 163. The <u>Cromwell</u> court articulated the state-action test in relevant part as follows:

> Actions are "fairly attributable" to the government where "there is a sufficiently close nexus between the State and the challenged action of the regulated entity." That nexus exists . . . where the state "has exercised coercive power [over a private decision] or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State . . . ."

<u>Cromwell</u>, 279 F.3d at 161 (citations omitted).

Here, the evidence reviewed above amply demonstrates that the USAO was working hand in glove with both S&C and the SEC. The prosecutors coordinated an investigatory process designed to extract statements from Mr. Richards against his will and his interests even as the government prepared to indict him. We believe that our requested discovery and an evidentiary hearing will only further confirm for the Court that the act of forcing Mr. Richards' to speak is fairly attributable to the government.

## 3. The Perjury Exception

Courts have held that even where the Fifth Amendment is violated under the penalty cases, there is an exception allowing use of the statements in a prosecution for

15

perjury and perhaps other obstructions of justice. United States v. Deegan, 440 F.2d 304, 306 (2d Cir. 1971) ("[A]ppellant was not prosecuted for past criminal activity based on what he was forced to reveal about himself; he was prosecuted for the commission of the crime while testifying, *i.e.*, perjury. In short, while a public employee may not be put to the Hobson's Choice of self-incrimination or unemployment, he is not privileged to resort to the third alternative, *i.e.*, lying."); see, e.g., United States v. Apfelbaum, 445 U.S. 115, 131 (1980) ("[n]either the [federal use] immunity statute nor the Fifth Amendment precludes the use of respondent's immunized testimony at a subsequent prosecution for making false statements"). Those authorities do not solve the Fifth Amendment problem here for two reasons.

First, the perjury exception does not allow the use of Mr. Richards' involuntary statements at a trial of the underlying charges being investigated by the questioner, including whether Mr. Richards committed the underlying securities fraud or participated in an obstruction of CA's internal investigation. The Fifth Amendment precludes the use of compelled testimony as proof that the witness committed *any* prior misconduct. United States v. DeSalvo, 26 F.3d 1216, 1220 (2d Cir. 1994) ("The rule remains that none of a witness's immunized testimony may be used in a prosecution for a crime (including perjury) that was 'committed prior to the grant of immunity that would have permitted the witness to invoke his Fifth Amendment privilege absent the grant.'"); see McKinley v. City of Mansfield, 404 F.3d 418, 434 (6th Cir. 2005) (immunity precluded use of public employee's statement "where 'the matter' includes a subsidiary investigation into the truth of an officer's statements," since "[i]t makes no difference that the crimes at issue in this case are falsification and obstruction, rather than assault or

16

robbery"); <u>United States v. Housand</u>, 550 F.2d 818, 823 (2d Cir. 1977) ("[T]he giving of truthful testimony on the second occasion could surely trigger investigation of whether the original testimony was false. . . . This is a reasonable cause for apprehension, and supports the claim of privilege.").

Mr. Richards provided two interviews to WLRK prior to the commencement of S&C's investigation, and the government sought the memoranda relating to his and other employee interviews prior to Mr. Richards' statements to S&C and the SEC. Accordingly, allegations of prior obstructive acts were under investigation at the time of Mr. Richards' coerced statements, which cannot be used as proof of a prior obstruction. And the accusations of securities fraud were surely part of the matters under investigation by S&C and the SEC. Thus, Mr. Richards' involuntary statements are not admissible at this trial.

Second, even if Mr. Richards' SEC testimony could be used for a limited purpose, the government would bear the burden, under <u>United States v. Kastigar</u>, 406 U.S. 441, 453 (1972), of demonstrating that its access to the testimony did not taint its prosecution of Mr. Richards for acts he allegedly committed prior to the SEC testimony. The Second Circuit has held that in order to protect a defendant's Fifth Amendment rights, statutory use immunity must "prohibit[ ] the prosecutorial authorities from using the compelled testimony in any respect," including both use of the compelled testimony itself and the use of "evidence derived directly and indirectly therefrom." <u>United States v. Nanni</u>, 59 F.3d 1425, 1431 (2d Cir. 1995) (citing <u>Kastigar</u>). <u>Nanni</u> explains that, once a defendant shows that "under a grant of immunity, he has testified to matters related to the prosecution," the government must prove, by a preponderance of the evidence, that no

violation occurred.  Id. at 1432.  Under Kastigar, the government's burden of proof is a "heavy" one because it "is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony."  Kastigar, 406 U.S. at 460.

## POINT II

### UNDER EMERGING CASE LAW, THE GOVERNMENT ABUSED THE SEC PROCESS

Courts have recently begun to acknowledge that modern "parallel" investigations, in which criminal prosecutors direct the gathering of evidence against a criminal defendant by civil means, violate the defendant's due process rights.  The district courts in two recent cases, United States v. Scrushy, 366 F.Supp.2d 1134 (N.D. Alabama 2005), and United States v. Stringer, 2006 WL 44193, No. CR 03-432 (D. Oregon Jan. 9, 2006), found that the Department of Justice had abused the civil discovery process in order to obtain testimony for its criminal prosecutions.  As a result, Scrushy's SEC testimony was suppressed; the court in Stringer went even further and dismissed the case against the defendant.  These cases are examples of the principle that although evidence gathered in a civil action may *ordinarily* be used in a subsequent criminal proceeding, the evidence may not be used where "such use would violate [the defendant's] constitutional rights or depart from the proper administration of criminal justice."  United States v. Teyibo, 877 F.Supp. 846, 855 (S.D.N.Y. 1995) (internal citations omitted).

Scrushy and Stringer, like this case, involved joint investigations by the USAO and SEC.  In Stringer, the USAO decided not to file a criminal action, or even to "surface," until after SEC testimony despite the fact that it had already identified the

18

defendant and others as "targets." Stringer, 2006 WL 44193, *3. Stringer testified before the SEC without being notified that he was a target, although he did receive the standard form indicating that disclosure to the USAO was one possible use of his statements. Id. at *4. The court found that the USAO "hid behind" the SEC's investigation, while secretly directing it. It noted that the USAO identified the case early on as a criminal case, communicated frequently with the SEC regarding investigative tactics, and requested that interviews be conducted in a location that would support its jurisdiction for perjury and similar charges. Id. at *5-6. In addition, the SEC gave misleading and evasive answers when Stringer's counsel asked, just before his testimony, whether Stringer was a subject or target of the SEC's investigation. Id. at *6. The court concluded that dismissal was warranted because this conduct was "so grossly shocking and so outrageous as to violate the universal sense of justice." Id.

The facts in Scrushy, although less egregious, were similar. Although the USAO and the SEC had been conducting separate investigations until a few days before the date of his scheduled testimony, everything changed when the USAO received a tip from two Healthsouth whistleblowers. The USAO prosecutors called members of the SEC staff and revealed that the whistleblowers were alleging widespread accounting fraud at Healthsouth and had indicated that Scrushy was aware of it. The prosecutors requested that the SEC staff make Neil Seiden, Senior Accountant with the SEC's Department of Enforcement in Atlanta, available to assist in interviewing these Healthsouth whistleblowers. They also advised the SEC regarding appropriate subjects for Scrushy's testimony and encouraged the SEC to move his testimony from Birmingham, where the SEC's offices were located, to Atlanta, where Scrushy had

previously requested it occur. 366 F.Supp.2d at 1134. One of the attorneys from the USAO noted that "if [Scrushy] lies, then he will be lying in our district." Id. at 1136. Like Stringer, Scrushy was not told that the USAO was conducting an investigation or that he was a target of that investigation.

Although the USAO's failure to notify the defendants of the criminal investigation and of their "target" status featured prominently in the Stringer and Scrushy opinions, the courts also condemned other aspects of the "parallel" investigations — aspects that are present here. The Scrushy court held as follows:

> The issue before this court is whether the Government departed from the proper administration of criminal justice in procuring the Defendant's deposition testimony. The court finds that the Government clearly so departed. The civil action and the criminal investigation improperly merged on March 12, 2003, when the U.S. Attorney's office called the S.E.C. office, gave the S.E.C. advice or "preferences" regarding the content of the deposition and its location, and recruited Neil Seiden to participate in the interviews of [the two Healthsouth whistleblowers] in the criminal investigation.

Id. at 1137.

Summarizing the applicable law, the court noted that although everyone agreed there could be no "perjury trap" defense where there were two *legitimate* parallel investigations, "neither side could cite any controlling law on what distinguishes a legitimate, parallel investigation from an improper one. The court could find no controlling authority on this critical point." Id. The court concluded that this was not really a case involving parallel investigations because "[t]o be parallel, by definition, the separate investigations should be like the side-by-side train tracks that never intersect." Id. at 1139. Quoting the opinion by which another district court judge had stayed the SEC's civil action against Scrushy, the court observed that the case was one in which "the government has undoubtedly manipulated simultaneous criminal and civil

20

proceedings, both of which it controls." There was, therefore, "a special danger that the government can effectively undermine rights that would exist in a criminal investigation by conducting a de facto criminal investigation using nominally civil means. In that special situation the risk to individuals' constitutional rights is arguably magnified." Id. (quoting Securities and Exchange Commission v. Healthsouth Corp., 261 F.Supp.2d 1298 (N.D. Ala. 2003)).

The Scrushy court concluded that "[b]ecause the Government manipulated the simultaneous investigations for its own purposes, including the transfer of Mr. Scrushy's deposition into this district for venue purposes, the court finds that the utilization of Mr. Scrushy's deposition in this case departs from the proper administration of justice. Therefore, the S.E.C. testimony must be excluded." Id. at 1140 (emphasis added).

Mr. Richards' case shares numerous elements with the investigations of Stringer and Scrushy. Although Mr. Richards was aware of the USAO's investigation, and even of the fact that he was a target, this knowledge did not protect him from the USAO's manipulation of the CA and SEC investigations to obtain evidence for use in a criminal trial. The USAO worked closely with both CA and the SEC, sharing information constantly. It reaped the immediate benefits of the SEC's document subpoenas; it participated in joint meetings with the SEC and CA; and it used its relationship with the SEC to manufacture jurisdiction over a perjury charge. Indeed, the circumstances surrounding Mr. Richards' SEC testimony reveal the depth of the relationship between CA, the SEC and the USAO, and the ends tow hich the SEC would go to further the USAO's objectives. Mr. Richards' SEC testimony was not taken in

Manhattan, where the SEC and Skadden both reside. Instead, Mr. Richards was forced to give testimony at the USAO's offices in Islip. As in the Scrushy and Stringer cases, this choice was not coincidental or for Mr. Richards' convenience; it was contrived to give the USAO jurisdiction in the Eastern District, where the underlying charges would ultimately be filed, for any perjury and obstruction charges that arose from the testimony.

It also appears that the USAO manipulated the SEC's power to subpoena testimony from other CA employees. Civil SEC subpoenas for testimony were issued to a select group of individuals who were unlikely to submit to informal interviews:

1) Individuals who had recently declined to be interviewed;

2) Other senior executives who faced likely criminal exposure; and

3) Directors of the company (who, given that they lacked personal knowledge of the company's sales and finance practices, appear to have been subpoenaed for the sole purpose of pressuring the company).

The USAO clearly intended to take advantage of the additional pressure to waive the Fifth Amendment that would arise only in a civil proceeding: the employee's invocation of the Fifth Amendment could be used against him and against CA.

Notably, the SEC did not subpoena any of the lower-level sales and finance employees who were interviewed by CA and/or by the USAO. This demonstrates that the SEC's investigation was not truly parallel; instead, the SEC rode piggyback on the USAO's shoulders, walking on its own only when the USAO asked it to do so.

While the Scrushy court suggested that a target's knowledge of his status could ameliorate the government's unfair advantage, the USAO's pressure on CA prevented Mr. Richards from taking advantage of the methods that the Scrushy court presumed would be available. The Scrushy court argued that "[w]hen a defendant knows

22

that he has been charged with a crime, or that a criminal investigation has targeted him, he can take actions to prevent the providing of information in an administrative or civil proceeding that could later be used against him in the criminal case." Here, however, Mr. Richards was helpless to take action despite his knowledge of the dangers attendant to testifying. As discussed above, Mr. Richards knew that he would be terminated if he refused to testify before the SEC. Not only would he be terminated, but he would be denied fair compensation and severance because of the government's stranglehold on the company.

Although Scrushy and Stringer dealt solely with the USAO's abuse of the SEC's discovery powers, the same arguments apply to the USAO's manipulation of CA's internal investigation. As with the SEC, the USAO worked closely with CA to determine the scope of its investigation. It advised CA regarding the topics to be explored, and it encouraged CA to take action against employees who did not cooperate in the internal investigation. This was not a situation in which legitimate parallel investigations created a quandary for company employees. Rather, the government ordered and then controlled the internal investigation, for the improper purpose of obtaining criminal discovery.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court order that Mr. Richards' SEC testimony and S&C interview memoranda be suppressed. In the alternative, if the Court feels that the factual record is insufficient to decide the motion, we request an evidentiary hearing.

Dated:   New York, New York
         February 17, 2006

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By:   _____

David M. Zornow
Christopher J. Gunther
Karen E. Willenken

4 Times Square
New York, New York  10036
(212) 735-3000